UNITED STATES DISTRICT COURT                ELECTRONIC PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                      :
DPWN HOLDINGS (USA), INC.,                            :
                                                      :
                                 Plaintiff,           :        MEMORANDUM AND ORDER
                                                      :
                 - versus -                           :        11-CV-564 (JG) (VVP)
                                                      :
UNITED AIR LINES, INC. d/b/a UNITED                   :
AIRLINES; UNITED CONTINENTAL                          :
HOLDINGS, INC., f/k/a UAL CORP.,                      :
                                                      :
                                 Defendants.          :
----------------------------------------------------------------x

A P P E A R A N C E S :

       ORRICK, HERRINGTON & SUTCLIFFE LLP
           1152 15th Street, N.W.
           Washington, District of Columbia 20005
       By:   Garret G. Rasmussen
           Antony P. Kim
           Ryan K. Quillian

       J. PETER COLL, JR.
           51 West 52nd Street
           New York, New York 10019

       *Attorneys for Plaintiff*

       MAYER BROWN LLP
           1999 K Street, N.W.
           Washington, District of Columbia 20006
       By:   Richard J. Favretto
           John Roberti
           Charles A. Rothfeld
           Phillip R. Dupré

       *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

       Plaintiff DPWN Holdings (USA), Inc. ("DHL") brings this action against United

Air Lines, Inc. and United Continental Holdings, Inc. (collectively, "United"), asserting a claim

that United was part of a conspiracy to fix the price of air cargo shipments, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.  United moves to dismiss DHL's amended complaint on the grounds that (a) the claim is time-barred; (b) the claim was discharged by the confirmation of United's plan of reorganization in proceedings pursuant to Chapter 11 of the Bankruptcy Code; and (c) the amended complaint has not alleged facts sufficient to state a plausible claim that United participated in an illegal price-fixing conspiracy.  For the reasons set forth below, the motion is denied.

## BACKGROUND

A.    *Factual Background*[1]

    1.    *The Parties*

        DHL is a business providing "logistics and freight-forwarding services" both to and from the United States.  First Am. Compl. ¶ 14, ECF No. 8.  United is an airline that provides shipping services for mail and freight to a variety of shippers.  *Id.* ¶ 16.  DHL is a major shipper of air cargo and has contracted with United for air cargo shipping services.  *Id.* ¶¶ 14, 16.

    2.    *The Alleged Conspiracy*

        Over a period of several years, United conspired with other airlines to fix the prices charged for air cargo shipments.  *See, e.g.*, *id.* ¶ 18.  In particular, the conspiracy was focused on fixing surcharges for fuel and security costs that were added to the base rates for shipments.  *See, e.g.*, *id.* ¶¶ 19, 21.[2]

---

[1]    The facts are drawn from the well-pleaded allegations of the First Amended Complaint, which are assumed to be true for purposes of this motion.

[2]    Though the complaint also alleges a conspiracy to fix a customs surcharge, *see, e.g.*, First Am. Compl. ¶¶ 19, 21, the parties' briefs in connection with this motion focus on the fuel surcharge and DHL's counsel confirmed at oral argument that the fuel surcharge is the focus of the case along with a "small claim" relating to the security surcharge.  Tr. of Argument, Dec. 22, 2011, at 15; *see also id.* at 16 ("The customs surcharges and

The conspiracy to fix fuel surcharges can be traced back to late 1996 and early 1997, when airlines became concerned about the rising price of aviation fuel.  *See id.* ¶¶ 33–35.  At least one airline had attempted to unilaterally impose a fuel surcharge on its air cargo shipments, "but it was unable to maintain that surcharge in the face of price competition from other [airlines]."  *Id.* ¶ 30.  The airlines turned to the International Air Transport Association ("IATA"), an industry group of which United was a member, to collectively address the problem of fuel costs.  *Id.* ¶ 27.

United and other IATA members developed a resolution, known as Resolution 116ss, under which member airlines would introduce a fuel surcharge tied to the price of aviation fuel.  *Id.* ¶ 37.  Resolution 116ss called for the creation of a Fuel Price Index ("FPI") to track changes in fuel costs, which would then trigger changes in the fuel surcharge charged by each member airline.  *Id.* ¶¶ 37–38.

With United's support, IATA adopted Resolution 116ss in April 1997.  *Id.* ¶ 40.  Pursuant to the adopted resolution, airlines would begin charging a $0.10 per kilogram surcharge if the FPI exceeded 130 on or after October 1, 1997.[3]  *Id.* ¶ 41.  In early 2000, fuel prices first exceeded the 130 FPI threshold.  *Id.* ¶ 42.  United informed its competitors that it intended to begin imposing a fuel surcharge of $0.10 per kilogram on February 1, 2000.  *Id.* ¶ 47.  United and other airlines began charging this fuel surcharge on that date.  *Id.* ¶ 51.

Recognizing their potential antitrust liability, the airlines sought approval of Resolution 116ss from the U.S. Department of Transportation ("DOT").  *Id.* ¶¶ 36, 43, 50.  The DOT, pursuant to the authority granted to it by 49 U.S.C. §§ 41308–09, had already given certain

---

everything else we don't care about.").  DHL also alleges that the conspiracy involved the base rates, but only to the extent that the conspirators agreed not to adjust their base rates in a manner that would offset the surcharges.

[3]        The FPI was set to equal 100 when fuel prices were at their June 1996 levels.  First Am. Compl. ¶ 37.  Thus, a FPI of 130 indicated that fuel prices were 30% higher than their June 1996 levels.

IATA activity immunity from U.S. antitrust laws. *See* First Am. Compl. ¶¶ 25, 27. However, the airlines believed that they would violate those laws if they implemented Resolution 116ss without DOT approval. *Id.* ¶ 43.

On March 14, 2000 – after United and other airlines had begun charging the fuel surcharge – the DOT rejected IATA's application for approval of Resolution 116ss. *Id.* ¶ 53. It concluded that the proposal "appear[ed] fundamentally flawed and unfair to shippers and other users of cargo air transportation." *Id.* (internal quotation marks and citation omitted) (emphasis removed).

Despite the DOT's disapproval of Resolution 116ss and their awareness of their potential antitrust liability, United and other airlines continued charging the $0.10 fuel surcharge and coordinating their fuel surcharges in accordance with the general terms and principles of Resolution 116ss. *Id.* ¶¶ 54–56. The airlines also continued to meet and discuss their fuel surcharging policies, *see, e.g.*, ¶¶ 57, 59–61, and raised their fuel surcharges "in a coordinated, largely parallel fashion." *Id.* ¶ 58. Despite the purported rationale for the surcharges, *i.e.*, to recover the increased costs of aviation fuel, they were disproportionate to actual fuel costs. *See, e.g.*, *id.* ¶¶ 5, 20. Indeed, because the surcharges were not tied to the distance shipped, they were not correlated with fuel usage. *Id.* ¶ 177c.

The airlines did not want to give up the revenue from these fuel surcharges even after their fuel costs decreased in late 2001. *See id.* ¶ 60. By that time, the FPI had fallen to a level that required suspending the surcharges pursuant to Resolution 116ss. *Id.* United and Lufthansa Cargo ("Lufthansa"), another airline, began discussions about modifying their fuel surcharge policies. *See id.* ¶¶ 60–62. United, Lufthansa and a third airline, Scandinavian Airlines System ("SAS"), had already entered into an alliance that had received limited antitrust

4

immunity from the DOT.  *See id.* ¶¶ 31–32.  United and Lufthansa, "purporting to 'tak[e]

advantage of [their] anti-trust immunity,'" coordinated a new schedule of fuel surcharges tied to

the FPI.  *Id.* ¶ 62 (citation omitted) (first alteration in original).

Lufthansa, with United's knowledge, coordinated the implementation of this new

methodology with other airlines that were not part of the DOT-approved alliance.  *Id.* ¶ 63.

Pursuant to this new methodology, United and other airlines increased their fuel surcharges in a

coordinated fashion throughout the period between Spring 2002 and the end of 2006.  *See id.*

¶¶ 64–65, 68, 70, 72–76, 78–82, 85, 90, 92, 94.  Essentially, United coordinated its surcharging

with Lufthansa, and Lufthansa coordinated it with other airlines.  *See, e.g.*, *id.* ¶¶ 67–70.

On February 14, 2006, law enforcement authorities raided the offices of several of

the airlines involved in the conspiracy.  *Id.* ¶ 88.  United's offices were not included in these so-

called "dawn raids."  *Id.* ¶ 26; *see also id.* ¶ 88.  Despite the raids, United and other airlines

continued to coordinate their fuel surcharges for several more months.  *See id.* ¶¶ 89–95.

Twenty of the airlines involved in the conspiracy and four of their executives

subsequently pleaded guilty and paid criminal fines in connection with the conspiracy.  *See id.*

¶ 152.  Lufthansa entered the corporate leniency program offered by the U.S. Department of

Justice, which required it to admit its role in the conspiracy.  *Id.* ¶¶ 149–50.

### 3.  *United's Bankruptcy*

On December 9, 2002, United petitioned for bankruptcy pursuant to Chapter 11 of

the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois.[4]

*Id.* ¶ 154.  The bankruptcy court confirmed United's plan of reorganization in an order on

---

[4]      Both of the defendants in this action – United Air Lines, Inc. and its corporate parent United
Continental Holdings, Inc. – were among the debtors in the bankruptcy case.

January 20, 2006.  *Id.*; *see also* Dupré Decl. Ex. 5 (Order Confirming Debtors' Second Am. Joint

Plan of Reorganization Pursuant to Ch. 11 of the U.S. Bankr. Code, *In re UAL Corp.*, No. 02-B-

48191 (Bankr. N.D. Ill. Jan. 20, 2006)), ECF Nos. 20-8 to 20-9.

B.    *Procedural Background*

1.    *The Multidistrict Proceedings*

On February 17, 2006 – three days after the dawn raids – a putative class action

was commenced against United and others asserting antitrust violations arising from alleged

price-fixing of air-cargo shipments.  DHL was a member of the putative class.  Numerous similar

cases were filed and, on June 20, 2006, the Judicial Panel on Multidistrict Litigation transferred

the cases to this Court for coordinated pre-trial proceedings.  *See* Transfer Order, *In re Air Cargo

Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (J.P.M.L. June 20, 2006).

The class plaintiffs reached a non-monetary settlement with United in late 2006.

However, they never sought judicial approval of the settlement, nor did they stipulate to a

dismissal of United from the *Air Cargo* class action.  United was effectively dropped from the

case on February 8, 2007, when the class plaintiffs filed an amended complaint in which United

was not named as a defendant.

2.    *The Present Action*

DHL commenced this action on February 4, 2011.  It thereafter filed an amended

complaint on June 8, 2011.  DHL asserts a single claim: that United violated § 1 of the Sherman

Act.  It seeks both monetary and injunctive relief.

On September 15, 2011, United moved to dismiss the amended complaint.

United's motion is based on three independent grounds:  (1) the claim is barred by the four-year

statute of limitations applicable in antitrust actions; (2) the claim was discharged when the

bankruptcy court confirmed United's plan of reorganization; and (3) the allegations in the amended complaint do not state a plausible antitrust claim.

DISCUSSION

A.    *The Timeliness of the Claim*

DHL's antitrust claim is subject to a four-year statute of limitations.  15 U.S.C. § 15b.  The parties agree that the limitations period should be measured from February 14, 2006, the date of the dawn raids.  DHL commenced this action on February 4, 2011.  United argues that DHL's claim is time-barred because it was filed nearly five years after the limitations period started running and tolling is not available for the full extent of DHL's lateness.

"The filing of a class action tolls the statute of limitations 'as to all asserted members of the class . . . .'"  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974)).  While a potential class claim is pending, absent class members may "rely on the named plaintiffs to press their claims." *Id.* at 353.  Thus, tolling continues until it absent class members' reliance on the class action is no longer reasonable.  *See id.* at 354; *see also Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1380 (11th Cir. 1998).  For example, reliance on the class is unreasonable when a motion for class certification is denied, *Crown, Cork & Seal,* 462 U.S. at 354, or the putative class claim is dismissed, *see, e.g.*, *Choquette v. City of New York*, --- F. Supp. 2d ----, No. 10-CV-6485 (JGK), 2012 WL 906680, at *9 (S.D.N.Y. Mar. 19, 2012).

United was named as a defendant in the *Air Cargo* class action on February 17, 2006.  United concedes that DHL was a member of the putative class and, thus, that the commencement of the class action tolled the limitations period.  However, the parties dispute how long this tolling lasted.

7

DHL contends that the limitations period was tolled until February 8, 2007, when the *Air Cargo* class plaintiffs filed an amended complaint that did not name United as a defendant.  United argues that tolling ended months earlier, when the class plaintiffs' settlement with United was announced in September 2006, or when the class plaintiffs formally executed their agreement with United in January 2007.  If tolling ceased on February 8, 2007, then DHL commenced its case on the last day of the limitations period.  But if tolling ceased any earlier, DHL's claim is time-barred.

I agree with DHL that tolling continued until February 8, 2007, when United was dropped from the *Air Cargo* class action.  Prior to that date, there could be no certainty that the settlement had been consummated.  Even after the settlement agreement was executed, there was no formal indication on the *Air Cargo* docket that United was no longer a part of the case until the February 8, 2007 amended complaint was filed.  Absent class members were entitled to rely on the class action to press their claims against United until they had a definitive indication that such claims would not go forward.  The first such indication was the omission of United from the amended complaint.

A holding that settlement discussions or even the execution of a settlement agreement end the tolling of claims with respect to a settling defendant would only encourage "a needless multiplicity of actions."  *Crown, Cork & Seal*, 462 U.S. at 351; *see also Choquette*, 2012 WL 906680, at *9.  If an announced settlement is not consummated, the class claims might then go forward.  By that time, however, absent class members may have already commenced a separate action and there would be two (or more) cases instead of one.  *See Choquette*, 2012 WL 906680, at *9.  On the other hand, once there is a definitive indication that a defendant has been dropped from a class action, it is reasonable to expect any absent class member who wants to

8

press its claim against that defendant to commence a separate action within the remaining limitations period.

Furthermore, a holding that the mere execution of a settlement agreement could restart the running of the limitations period would be unfair to absent class members who are unaware of that event. Even a class member that was actively monitoring the docket to ensure its interests were being pursued might be unaware of the settlement until the filing of an order, stipulation, pleading or other document clearly indicating that a defendant had been dropped. United conceded at oral argument that there was no such indication on the docket sheet in the class action until the amended complaint was filed on February 8, 2007. *See* Tr. of Argument, Dec. 22, 2011, at 12. I conclude that tolling continued until the absent class members could have reasonably determined from a review of the docket that United was no longer a defendant in the case.

Since the limitations period was tolled from February 17, 2006, until February 8, 2007, DHL's claim is timely.

B.      *Whether DHL's Claim Was Discharged in United's Bankruptcy Proceeding*

1.      *The Scope of Discharge Under the Bankruptcy Code*

"[T]he confirmation of a [Chapter 11 bankruptcy] plan . . . discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). "A 'debt' is defined to mean 'liability on a claim,' and, in turn, a 'claim' is defined to include any 'right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'" *Browning v. MCI, Inc. (In re WorldCom, Inc.)*, 546 F.3d 211, 216 (2d Cir. 2008) (quoting 11 U.S.C. § 101(5)(A), (12)).

9

A debtor that has completed Chapter 11 proceedings may use the bankruptcy court's confirmation order as an affirmative defense in subsequent lawsuits.  If a plaintiff asserts a claim that arose before the confirmation of  the debtor's reorganization plan, the claim will generally be dismissed as having been discharged.  *See, e.g.*, *Delgado v. Derecktor Shipyards, Inc.*, No. 08-CV-316 (VLB), 2012 WL 162301, at *2–3 (D. Conn. Jan. 18, 2012); *Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F. Supp. 2d 176, 196–97 (E.D.N.Y. 2010); *Carter v. Safety-Kleen Corp.*, No. 06-CV-12947 (CM) (GAY), 2007 WL 1180581, at *5 (S.D.N.Y. Mar. 14, 2007); *Tadic v. Stolt-Nielsen S.A.*, No. 01-CV-6814 (SJ), 2005 WL 946567, at *1 (E.D.N.Y. Apr. 18, 2005).

The word "claim" has "the broadest available definition" under the Bankruptcy Code, *Fed. Commc'ns Comm'n v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (internal quotation marks and citation omitted), and includes "unliquidated," "contingent," "unmatured" and "disputed" rights, 11 U.S.C. § 101(5)(A).  The legislative history indicates that Congress defined "claim" broadly so that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case" and to "permit[] the broadest possible relief in the bankruptcy court."  H.R. Rep. No. 95-595, at 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266; *see also United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1003 (2d Cir. 1991).  Given this definition, a claim may have arisen for purposes of a bankruptcy discharge even if it could not yet be asserted as a viable claim in a non-bankruptcy proceeding.  *See In re Rodriguez*, 629 F.3d 136, 139 (3d Cir. 2010), *cert. denied*, 132 S. Ct. 573 (2011).

The broad discharge of claims afforded by § 1141(d)(1)(A) is justified by the purpose of bankruptcy law to give debtors a "fresh start."  *WorldCom*, 546 F.3d at 221; *see also*

10

*Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64 (2006) ("Critical features of every bankruptcy proceeding [include] . . . the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts."). This goal is "made more feasible by maximizing the scope of a discharge." *Chateaugay*, 944 F.2d at 1002.

However, the goal of giving debtors a fresh start may conflict with other important interests. *See id.* "[A] broad discharge may disadvantage potential claimants, such as tort claimants, whose injuries were allegedly caused by the debtor but which have not yet manifested and who therefore had no reason to file claims in the bankruptcy." *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 122 (3d Cir. 2010) (en banc). As discussed below, there may also be constitutional problems from discharging the rights of unknown potential claimants without giving them adequate notice and an opportunity to be heard. *See id.* (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Unfortunately, "[t]hese competing considerations have not been resolved consistently by the cases decided to date." *Id.*

Thus, determining whether a claim arose before the bankruptcy court's confirmation is not always a straightforward task. The Second Circuit addressed whether claims that were unknown at the time of bankruptcy could be discharged by a confirmation order in *Chateaugay*. The asserted claim was the right of the Environmental Protection Agency ("EPA") to seek reimbursement of environmental clean-up costs under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The EPA argued that its right to seek reimbursement could be discharged only to the extent it had already incurred such costs at the time of confirmation.

The Second Circuit disagreed, holding that any clean-up costs incurred in the future as a result of released or threatened releases of hazardous materials that occurred prior to the filing of the bankruptcy petition were dischargeable claims.  *See Chateaugay*, 944 F.2d at 1005.  The court focused on the fact that the EPA and the debtor had an existing relationship, which "provide[d] sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of 'claims.'"  *Id.*

> True, EPA does not yet know the full *extent* of the hazardous waste removal costs that it may one day incur and seek to impose upon [the debtor], and it does not yet even know *the location of all the sites* at which such wastes may yet be found.  But the location of these sites, the determination of their coverage by CERCLA, and the incurring of response costs by EPA are all steps that may fairly be viewed, in the regulatory context, as rendering EPA's claim "contingent," rather than as placing it outside the Code's definition of "claim."

*Id.* (emphasis added); *see also Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp.)*, 209 F.3d 125, 129 (2d Cir. 2000) ("A 'claim' may exist even where, as in this case, the parties lack complete knowledge about the *scope* of [the] potential liability." (citing *Chateaugay*, 944 F.2d at 1004–05) (emphasis added)).  Thus, *Chateaugay* holds that even unknown claims may be discharged so long as there is a sufficient relationship between the debtor and the claimant such that the potential future claims might be contemplated and addressed in the bankruptcy proceeding.  *See In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 974 F.2d 775, 784 (7th Cir. 1992) ("In short, [*Chateaugay*] involved [a] claimant[] who had some knowledge about the release or threatened release of a hazardous substance and who had some idea that the bankruptcy debtor was a potentially responsible party under CERCLA.").

While *Chateaugay* provides guidance on the scope of the discharge under § 1141(d), this case is significantly distinct.  Although DHL and United had a contractual

relationship prior to the confirmation of United's reorganization plan, the nature of that relationship was not such that DHL might have contemplated antitrust claims against United.[5] Indeed, it is undisputed for purposes of this motion that DHL could not have discovered United's alleged antitrust violations until after confirmation of the plan. The situation in *Chateaugay* was quite different. The EPA had already incurred clean-up costs and sought reimbursement at the time of confirmation. Thus, while the EPA merely lacked knowledge as to the scope of its unknown claims, DHL lacked knowledge as to the *existence* of any claim whatsoever. *Cf. Big Yank Corp. v. Liberty Mut. Fire Ins. Co. (In re Water Valley Finishing, Inc.)*, 139 F.3d 325, 328–29 (2d Cir. 1998) (claim for attorney's fees in litigation was not discharged because claimant could not have contemplated the award would be made prior to confirmation of the reorganization plan); *AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d 1342, 1348 (7th Cir. 1997) (CERCLA claim was not discharged because claimant "did not have sufficient information to tie [the debtor] to environmental contamination before [the debtor's] bankruptcy was confirmed").

Nevertheless, DHL does not seriously dispute that its antitrust claim, to the extent it is premised on pre-confirmation acts, is within the scope of the discharge provided by

---

[5]     Some have described *Chateaugay* as adopting a "relationship test," under which claims arising from pre-petition conduct can be discharged only if the debtor and the claimant had some existing relationship at the time of bankruptcy. *See, e.g.*, *Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573, 1577 (11th Cir. 1995); Ryan M. Murphy, *Revisiting Treatment of Environmental Cleanup Obligations Under the Bankruptcy Code: Using Chapter 11 To Create a Clean Slate*, 19 Norton J. Bankr. L. & Prac. 395, 398 & 409 n.32 (2010). However, it was not the relationship between the debtor and the EPA *per se* that the Second Circuit found significant in *Chateaugay*, but rather the fact that the relationship allowed them to "contemplate" contingencies concerning unknown future clean-up costs. *See Chateaugay*, 944 F.2d at 1005. Thus, the Second Circuit's standard for assessing the discharge of unknown claims is perhaps closer to the "fair contemplation" test adopted by the Ninth Circuit in *California Department of Health Services v. Jensen (In re Jensen)*, 995 F.2d 925 (9th Cir. 1993). *See, e.g.*, Hon. Barbara J. Houser *et al.*, *Section 363 Issues – Acquiring Troubled Companies and Assets*, Am. L. Inst. – Am. Bar Assoc. Continuing Legal Educ. 281, 333 (2011) ("Some jurists do not see a significant distinction between the two standards, and put Ninth Circuit 'fair contemplation' cases such as *Jensen* . . . in the same category as *Chateaugay* . . . ."); *see also, e.g.*, *Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243, 252 (Bankr. S.D.N.Y. Feb. 25, 2011) (describing *Chateaugay* as having adopted the fair contemplation test), *aff'd*, No. 11-CV-2291 (JPO), 2012 WL 1038672 (S.D.N.Y. Mar. 29, 2012); Irina Gomelskaya *et al.*, *Current Developments in Allowance and Priority of Claims; Expenses of Administration; Late Claims; CERCLA Claims; Equitable Subordination*, 849 Practicing L. Inst. Com. L. & Prac. Course Handbook Series 469, 479–80 (2003) (same).

§ 1141(d)(1).  Thus, I need not address *Chateaugay*'s application to the circumstances in this

case.  As explained below, however, the conclusion that DHL's antitrust claim (at least partially)

falls within the scope of § 1141(d)(1) does not necessarily mean that DHL's claim has been

discharged.

>    2.    *Whether Discharge of DHL's Claim Comports With Due Process*

Any determination of whether a claim has been discharged "cannot be divorced

from fundamental principles of due process."  *Grossman's*, 607 F.3d at 125.  Before a claim may

be discharged in a bankruptcy proceeding, the claimant must therefore be afforded notice and an

opportunity to be heard.  *See Sanchez v. Northwest Airlines, Inc.*, 659 F.3d 671, 675–76 (8th Cir.

2011); *Arch Wireless, Inc. v. Nationwide Paging, Inc. (In re Arch Wireless, Inc.)*, 534 F.3d 76,

82–83 (1st Cir. 2008); *Banks v. Sallie Mae Servicing Corp. (In re Banks)*, 299 F.3d 296, 302 (4th

Cir. 2002) ("We agree a bankruptcy court confirmation order generally is afforded a preclusive

effect.  *But we cannot defer to such an order if it would result in a denial of due process . . . .*"

(footnote omitted) (emphasis added)), *abrogated on other grounds by United Student Aid Funds,*

*Inc. v. Espinosa*, 130 S. Ct. 1367 (2010); *Am. Bank & Trust Co. v. Jardine Ins. Servs. Tex., Inc.*

*(In re Barton Indus., Inc.)*, 104 F.3d 1241, 1245 (10th Cir. 1997) ("[A] creditor's claim is not

subject to a confirmed bankruptcy plan when the creditor is denied due process because of

inadequate notice."); *Reliable Elec. Co. v. Olson Constr. Co.*, 726 F.2d 620, 623 (10th Cir. 1984)

("[W]e hold that notwithstanding the language of section 1141, the discharge of a claim without

reasonable notice of the confirmation hearing is violative of the fifth amendment to the United

States Constitution.").[6]  Thus, a court considering whether a claim has been discharged by the

---

>    [6]    In *Chateaugay*, the EPA's reimbursement claims were included on the debtor's schedule of
> liabilities and the EPA had notice and an opportunity to be heard on its claims in the bankruptcy proceedings.  *See*

confirmation of a bankruptcy plan should engage in a two-step inquiry, determining (1) whether the claim falls within the Bankruptcy Code's definition of a dischargeable claim; and, if so, (2) whether the discharge would comport with due process.[7]  *See Grossman's*, 607 F.3d at 125–26; *Arch Wireless*, 534 F.3d at 82–83.[8]

Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane*, 339 U.S. at 314; *see also Jones v. Flowers*, 547 U.S. 220, 226 (2006).  Furthermore, "[t]he notice must be of such nature as reasonably to convey the required information," *i.e.*, the nature and purpose of the proceeding.  *Mullane*, 339 U.S. at 314; *see also Brody v. Vill. of Port Chester*, 434 F.3d 121, 130 (2d Cir. 2005).  "The basic standard is one of reasonableness."  *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 517 (E.D.N.Y. 2003), *aff'd sub nom.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005).

Here, there is no dispute that DHL, a United customer, received actual notice of United's bankruptcy proceedings, including the key procedural events leading up to the

---

*Chateaugay*, 944 F.2d at 999.  Thus, *Chateaugay* does not address the question of whether a claim can be discharged absent constitutionally adequate notice to the claimant.

[7]     In the case of individual debtors, the Bankruptcy Code expressly prevents the discharge of claims held by creditors who were not given an adequate opportunity to object to the reorganization plan.  *See* 11 U.S.C. § 523(a)(3); Nicholas A. Franke, *The Code and the Constitution: Fifth Amendment Limits on the Debtor's Discharge in Bankruptcy*, 17 Pepp. L. Rev. 853, 863 (1990) ("[W]hen the debtor is an individual, section 523(a)(3) of the Bankruptcy Code generally excepts from discharge the claims of creditors who do not receive notice of the case soon enough to file a timely proof of claim.").  Although there is no such provision for cases involving corporate debtors – implying a congressional intent that lack of notice not affect the discharge in such cases – the Code cannot override the constitutional protections of the Due Process Clause.

[8]     While some courts have responded to the seeming unfairness of discharging unknown claims by narrowing the meaning of "claim," this approach may conflict with the congressional purpose to give the word its broadest possible definition.  *See NextWave Pers. Commc'ns*, 537 U.S. at 302.  Indeed, while creditors might appear to suffer from the broad definition of claim, this will not always be so.  In cases where a debtor is liquidating rather than reorganizing, "the creditor may very well find himself trying to persuade the court that he does have a claim, so he can share in the (finite and terminable) asset pool."  John D. Ayer & Michael L. Bernstein, *Bankruptcy in Practice* § 13.17, at 290 (4th ed. 2007).  The better approach is to faithfully apply Congress's broad definition of "claim" while also enforcing constitutional limitations on discharge.

confirmation of United's reorganization plan and the discharge of all its debts.  United argues

that due process was thus satisfied, and DHL's antitrust claims have been discharged.  DHL

argues that this notice was insufficient, because United fraudulently concealed its participation in

the antitrust conspiracy.  DHL argues that since United did not notify it of a potential antitrust

claim prior to the confirmation, notice of the bankruptcy proceedings was essentially

meaningless.

> While litigation over due process often turns on the form of notice, *e.g.*, whether

notice by publication sufficed, here the issue boils down to what the notice must contain.  Is

notice of the proceedings alone sufficient, as United argues?  Or, as DHL argues, must the notice

provide some indication of the nature of the existing claims subject to discharge, at least if the

claimant could not otherwise discover the existence of the claims prior to the time of the

discharge?

> As a general matter, due process requires notice not just that there is a pending

case or hearing, but of the nature of the charges or claims that will be adjudicated.  *See In re*

*Ruffalo*, 390 U.S. 544, 551 (1968) (failure to notify party of issues to be raised at hearing was a

"procedural violation of due process [that] would never pass muster in any normal civil or

criminal litigation" (internal quotation marks and citation omitted)); *Chi. Cable Commc'ns v.*

*Chi. Cable Comm'n*, 879 F.2d 1540, 1546 (7th Cir. 1989) ("Parties must be notified of the

precise issues to be raised in the hearing . . . .").  For example, the government could not simply

inform a criminal defendant that his guilt or innocence with respect to any conceivable crime he

may have committed will be determined at a particular time and place.  *See Bousley v. United*

*States*, 523 U.S. 614, 618 (1998) ("[A] criminal defendant [must] receive[] 'real notice of the

true nature of the charge against him, the first and most universally recognized requirement of

due process.'" (quoting *Smith v. O'Grady*, 312 U.S. 329, 334 (1941))); *see also Wong Tai v. United States*, 273 U.S. 77, 80–81 (1927).  Similarly, an absent class member cannot merely be notified that he is a member of a class whose unspecified claims are to be settled on a given date. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (due process requires that notice to absent class members "describe the action and the plaintiffs' rights in it"); *see also Wal-Mart Stores*, 396 F.3d at 113–14.  In an ordinary civil action, a plaintiff cannot merely serve a summons directing the defendant to appear in court to answer any and all claims the plaintiff may have against it, but must instead provide fair notice of the particular claims being asserted. *See* Fed. R. Civ. P. 4(c)(1), 8(a).[9]

      Applying these general principles in the context of a bankruptcy reorganization, a debtor should not be able to obtain the final discharge of all claims against it without giving any indication of what those claims might be.  The due process rights of an unknowing victim of a debtor's secret unlawful conduct are not protected by the victim's receipt of notice of the debtor's bankruptcy proceedings.  Absent any practicable means of identifying what claim he might have, such a victim is no more able to become a claimant in the bankruptcy proceeding than if he had not received notice at all. *See Acevedo v. Van Dorn Plastic Mach. Co.*, 68 B.R. 495, 499 (Bankr. E.D.N.Y. 1986) ("A creditor who is notified of the bankruptcy but not of his claim is in the same position as a creditor who has notice of his claim, but not of the bankruptcy.").  Notice of the proceedings would be "a mere gesture," not due process. *Mullane*, 339 U.S. at 315.

      However, other considerations need to be taken into account.  The ability to discharge all claims is essential to an effective reorganization because it allows the debtor to

---

[9]    Although in this instance the content of the notice is required by rule rather than the Constitution, the rules themselves are "are designed to further the due process of law that the Constitution guarantees." *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000).

attract fresh capital.  *See, e.g.*, Laura B. Bartell, *Due Process for the Unknown Future Claim in Bankruptcy – Is This Notice Really Necessary?*, 78 Am. Bankr. L.J. 339, 341 (2004).  And the inability to obtain a complete discharge would encourage liquidation rather than reorganization, which would eliminate the value of the debtor as a going-concern while still leaving future claimants without the possibility of any recovery.  *See* Ralph R. Mabey & Jamie Andra Gavrin, *Constitutional Limitations on the Discharge of Future Claims in Bankruptcy*, 44 S.C. L. Rev. 745, 783 (1993); John D. Ayer & Michael L. Bernstein, *Bankruptcy in Practice* § 13.16, at 289 (4th ed. 2007); *see also* Mark J. Roe, *Bankruptcy and Mass Tort*, 84 Colum. L. Rev. 846, 901 (1984).

> Furthermore, the discharge of less than all claims disadvantages those creditors who do assert their claims in the bankruptcy proceedings.  *See* J. Maxwell Tucker, *The Clash of Successor Liability Principles, Reorganization law, and the Just Demand That Relief Be Afforded Unknown and Unknowable Claimants*, 12 Bankr. Dev. J. 1, 76 (1995).  It allows claimants who assert their claims after the bankruptcy proceedings have ended to potentially recover their claims in full from the reorganized company, while other creditors may have received just pennies on the dollar.  And those very same creditors may now be the owners of the reorganized company, so their recovery is further reduced to the extent the reorganized company remains liable for any pre-confirmation claims.  *See* Mabey & Gavrin, *supra*, at 783 n.159; *see also Ind. State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108, 126 (2d Cir.) ("To allow the claimants to assert successor liability claims . . . while limiting other creditors' recourse to the proceeds of the asset sale would be inconsistent with the Bankruptcy Code's priority scheme." (internal quotation marks and citation omitted)), *vacated and remanded*

*with instructions to dismiss appeal as moot*, 130 S. Ct. 1015 (2009), *judgment vacated and appeal dismissed as moot*, 592 F.3d 370 (2d Cir. 2010).

Thus, the ability to discharge *all* debts – including claims that may be unknown or undiscoverable at the time of the reorganization – is vital to the purposes of Chapter 11.  "A construction of the Due Process Clause which would place impossible or impractical obstacles in the way" of this vital interest "could not be justified."  *Mullane*, 339 U.S. at 313–14; *see also Tulsa Prof'l Collection Servs. v. Pope*, 485 U.S. 478, 490 (1988); Roe, *supra*, at 901.

Given that the ultimate standard for notice is reasonableness, a rule that balances the competing interests of fairness to claimants and the fresh start offered by Chapter 11 is desirable.  Such a rule might vary with the parties' respective access to information regarding the existence of claims against the debtor at the time of bankruptcy.

In one scenario, the debtor may be unaware of, and unable to discover through reasonably diligent efforts, claims against it.  Since due process demands only what is reasonable, not what it is impossible or impracticable, debtors are not required to give notice of such claims.  They should not have to engage in inefficient, exhaustive investigations in an attempt to identify and catalog every conceivable claim against them, and then invite claimants to assert them.[10]  *See Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) ("A debtor does not have a 'duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it.'" (quoting *Charter Crude Oil Co. v. Petroleos Mexicanos (In re*

---

[10]        The "unknown claims" that a debtor is unable to discover through reasonable means can be analogized to "unknown creditors," *i.e.*, those creditors whose identities cannot "be discovered through 'reasonably diligent efforts.'"  *Arch Wireless*, 534 F.3d at 81 (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4 (1983)).  Since actual notice cannot be provided to unknown creditors, due process is satisfied through constructive notice.  *See id.* at 80–81.  Similarly, since a debtor cannot give actual notice of unknown claims, these claims may be discharged even absent the particularized notice that might otherwise be required.

*Charter Co.)*, 125 B.R. 650, 654 (M.D. Fla. 1991))); *see also Mullane*, 339 U.S. at 317–18

("[I]mpracticable and extended searches are not required in the name of due process.").

In a second scenario, where the claimant knew or should have known of its claim

at the time of the bankruptcy proceedings, a lack of notice of the character of the claims also

should not violate due process and prevent discharge of the claims.  A claimant that receives

notice of bankruptcy proceedings has a duty to reasonably investigate what debts it is owed.  *Cf.*

*Am. Bank & Trust Co. v. Jardine Ins. Servs. Tex., Inc. (In re Barton Indus., Inc.)*, 104 F.3d 1241,

1246 (10th Cir. 1997) ("[C]reditors have a responsibility to take an active role in protecting their

claims . . . .").  Claimants should not have an incentive to delay asserting their claims until after

the debtor is reorganized, in the hopes of obtaining a complete recovery rather than the partial

recovery they would likely get as part of the reorganization plan.  In addition, this rule relieves

debtors of the burden of providing more extensive notice with respect to run-of-the-mill claims.

I need not determine what notice is required in the preceding scenarios, however,

because this case presents a different scenario.  Accepting the allegations in the complaint as

true, the debtor was well aware of its involvement in a conspiracy to fix surcharges and, thus, of

the antitrust claim against it.  On the other hand, the claimant was completely unaware of the

antitrust conspiracy and could not have learned of its antitrust claim through the exercise of

reasonable diligence until after the confirmation of the reorganization plan.  Under these

circumstances, discharge of the claim satisfies due process only if the debtor notified the

claimant not only of the pending bankruptcy proceedings, but also provided sufficient

information to apprise the claimant of the nature of the claim to be discharged.  *See Acevedo*, 68

B.R. at 499 ("[D]ue process should . . . require that a debtor notify a creditor of his claim when

the creditor is unlikely to know about the claim otherwise.").

This rule ensures that claimants receive meaningful notice, without unduly interfering with the purposes of reorganization proceedings. A debtor may gain the fresh start offered by the Bankruptcy Code by giving claimants sufficient information to assert their claims in the bankruptcy proceedings. If the debtor does so, it can rest assured that the claims will be discharged. If it does not do so, there is no reason the debtor should be afforded the benefit of a discharge simply because it has given its unsuspecting victims notice of the bankruptcy proceedings while concealing the basis of its liability. *Cf. In re Tabibian*, 289 F.2d 793, 795 (2d Cir. 1961) ("[D]ischarge is a privilege granted the honest debtor and not a right accorded to all bankrupts."). Those victims would have no way of identifying and asserting their claims in the bankruptcy proceedings. The generic notice they received would amount to a meaningless gesture, not notice reasonably calculated to "afford them an opportunity to present their objections" to the discharge of their claims. *Mullane*, 339 U.S. at 314; *see also Acevedo*, 68 B.R. at 499. On the other hand, creditors are not relieved of their responsibility to diligently investigate what claims they may have against the debtor – a lack of particularity in the notice will not defeat discharge if the claims were ascertainable to the claimant through reasonable efforts.

Contrary to United's contention, a rule requiring the debtor to provide notice of the claims to be discharged, limited to the circumstances outlined above, would not "wreak havoc" on the bankruptcy system. In order to identify known creditors who must receive actual notice, a debtor already has a responsibility to conduct "a careful search of the debtor's own records" for "some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable." *Arch Wireless*, 534 F.3d at 81 (quoting *La. Dep't of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, 297

(5th Cir. 1998)) (internal quotation marks omitted); *see also Chemetron*, 72 F.3d at 346–47.  In addition, a debtor is required to prepare schedules of its debts, and should include potential legal claims against it, even if disputed.  *See* 11 U.S.C. § 521(a)(1)(B)(i); Fed. R. Bankr. P. 1007(b)(1)(A); *Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242, 252 (4th Cir. 2007); *Ossen v. First Software Corp. (In re Ne. Software, Inc.)*, 111 B.R. 387, 391 (Bankr. D. Conn. 1990) ("[W]hen a debtor knows that the elements of a potential cause of action against it exist, it should list that cause of action as an unliquidated, contingent claim."); *see also* 11 U.S.C. § 1125(a)(1), (b) (requiring disclosure of "adequate information" regarding a claim before acceptance or rejection of a plan may be solicited from the claimant); *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991).  Thus, a rule requiring debtors to notify unsuspecting claimants of the nature of their claims does not impose any burdens on the debtor that are materially greater than what is already required under the Bankruptcy Code and Rules.

In light of the foregoing, the cases United relies on – *In re Penn Central Transportation Co.*, 771 F.2d 762 (3d Cir. 1985), *Eisenberg Brothers, Inc. v. Clear Shield National, Inc. (In re Envirodyne Industries, Inc.)*, 214 B.R. 338 (N.D. Ill. 1997), and *Bowen v. Residential Financial Corp.* (*In re Bowen*), 89 B.R. 800 (Bankr. D. Minn. 1988) – are distinguishable.  In *Penn Central*, the trustees that were running the debtor during its reorganization were unaware of potential antitrust claims against the debtor.  *See Penn Central*, 771 F.2d at 768 ("[D]espite their opportunity to gain information through extensive discovery, [the claimants] admit that the trustees had no knowledge of facts which would suggest that the instant alleged antitrust claims existed.").  The situation in *Bowen* was similar.  *See Bowen*, 89 B.R. at 806 ("[The claimant] has failed to produce any evidence that [the debtor] was aware of the basis for [the claimant's] fraud claim . . . .").  In *Envirodyne*, regardless of what the debtor

knew, the claimant knew or should have known of its claims before the bankruptcy proceeding had ended. *See Envirodyne*, 214 B.R. at 350 ("[A]ppellants' antitrust allegations against appellee Clear Shield were capable of detection prior to their being discharged by the Confirmation Order."); *see also id.* at 350 n.3. Thus, while in these cases the discharge of the claims may have been consistent with due process, the facts alleged here present a starkly different situation and demand a different outcome.[11]

In sum, where a debtor is aware of certain claims against it due to information uniquely within its purview, due process requires that it notify claimants of the character of those claims prior to any discharge.[12] If such notice is not provided, then the claim cannot have been discharged, unless the claimant could have discovered the existence of the claim through the exercise of reasonable diligence prior to the discharge.

Of course, United's perspective is undoubtedly that it had no obligation to notify DHL of a potential antitrust claim because there is no such claim. If that is true, then United will prevail on the merits and will not be liable just as it would not be liable if DHL's antitrust claim had been discharged. While United will have to incur the costs of defending itself on the merits,

---

[11]     In addition, it is unclear whether *Penn Central* and decisions relying on it, such as *Envirodyne* and *Bowen*, remain good law. More recently, the Third Circuit sitting *en banc* has taken a more nuanced view of what due process requires, holding that "[w]hether a particular claim has been discharged by a plan of reorganization depends on factors applicable to the particular case." *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 127 (3d Cir. 2010) (en banc). The court identified a number of factors that might be considered in determining whether the claim at issue – injuries from exposure to asbestos that did not manifest themselves until after the confirmation of the asbestos seller's reorganization plan – had been discharged:

> the circumstances of the initial exposure to asbestos, whether and/or when the claimants were aware of their vulnerability to asbestos, whether the notice of the claims bar date came to their attention, whether the claimants were known or unknown creditors, whether the claimants had a colorable claim at the time of the bar date, and other circumstances specific to the parties . . . .

*Id.*

[12]     It is unnecessary to determine with greater specificity what adequate notice would consist of, since it is undisputed in this case that the notice to DHL did not give any indication that it might have an antitrust claim against United.

that is true of any defendant with a valid affirmative defense that cannot be established at the pleadings stage.[13]

Moreover, I have assumed for purposes of this motion that DHL could not have discovered its antitrust claim against United through the exercise of reasonable diligence until after the confirmation of United's reorganization plan.  If United is able to demonstrate after discovery that this assumption is wrong, then a different conclusion regarding the discharge of DHL's claims might result.

3.      *Whether DHL Must Seek Relief From the Discharge in the Bankruptcy Court*

United argues that DHL can challenge the effectiveness of the bankruptcy discharge only in the bankruptcy court that issued the confirmation order.  According to United, DHL should have moved in the bankruptcy court either to revoke confirmation of United's reorganization plan, *see* 11 U.S.C. § 1144, or for relief from the bankruptcy court's final judgment, *see* Fed. R. Civ. P. 60(b); Fed. R. Bankr. P. 9024 – avenues for relief that are, according to United, no longer available.[14]  United asserts that DHL cannot collaterally attack the bankruptcy court's confirmation order through this civil action.

United is correct that a bankruptcy court's confirmation order is *res judicata* and bars relitigation of issues or claims that should have been raised in the bankruptcy proceedings. *See Sure-Snap*, 948 F.2d at 873; *see also Celli v. First Nat'l Bank of N. N.Y (In re Layo)*, 460

---

[13]      Unlike defenses such as sovereign immunity, there is nothing to indicate a congressional intent that the discharge of claims in bankruptcy proceedings would immunize debtors from suit rather than just eliminate their liability. *Cf. Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) (sovereign immunity "is an *immunity from suit* rather than a mere defense to liability [and] is effectively lost if a case is erroneously permitted to go to trial" (internal quotation marks and citation omitted)).

[14]      Another potential remedy for a party in DHL's situation would be to seek leave to file a late proof of claim.  *See* Fed. R. Bankr. P. 9006(b); *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 & n.4 (1993); *In re Lear Corp.*, No. 09-14326 (ALG), 2012 WL 443951, at *9 (Bankr. S.D.N.Y. Feb. 10, 2012) ("If a party who has a 'claim' asserts lack of adequate notice of the applicable Bar Date, its recourse should ordinarily be to request permission to file a late proof of claim.").

F.3d 289, 293–94 (2d Cir. 2006).  But an exception to *res judicata* applies if there was not a full and fair opportunity to litigate a claim in the prior proceeding, and the lack of due process here deprived DHL of the opportunity to litigate its antitrust claim in the bankruptcy proceedings.  *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481–83 (1982); *Brawders v. Cnty. of Ventura (In re Brawders)*, 503 F.3d 856, 867 (9th Cir. 2007); *see also Whelton v. Educ. Credit Mgmt. Corp.*, 432 F.3d 150, 154–55 (2d Cir. 2005) (confirmed bankruptcy plan does not have *res judicata* effect to the extent notice provided to a claimant was constitutionally deficient), *abrogated on other grounds by United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367 (2010).

This Court has jurisdiction over DHL's federal antitrust claim against United.  Although United has asserted discharge as an affirmative defense, I have concluded that DHL's claim was not discharged by the confirmation order on due process grounds.  Thus, there is no need for DHL to seek relief from the bankruptcy court because the bankruptcy court's order does not pose an obstacle to its claim.

There may be sound policy reasons in favor of requiring a party seeking to avoid the preclusive effect of a prior judgment to seek relief from the court that issued the judgment.  *See generally Restatement (Second) of Judgments* §§ 78–82 (1982).  Bankruptcy courts in particular are in a better position to resolve belatedly asserted claims with an eye to protecting the interests of other creditors and ensuring the continued effectiveness of the reorganization plan.  Certainly, there are mechanisms through which DHL could have sought relief in the bankruptcy proceeding, especially since it was arguably on notice of its antitrust claim less than two weeks after the effective date of United's reorganization.[15]  But United has not pointed to

---

[15]    United notes that the bar date for "administrative claims" was March 3, 2006 – *after* DHL was on notice of its claims.  But United has not explained the significance of this.

anything that makes those mechanisms the exclusive means for DHL to assert its antitrust claim.[16]

C.     *Whether DHL Has Alleged a Plausible Antitrust Claim*

1.     *Standard of Review*

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  A plausible claim must be based on "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 1949.  A motion to dismiss should be granted if a complaint offers only "'labels and conclusions,'" "'a formulaic recitation of the elements of a cause of action'" or "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (alteration in original).

In considering a Rule 12(b)(6) motion, a court should first identify any allegations in the complaint that "are no more than conclusions" and therefore "are not entitled to the assumption of truth."  *Id.* at 1950; *see also Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  A court should assume that any remaining well-pleaded allegations are true and "then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 129 S. Ct. at 1950; *see also Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59 (2d Cir.), *cert. denied*, 131 S. Ct. 824 (2010).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"

---

[16]     Because I have concluded, at this stage, that DHL's antitrust claim was not discharged, I need not address DHL's alternative argument that United remains liable for all damages caused by the antitrust conspiracy due to its continued participation in the conspiracy post-confirmation.

*Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).  However, "a well-pleaded

complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is

improbable, and that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556

(internal quotation marks and citation omitted).

     2.    *Application*

        Section 1 of the Sherman Act prohibits any "contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

with foreign nations."  15 U.S.C. § 1.  "The crucial question in a Section 1 case is therefore

whether the challenged conduct 'stem[s] from independent decision or from an agreement, tacit

or express.'"  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (alteration in

original), *cert. denied*, 131 S. Ct. 901 (2011).  This is, indeed, the crucial question in this case, as

United challenges the sufficiency of the allegations regarding its participation in any kind of

unlawful agreement.

        In *Twombly*, the Supreme Court discussed the pleading requirements for a

Sherman Act conspiracy claim.  *See Twombly*, 550 U.S. at 556–57.  It explained that "an

allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more,

parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some

unidentified point does not supply facts adequate to show illegality."  *Id.*  Thus, allegations of

parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement,

not merely parallel conduct that could just as well be independent action."  *Id.* at 557; *see also*

*Starr*, 592 F.3d at 322.  However, these allegations need not "tend[] to exclude independent self-

interested conduct."  *Starr*, 592 F.3d at 325 (internal quotation marks and citation omitted)

(alteration in original).  Nor must a "plaintiff identify the specific time, place, or person related to each conspiracy allegation."  *Id.*

DHL's amended complaint provides sufficient "context" and "factual enhancement," *Twombly*, 550 U.S. at 557, to plausibly allege United's participation in a price-fixing conspiracy.  In essence, the amended complaint alleges as follows:  United and competing airlines developed Resolution 116ss to coordinate fuel surcharges charged by competing airlines; recognizing that this price-fixing would violate the antitrust laws, the airlines sought DOT approval of their plan; they nevertheless implemented the plan before the DOT issued its decision and even after it rejected the plan; United and its competitors thereafter endeavored to charge identical fuel surcharges and repeatedly modified the fuel surcharges at the same time by the same amount over a period of several years; and these fuel surcharges were not reasonably tied to the airlines' actual fuel costs.  This alleged conduct, if proven, establishes a "garden-variety price-fixing conspiracy."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002).

United argues that the amended complaint does not plausibly allege its participation in an unlawful conspiracy for three reasons.  First, United argues it cannot be held liable for the unlawful acts of other carriers.  While there may have been a price-fixing conspiracy in the air cargo industry, United argues that the amended complaint does not adequately allege its participation in that conspiracy.  Second, United argues that it cannot have violated the antitrust laws by engaging in conduct for which it was granted antitrust immunity by the DOT pursuant to its statutory authority.  Thus, United argues that its communications with Lufthansa and its discussions with other airlines at IATA meetings cannot have been part of an

unlawful conspiracy.  Third, United argues that the allegations concerning its contact with competitors do not adequately plead its participation in a cartel.

While I agree with many of United's general legal propositions, I do not believe they mandate dismissal in this case.  First, I agree with United that DHL must allege more than just the existence of a cartel – it must allege United's participation in that cartel.  *See, e.g.*, *In re Citric Acid Litig.*, 191 F.3d 1090, 1093–94, 1106 (9th Cir. 1999).  But I conclude that DHL has done so.  DHL alleges United's active role in developing, advocating and following the fuel surcharge practices collectively developed by the airlines.

Second, I agree with the tautological proposition that United cannot be liable under the antitrust laws for conduct that is immune from the antitrust laws.  *See LaFlamme v. Société Air France*, 702 F. Supp. 2d 136, 149 (E.D.N.Y. 2010) (discussions at IATA meeting cannot give rise to antitrust liability); *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 669–70 (E.D.N.C. 2003) (airline is immune from antitrust liability for its coordinated action as part of an alliance approved by DOT), *aff'd sub nom.*, *Hall v. Am. Airlines, Inc.*, 118 F. App'x 680 (4th Cir. 2004).  However, whatever immunity United had in its discussions at IATA meetings or through its alliance with Lufthansa could not possibly extend to a conspiracy to fix fuel surcharges that involved dozens of other carriers.

The allegations in the amended complaint are that the coordination of fuel surcharges began through IATA.  But this does not immunize the subsequent decision by the airlines to coordinate their fuel surcharges.  Conduct at "IATA trade association meetings enjoy[s] *limited* antitrust immunity under federal law *so long as the defendants submitted any proposed resolutions and agreements to the DOT for approval and received approval prior to implementation*."  *LaFlamme*, 702 F. Supp. 2d at 149 (emphasis added); *see also* 49 U.S.C.

§ 41308(b) (limiting immunity to the "transaction specifically approved by the [DOT's] order and . . . any transaction necessarily contemplated by the order").  Here, DHL alleges that United and other airlines began coordinating their fuel surcharges *before* the DOT acted on their application for approval of their surcharging plan and even *after* the DOT *rejected* this plan. Their limited immunity does not extend to that alleged conduct.

Similarly, any immunity arising out of United's alliance with Lufthansa does not extend so far as to allow United to coordinate its pricing with dozens of other airlines.  The allegations in the amended complaint are that United coordinated its fuel surcharges with Lufthansa while knowing that Lufthansa was then coordinating those surcharges with other airlines.  This is nothing other than a conspiracy involving United and all the other airlines, with Lufthansa acting as an intermediary.[17]  Thus, even assuming that United is immune from antitrust liability for its agreements with Lufthansa, it is not immune from liability for agreeing to fix prices with other airlines merely because it used Lufthansa as an intermediary.

United's arguments that the various meetings and communications alleged to have taken place do not plausibly establish an antitrust claim are beside the point.  DHL has plausibly alleged United's participation in a conspiracy to fix fuel surcharges.  United's discussions and emails with other airlines relating to pricing policies is, at least, indicative of a conspiracy even if they would not establish a conspiracy on their own.  *See, e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 445–47 (9th Cir. 1990).

---

[17]     Contrary to United's argument, the antitrust claim against it is not premised on United's mere knowledge of Lufthansa's conspiracy with other airlines.  United's active participation in the conspiracy through its agreements with Lufthansa make it a co-conspirator as much as if it were actively dealing with the other co-conspirators itself.  *See, e.g.*, *United States v. Otibu*, No. 02-CR-104 (AGS), 2002 WL 1033882, at *2 (S.D.N.Y. May 21, 2002) ("[C]onnection through a common intermediary is sufficient to establish that two defendants were both part of a conspiracy." (citing *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990); *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989))).

United also emphasizes the fact that, despite extensive scrutiny of surcharging practices by government regulators and private plaintiffs, United has thus far avoided any criminal or civil liability relating to the conspiracy alleged here.  While United does not argue that this alone warrants dismissal of the case, it does argue that "DHL's assertion that it alone perceives illegal conduct that has escaped the attention of the rest of the world is wholly implausible."  Defs. Mem. of Law 8, ECF No. 20-1.

As in *Starr*, United "cite[s] no case to support the proposition that a civil antitrust complaint must be dismissed because an investigation undertaken by the Department of Justice found no evidence of conspiracy," or, as relevant here, evidence of the defendant's involvement in an undisputed conspiracy.  *Starr*, 592 F.3d at 325.  Moreover, while it might be unlikely that DHL has uncovered wrongdoing by United that other sophisticated parties have overlooked, I cannot conclude that DHL's claim is implausible on this basis.  Since the facts alleged, if true, would establish United's violation of § 1, I cannot dismiss the case even if "actual proof of the facts alleged is improbable" or "a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks and citation omitted).

## CONCLUSION

For the reasons stated above, United's motion to dismiss is denied.


So ordered.


John Gleeson, U.S.D.J.


Dated: May 18, 2012
        Brooklyn, New York