## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

DPWN HOLDINGS (USA), INC.
  1200 South Pine Island Road, Suite 600,
  Plantation, FL 33324,

                Plaintiff,

       v.

UNITED AIR LINES, INC. d/b/a UNITED
AIRLINES; UNITED CONTINENTAL
HOLDINGS, INC. f/k/a UAL CORP.
  77 West Wacker Drive, Chicago, Illinois 60601

                Defendants.

11-cv-0564

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

    1.     Plaintiff DPWN Holdings (USA), Inc., on behalf of itself and as the assignee of all relevant claims of its affiliated entities (collectively "DHL"), brings this action for damages and injunctive relief to remedy violations of the federal antitrust laws by United Continental Holdings, Inc. and United Air Lines, Inc. (collectively "UA" or "Defendant").  DHL alleges as follows:

### INTRODUCTION

    2.     UA and its competitor airlines ("Airfreight Carriers") engaged in a conspiracy from as early as January 1997 through at least September 2006 (the "Cartel Period"), to fix, raise, maintain and/or stabilize the prices for air cargo shipments to and from the United States ("U.S. Airfreight Shipping Services").

    3.     To date, twenty of UA's co-conspirator Airfreight Carriers have pled guilty to felony antitrust violations in the United States and have paid criminal fines totaling almost $1.75 billion.  In addition, twelve Airfreight Carrier executives have been charged in the government's

investigation and four have pled guilty, paid criminal fines and been sentenced to serve varying

jail terms for their roles in the conspiracy.  Upon information and belief, the criminal

investigation is ongoing.

4.     As part of their cartel, UA and its co-conspirators agreed to illegally fix the price

of U.S. Airfreight Shipping Services.  The fixed-prices included base rates as well as three types

of surcharges that the Airfreight Carriers imposed on top of the already fixed base rates:

(a)     *Fuel Surcharges*:  Beginning as early as October 1996, UA began
discussing Fuel Surcharges with competing Airfreight Carriers.  Starting
in February 2000, after discussions with other Airfreight Carriers and
pursuant to the cartel agreement, UA began imposing a fixed per kilogram
Fuel Surcharge on a worldwide basis, regardless of distance shipped.  UA
continued to charge such Fuel Surcharges through at least the end of 2006.

(b)     *Security Surcharges*:  From September 2001 through at least February
2006, the Airfreight Carriers, including UA, agreed to impose and did
impose a fixed per kilogram Security Surcharge affecting U.S. commerce,
regardless of distance shipped.

(c)     *Customs Surcharges*:  From at least February 2004 through at least
February 2006, the Airfreight Carriers, including UA, agreed to impose
and did impose a Customs Surcharge on shipments to, from, and within
the United States.

5.     As a direct result of the cartel in which UA participated, DHL — which was at all

relevant times a large, if not the largest, direct purchaser of UA's U.S. Airfreight Shipping

Services — has suffered substantial injury to its business and property.  DHL paid at least $56.1

million in Surcharges to UA for U.S. Airfreight Shipping Services during the Cartel Period –

most if not all of which constituted illegal overcharges given the following:  (i) base freight rates

had already been fixed at the time the surcharges were imposed; (ii) the Airfreight Carriers

continued to fix base freight rates throughout the Cartel Period; (iii) Fuel Surcharges  over-

recovered for increases in the cost of aviation fuel during the Cartel Period; and (iv) at all

relevant times, Fuel Surcharges (and, upon information and belief, Security and Customs

-2-

Surcharges) significantly exceeded – and thus were not necessary to recoup – the Airfreight Carriers' actual fuel-, security- and customs-related incremental costs.

6.       DHL paid at least $334.8 million in illegal overcharges for U.S. Airfreight Shipping Services during the Cartel Period to the Airfreight Carriers that have pled guilty to criminal price fixing charges in the United States.  As a participant in the same cartel, UA is jointly and severally liable for all the overcharges that DHL paid.

7.       UA is liable for these overcharges notwithstanding its 2006 bankruptcy discharge. UA concealed its participation in the conspiracy throughout its bankruptcy and thereafter, and never notified DHL of its claim.  As a result, DHL was not and could not have been aware that it had a claim against UA until long after all the bankruptcy deadlines for filing claims had passed, and after the plan of reorganization had gone into effect on February 1, 2006.

8.       DHL first became aware of the possibility of a cartel involving Airfreight Cargo shipments to, from, and within the United States on February 14, 2006, when the U.S. Department of Justice raided the offices of a number of Airfreight Carriers other than UA. However, DHL did not learn of UA's participation in that cartel until *after* July 5, 2010, when DHL reached a settlement agreement with an Airfreight Carrier that had acknowledged participation in the cartel and that produced confidential documents to DHL, showing UA's attendance at cartel meetings and participation in other communications facilitating the cartel. Those documents for the first time gave DHL a basis for filing a complaint against UA that could satisfy the pleading standards of *Twombly* and *Iqbal* as well as Rule 11 of the Federal Rules of Civil Procedure.  The specific allegations in this Amended Complaint are based on those documents.

9.    The information reasonably available and accessible to DHL *prior* to July 5, 2010

was as follows:

(a)    The U.S. Department of Justice ("DOJ") had *not* raided UA's offices on February 14, 2006, when it raided the offices of other Airfreight Carriers.

(b)    UA's SEC disclosures after the dawn raids stated that UA was not a target in the DOJ investigation.

(c)    The DOJ did not indict UA.

(d)    The putative class action complaints, that had been filed immediately after the dawn raids and that had named UA as a defendant, contained no specific factual allegations regarding UA's participation in any agreement, meeting, or communication relating to the alleged cartel. Rather, the complaints alleged in conclusory terms a conspiracy to fix prices against a long list of Airfreight Carriers lumped together and referred to as "Defendants." The complaints did little more than refer to the dawn raids of February 14, 2006 and to the "Defendants" participation in trade associations and alliances.

(e)    A subsequently filed amended consolidated class action complaint dropped UA as a defendant.

(f)    During the cartel, UA typically increased its fuel surcharges *after* Lufthansa Cargo had increased its fuel surcharges, suggesting that UA was acting unilaterally – merely following Lufthansa's lead, rather than actually executing a cartel agreement. Moreover, UA publicly posted its own "Jet Fuel Index" in July 2002, giving the further appearance that its Fuel Surcharges were unilateral.[1]

(g)    Although the rates of the different carriers were similar throughout the cartel period, that was not unusual since historically the rates of the Airfreight Carriers had been regulated and, after deregulation, the Airfreight Carriers continued to follow each other's lead.

(h)    DHL was unaware of UA's actual fuel costs relating to air cargo which are determined by such factors as long-term contracts, hedging strategies, and the proportion of cargo that UA carried in the bellies of passenger planes – none of which was publicly available. Moreover, the timing of UA's fuel surcharges was directionally *consistent* with increases in the spot price of fuel as shown on the graph below:

---

[1]    Press Release, United Airlines Cargo (Feb. 25, 2003) [LH_CIV_0040133]; United Airlines Cargo, *Jet Fuel Index* (Aug. 9, 2004).



**United Fuel Surcharge, Fuel Cost per Mile, and Fuel Price per Gallon**
**(Fuel Cost Indexed to Feb 2000)**
**U.S. Routes Only**

10.     UA continued to participate in the conspiracy after the bankruptcy court approved UA's plan of reorganization on January 20, 2006, and after that plan became effective on February 1, 2006.  Indeed, subsequent to February 1, 2006, UA and other cartel members engaged in overt acts in furtherance of the conspiracy, including agreeing on and then implementing increases to the Fuel Surcharge and monitoring the activity of the cartel.  Indeed, UA overcharged DHL at least $1 million in Fuel and Security Surcharges between the time the bankruptcy plan of reorganization was confirmed on January 20, 2006 and the dawn raids on February 14, 2006, and many more millions from February 14, 2006 through the third quarter of 2006.

11.     UA's limited antitrust immunity for certain agreements with Lufthansa and Scandinavian Airlines System ("SAS") does not shield UA from liability for its participation in

the cartel any more than it shielded SAS, which paid a $52 million fine to the United States

Department of Justice and settled the U.S. Class Action for $13.9 million, or Lufthansa Cargo,

the amnesty applicant.  In November 1996, United States Department of Transportation ("U.S.

DOT") approved an "Alliance" between Lufthansa, SAS and UA.[2]  The immunity conferred by

the U.S. DOT was limited to what was specified in the "Coordinating Agreement" between

Lufthansa, SAS and UA for the purpose set forth in that Agreement – *i.e.*, "globally

integrat[ing]" complementary air transportation services to provide benefits to consumers.[3]  The

U.S. DOT did not give the Alliance immunity to conspire with competing Airfreight Carriers to

overcharge customers.  Indeed, the Coordination Agreement creating the Alliance expressly

states that "the Parties shall not exchange information, discuss, agree upon or coordinate . . . on

any subject that would cause any Party to contravene (i) any law, regulation or order of any

government authority or court having jurisdiction over such Party . . . ."[4]

12.     As set forth below, Lufthansa Cargo acted as one of the primary facilitators of a

horizontal cartel, coordinating prices for UA and other competing Airfreight Carriers on

shipments to, from, and within the United States.  The cartel members, including UA, were

aware that Lufthansa Cargo was playing that role and participated in the cartel with that

knowledge.

13.     UA overcharged DHL by at least $56.1 million during the Cartel Period on

shipments to, from and within the United States.  During the same period, the cartel as a whole,

for which UA is jointly and severally liable, overcharged DHL by at least $335 million on

shipments to, from, and within the United States.

---

[2]     U.S. Dep't of Transportation, Order 96-11-1 (Nov. 1, 1996).
[3]     Coordination Agreement between Lufthansa, SAS and UA, at 1 (Aug. 9, 1996).

**JURISDICTION AND VENUE**

14.     This action is brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover damages and costs of suit, including reasonable attorneys' fees and costs, for the injuries sustained by DHL as a result of UA's violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged herein.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

16.     UA's violations occurred in and directly affected United States commerce, including United States import commerce.  These violations give rise to DHL's claims in this action under Section 1 of the Sherman Act.

17.     Venue is proper in this District under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d), because during all times relevant to this action, UA resided, transacted business, maintained offices, maintained agents or was found in this District, and because a substantial part of the events giving rise to DHL's claims, and a substantial portion of the affected interstate trade and commerce as described below, occurred and was carried out, in this District.  UA also inserted products or services in the stream of commerce that were intended to and did reach this District.

**PARTIES**

18.     Plaintiff DPWN Holdings (USA), Inc. ("DPWN") is the holding company of all DHL operating companies in the United States, including but not limited to DHL Express (USA), Inc., Exel, Inc. and Danzas.  DPWN is a company organized under the laws of Ohio, with its principal place of business located at 1200 South Pine Island Road, Suite 600, Plantation, Florida 33324.  DPWN is the assignee of the legal right to prosecute and recover damages in this

---

[4]   Coordination Agreement between Lufthansa, SAS and UA, at 5 (Aug. 9, 1996).

action by all of its commonly owned companies — which together with DPWN are collectively referred to herein as "DHL."

19.     DHL is engaged in the business of providing, among other things, logistics and freight-forwarding services to manufacturers and other businesses that require the transportation of goods within, to and from the United States.  DHL is one of the largest, if not the largest, purchasers of U.S. Airfreight Shipping Services.  At all relevant times, DHL directly purchased U.S. Airfreight Shipping Services from UA.

20.     Defendant United Continental Holdings, Inc., formerly known as UAL Corporation (prior to the merger between United Airlines and Continental Airlines, which was approved by the United States Department of Justice on August 27, 2010), is a holding company organized and existing under the laws of the State of Delaware with its corporate headquarters located at the United Building, 77 West Wacker Drive, Chicago, Illinois 60601.  Defendant United Continental Holdings, Inc. is the parent company of Defendant United Air Lines, Inc.

21.     Defendant United Air Lines, Inc., doing business as United Airlines, is a corporation organized and existing under the laws of the State of Delaware with its principal business address located at the Willis Tower, 233 South Wacker Drive, Chicago, Illinois 60606.  Defendant United Air Lines, Inc. is a wholly owned subsidiary of Defendant United Continental Holdings, Inc.  Defendant United Air Lines, Inc. is one of the largest Airfreight Carriers in the world, providing a wide range of freight and mail services to shippers throughout its system.  During the Cartel Period, United Air Lines, Inc., either directly or through its predecessors, successors and/or affiliates, marketed and/or sold U.S. Airfreight Shipping Services.  In particular, United Air Lines, Inc. and other Airfreight Carriers, at all times relevant to this action,

sold U.S. Airfreight Shipping Services to DHL and made shipments of goods on behalf of DHL in United States commerce, including United States import commerce.

## INTERSTATE COMMERCE

22.     At all times relevant to this action, UA engaged in a continuous and uninterrupted flow of transactions and U.S. Airfreight Shipping Services that occurred in and involved interstate commerce, including United States import commerce.  The conduct of UA and its co-conspirators affected the flow of such commerce to customers of U.S. Airfreight Shipping Services, such as DHL, and was intended to, and did, have a direct, substantial and reasonably foreseeable effect upon United States interstate commerce, including United States import commerce.

## FACTS

**I.     Background**

23.     On August 9, 1996, UA entered into a Coordination Agreement with Lufthansa and SAS ("the Alliance") to provide "globally integrated air transportation services in competition with other carriers and carrier alliances while remaining independent companies."[5]

24.     On November 1, 1996, the U.S. DOT issued an Order permitting Lufthansa, SAS and UA to proceed with their Alliance in accordance with the terms of the Coordination Agreement.[6]  The Coordination Agreement stated that its purpose was to "enhance efficiency" and reduce costs.[7]  The Coordination Agreement further provided that "[n]otwithstanding the foregoing, the Parties shall not exchange information, discuss, agree upon, or coordinate . . . on any subject or in any manner that would cause any Party to contravene (i) any law . . . ."[8]  Thus,

---

[5]   Coordination Agreement between Lufthansa, SAS and UA, at 1 (Aug. 9, 1996).
[6]   U.S. Dep't of Transportation, Order 96-11-1 (Nov. 1, 1996).
[7]   Coordination Agreement between Lufthansa, SAS and UA, at 1 (Aug. 9, 1996).
[8]   Coordination Agreement between Lufthansa, SAS and UA, at 5 (Aug. 9, 1996).

UA had antitrust immunity only to the extent that it acted in a manner consistent with the purpose and letter of the Coordination Agreement and did not contravene any law.

25.     The International Air Transport Association ("IATA"), of which UA was a member, had been monitoring the price of aviation fuel since before 1990 and created an index based on the average of the spot price of aviation fuel in the "US Gulf" market, the "US West Coast" market and various markets around the market including Rotterdam and Singapore.[9] IATA set the index at 100 as of June 1996.[10]

26.     In September 1996, IATA advised the Cargo Steering Group that the Index had risen to 132 and "sought their views on the convening of a Special Fuel Conference," which it proposed for mid-December 1996.[11]

27.     On November 6, 1996, the Singapore Board of Airline Representatives Cargo Subcommittee ("Singapore BAR CSC") held an "extraordinary" meeting to discuss imposing a Fuel Surcharge.[12]  UA, Air France, All Nippon Airways, China Airlines, Cathay Pacific, Emirates, EVA Airways, Japan Airlines, Korean Air, Lufthansa Cargo, Malaysian Airlines, Nippon Cargo Airlines, Qantas Airways, SAS, Singapore Air, and Thai Airways, among others, attended the meeting.[13]

## II.    The Initial Fuel Surcharge Agreement

28.     On December 9, 1996, the IATA Cargo Steering Group of the IATA Composite Fuel Conference held a special meeting  "to determine what further action was to be taken" with

---

[9]    Agenda, IATA Cargo Committee, 9th Meeting, at 3 (Mar. 3, 1997) [QAL-01-194074].
[10]   Agenda, IATA Cargo Committee, 9th Meeting, at 3 (Mar. 3, 1997) [QAL-01-194074].
[11]   Agenda, IATA Cargo Committee, 9th Meeting, at 3 (Mar. 3, 1997) [QAL-01-194074].
[12]   Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, Singapore Board of Airline Representatives (Nov. 6, 1996) [SIA_CIV_0028160].
[13]   Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, Singapore Board of Airline Representatives, at 1 (Nov. 6, 1996) [SIA_CIV_0028160].

respect to the increasing price of aviation fuel.[14]  UA representatives attended as members of the

Steering Group.[15]  Other Airfreight Carriers that attended included Air France, All Nippon,

British Airways, Japan Airlines, Korean Air, Nippon Cargo Airlines, SAS and Thai Airways.[16]

According to the Minutes of the meeting, "events of the recent past [unsuccessful unilateral

attempts to impose fuel surcharges] and the resultant market confusion, underline the need for

carriers in the future, to develop concerted and co-ordinated industry action under the auspices of

an IATA conference."[17]  Thus, the Airfreight Carriers understood that "concerted and co-

ordinated industry action" was necessary to impose sustainable fuel surcharges.[18]  The Cargo

Steering Group concluded that all members of the Cargo Tariff Coordinating Conference would

meet again in January 1997 to further coordinate on a joint course of action.[19]

     29.    On January 14-16, 1997, at the Special Composite Meeting of Cargo Tariff

Coordinating Conferences held in Geneva, Switzerland, the IATA Cargo Steering Group

presented its recommendation that the Conference "attempt to adopt surcharge Resolutions for

all routes."[20]  UA attended the meeting.  DHL was not a member and did not attend the meeting.

At the meeting, British Airways made the following submission to the Conference:

> Aviation fuel costs have risen significantly since mid 1996 and are
> still approx[imately] 40[%] above the base point established in
> July 1990.  Consequently urgent industry compensatory price
> increases are r [sic] required.
>
> We anticipate considerable debate at the meeting on the
> methodology used to secure price increases to offset fuel prices.
> Invariably this will surround increases to rates (percentage or fixed
> increase per [kilogram]) and the old argument of IATA/market

---

[14]   Agenda, IATA Cargo Committee, 9th Meeting, at 24 (Mar. 3, 1997).
[15]   Agenda, IATA Cargo Committee, 9th Meeting, at 24 (Mar. 3, 1997).
[16]   Agenda, IATA Cargo Committee, 9th Meeting, at 24 (Mar. 3, 1997).
[17]   Minutes, Special Meeting, Cargo Tariff Conferences Steering Group, at 4 (Dec. 9, 1996) [SIA_CIV_0030544].
[18]   Minutes, Special Meeting, Cargo Tariff Conferences Steering Group, at 4 (Dec. 9, 1996) [SIA_CIV_0030544].
[19]   Agenda, IATA Cargo Committee, 9th Meeting, at 24 (Mar. 3, 1997) [QAL-01-194074].
[20]   Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 2 (Jan. 14-16, 1997) [QAL-01-194051].

-11-

price differentials.  It will also include the methodology of establishing a separate surcharge perhaps as a due carrier charge and not in the actual price at all.  Perhaps we should consider a separate rating line as a hybrid between the two approaches.  The conference should be open minded to all approaches with the objective of securing a realistic and workable solution that win actually provide the neccessary [sic] revenue compensations to the industry that is clearly justified.  BA [British Airways] is open to all approaches – even a combination of the two may be appropriate provided theres [sic] is total transparency and understanding for both airlines and customers.

If a separate charge solution is considered then it is essential for the conference to establish associated codes and application rules. *As a guide BA will be seeking across the board price increases of five (5) percent or in the case of fixed amounts increases of between USD0.05 and USD0.10 per [kilogram]* depending upon stage distance. . . .  [W]e propose that any agreed price increases should be effective 1Mar97.

*We would also like the conference to consider a variable price "triggered" by an enabling resolution which would only come into effect if a base point was exceeded by a certain tolerance.*[21]

UA's submission stated as follows:

UA is seeking a fuel surcharge agreement between TC areas, particularly TC3.  The amount proposed is USD 0.10/kg or equivalent in local currency. . . .  We believe that in the USA a rate increase to cover rising fuel cost will not be accepted in the forwarders community, however a surcharge would be manageable.  UA would also like to see the development of procedures that would be able to be implemented in the event of future cost critical situations.

Another Airfreight Carrier, Iberia, stated that it was "seeking an IATA agreement in order to apply [fuel] surcharges without exception."[22]

30.    At the January 1997 meeting of the IATA Cargo Tariff Coordinating

Conferences, several Airfreight Carriers initially opposed the resolution to adopt fuel

---

[21]  IATA, Submissions by Carriers, at 5 (Jan. 14, 1997) [SIA_CIV_0030604] (emphasis added).
[22]  IATA, Submissions by Carriers, at 1 (Jan. 14, 1997) [SIA_CIV_0030604].

surcharges.[23]  Five Airfreight Carriers believed that a surcharge was unnecessary because any increase in fuel costs already had been recouped through increased passenger fares or through base -freight rates.[24]  Four Airfreight Carriers opposed a flat per kilogram surcharge because the proposed surcharge did not differentiate between area and route.[25]  Another Airfreight Carrier wanted a percentage surcharge, rather than the proposed cents per kilogram surcharge.[26]  Other Airfreight Carriers proposed increases in base -freight rates, rather than a surcharge.[27]

  31. Members of the Conference were aware of the antitrust risks of their conduct. The director of the IATA Legal Department, Andrew Charlton, addressed the attendees of the Special Composite Meeting as follows:

> Antitrust laws prohibit competitors reaching any form of agreement, understanding or arrangement which is likely to have an impact on price.  As a general rule, competitors cannot discuss in any way the price they intend charging consumers.  There are very few exceptions to this.  The relevant exception is where immunity has been granted by the relevant authority for rates reached pursuant to a particular procedure and within the strict confines of the terms of the approval itself.  IATA has such an approval for this conference.  These immunities are very rare.

> Without immunity, authorities regard with great suspicion any situation where competitors charge the same rate.  In the event that there is any evidence whatsoever that competitors have had an opportunity to communicate in any way, and charge the same rate, there is a very strong assumption that they do so having colluded.

> Until the particular approval is granted for any rate agreed at this conference, that situation would apply.  In other words, *in my opinion, any airline which moves to charge the rate which is*

---

[23]  Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 3-4 (Jan. 14-16, 1997[QAL-01-194051].

[24]  Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 4 (Jan. 14-16, 1997) [QAL-01-194051].

[25]  Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 4 (Jan. 14-16, 1997) [QAL-01-194051].

[26]  Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 4 (Jan. 14-16, 1997) [QAL-01-194051].

[27]  Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 4 (Jan. 14-16, 1997) [QAL-01-194051].

*agreed at this conference before government approval, and therefore antitrust immunity, is obtained, would face a very strong evidential presumption that the rate being charged had been agreed between competitors and without antitrust immunity.* The question is one of evidence.[28]

32.    Notwithstanding the antitrust risk and apparently recognizing that concerted action was necessary for Fuel Surcharges to be successfully imposed, the attendees pursued the Steering Group's recommendation to charge a Fuel Surcharge on a global basis, including on U.S. Airfreight Shipping Services.  UA and the other attendees "developed" Resolution 116ss, which contained the mechanism by which the Airfreight Carriers would impose the Fuel Surcharge.[29]  Specifically, the Fuel Surcharge would be tied to percentage changes in the spot price of aviation fuel as tracked by the IATA Fuel Price Index ("FPI"), which IATA benchmarked against the June 1996 average spot price of aviation fuel in five markets around the world (*i.e.*, IATA set its FPI at 100 to represent the average spot price of aviation fuel in June 1996).[30]

33.    The initial Fuel Surcharge would be USD 0.10 (or the equivalent amount in local currency) per kilogram, regardless of the distance shipped, just as UA had proposed.[31]   The Airfreight Carriers, including UA, agreed that members of the IATA Cargo Tariff Coordinating Conferences would implement this Fuel Surcharge by March 1, 1997, provided the FPI remained

---

[28]   Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 5-6 (Jan. 14-16, 1997) (emphasis added).

[29]   Agenda, IATA Cargo Committee, 9th Meeting, at 25 (Mar. 3, 1997).

[30]   Despite IATA's claim that its FPI measured the average spot of fuel, the IATA FPI was severely distorted.  As of October 1996, the FPI exceeded 140 (*i.e.*, according to IATA, the spot price of aviation fuel had increased by forty percent from June to October 1996).  Agenda, IATA Cargo Committee, 9th Meeting, at 24 (Mar. 3, 1997).  In reality, the increase in fuel costs faced by Airfreight Carriers was significantly less than forty percent.  *See* Order, U.S. Dep't of Transportation, Docket OST-2000-6837-2, at 2 (Mar. 17, 2000) (U.S. DOT noting that "the actual average fuel prices, as reported to the Department [by IATA] . . . measured between June 1996 and November 1999, increased about six percent, while IATA's index, based on spot market prices, showed a 34 percent increase over the same period.").

[31]   For this Resolution, the Fuel Surcharge would not apply in some countries.  Agenda, IATA Cargo Committee, 9th Meeting, at 25 (Mar. 3, 1997).  The Fuel Surcharge imposed in 2000 had no such limitation. UA's proposal is set forth at Submissions by Carriers, at 1 (Jan. 14, 1997) [SIA_CIV_0030604].

above 110 (*i.e.*, spot prices remained ten percent above the June 1996 spot price).  Thereafter, the

Fuel Surcharge would remain in effect until the FPI fell below 110.  If the FPI continued to

increase and reached 150, the Airfreight Carriers agreed they would convene a meeting of the

IATA Cargo Tariff Conferences to discuss increasing the Fuel Surcharge.

      34.     Twenty Airfreight Carriers, including UA, voted in favor of approving Resolution

116ss, while five abstained and two opposed it — Lufthansa Cargo and Swissair.[32]  Lufthansa

Cargo initially opposed the resolution because it had been charging a fuel surcharge and was

concerned that it might be "at risk" if the Resolution were adopted.[33]  Because there was not

unanimous support for the resolution, it was defeated pursuant to IATA rules.[34]  However, that

was not the end of the resolution.

      35.     On April 15, 1997 the Singapore BAR held an "extraordinary" meeting.[35]  UA,

Air France, Cargolux, Cathay Pacific, China Airlines, EVA Airways, Japan Airlines, Korean Air,

Lufthansa Cargo, Malaysian Airlines, Nippon Cargo Airlines, Northwest Airlines, SAS,

Singapore Air, Swissair, and Thai Airways, among others, attended.[36]  The purpose of the

meeting was "to find out member airlines' plans on the fuel surcharge . . . ."[37]  After a discussion

about whether Lufthansa Cargo would withdraw its opposition from IATA's adoption of a Fuel

Surcharge, the attendees engaged in a discussion about how "it [was] an opportune time for

members to increase rates especially in high demand sectors" because the "market so far [had]

---

[32]  Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 10 (Jan. 14-16, 1997).
Swissair was previously the national airline of Switzerland, but filed for bankruptcy in March 2002.  Swiss
International Air Lines ("Swiss") is the successor Airfreight Carrier to Swissair.  Swiss WorldCargo is the cargo
subsidiary of Swiss.
[33]  Agenda, IATA Cargo Committee, 9th Meeting, at 3 (Mar. 3, 1997).
[34]  Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 12 (Jan. 14-16, 1997);
Agenda, IATA Cargo Committee, 9th Meeting, at 26 (Mar. 3, 1997).
[35]  Minutes, Extraordinary BAR Cargo Sub-Committee Meeting (Apr. 15, 1997) [SIA_CIV_0028170].
[36]  Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, at 1 (Apr. 15, 1997) [SIA_CIV_0028170].
[37]  Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, at 2 (Apr. 15, 1997) [SIA_CIV_0028170].

been receptive to the fuel surcharge which [was] effectively a rate increase."[38]  The participants agreed that "member airlines should cooperate with one another, and ensure that a longer notice is served to announce any intentions or decisions that may impact the aircargo [sic] industry."[39]

36.     Later in 1997, apparently recognizing the importance of concerted action to making the Fuel Surcharge effective, Lufthansa Cargo withdrew its objection to the IATA Fuel Surcharge Resolution and suggested that IATA adopt it by mail vote.[40]  Thereafter, the Airfreight Carriers, including UA, adopted a revised version of Resolution 116ss by Mail Vote 875 on August 7, 1997, with an intended effective date of October 1, 1997.[41]

37.     Resolution 116ss, as passed, was the same as the initial resolution in key respects. The revised Resolution 116ss still used the IATA FPI benchmarked to the June 1996 spot price of fuel as the mechanism for implementing the Fuel Surcharge.[42]  But the triggering amount was changed.  If the FPI equaled or exceeded 130 on or after October 1, 1997, the Airfreight Carriers would implement a Fuel Surcharge not to exceed USD 0.10 per kilogram except on "minimum charge" shipments.[43]  As with the original resolution, if at any time the FPI exceeded 150 for two consecutive weeks, IATA would convene a meeting of the Cargo Tariff Coordinating Conferences to consider further increasing the Fuel Surcharge.  As with the original resolution, the revised resolution provided that, if the FPI fell below 110 for two consecutive weeks, IATA would suspend the Fuel Surcharge.

---

[38]   Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, at 2 (Apr. 15, 1997) [SIA_CIV_0028170].
[39]   Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, at 2 (Apr. 15, 1997) [SIA_CIV_0028170].
[40]   Agenda, IATA Cargo Committee, 10th Meeting, at 41 (Sept. 10, 1997).
[41]   Agenda, IATA Cargo Committee, 10th Meeting, at 41 (Sept. 10, 1997); Memorandum from Director, Tariff Affairs and Conferences, IATA, to Members Participating in Tariff Coordinating Conferences (Aug. 12, 1997).
[42]   Memorandum from Director, Tariff Affairs and Conferences, IATA, to Members Participating in Tariff Coordinating Conferences, at 4 (Aug. 12, 1997).
[43]   Memorandum from Director, Tariff Affairs and Conferences, IATA, to Members Participating in Tariff Coordinating Conferences, at 4-10 (Aug. 12, 1997); Agenda, IATA Cargo Committee, 10th Meeting, at 41 (Sept. 10, 1997).

38.      Although the Airfreight Carriers, including UA, adopted the resolution in 1997, IATA did not submit Resolution 116ss to the U.S. DOT until early 2000, when the FPI exceeded 130 for the first time since IATA adopted the resolution.[44]

39.      In May 1998, UA participated in the IATA Composite Meeting of Cargo Tariff Coordinating Conferences in Geneva, Switzerland.   The Airfreight Carriers again noted that Resolution 116ss "could not be declared effective because of the outstanding approval of Argentina, India and USA ('required governments')."[45]  In particular, IATA stated that

> As with all traffic conference meetings, these [IATA] meetings had immunity from US anti-trust laws, *on the condition that all agreements were submitted for specific approval by the US authorities.*  IATA would submit the agreements to the DOT in accordance with this condition.  In addition, IATA's Board of Governors had determined that any agreement reached at this meeting must not be put into effect prior to its declaration of effectiveness. . . . This ruling was contained in the Provisions for the Conduct of the IATA Traffic Conferences and must be complied with to ensure continued immunity.[46]

Moreover, the Airfreight Carriers knew that the "US DoT [ ] advised that they would not accept filing of this Resolution for approval unless accompanied by economic justification based on current prices which the US carriers were unable to provide."[47]

40.      Even though the Airfreight Carriers knew that they could not lawfully implement IATA Resolution 116ss without government approval, cartel members, including UA, did so in parallel, but with staggered implementation dates, as set forth with specificity in the next section, which disguised the cartel.

---

[44]   IATA, Application for Approval of Agreements by the Int'l Air Transport Ass'n to the U.S. Dep't of Transp., Docket OST-2000-6837-1, at 2 (Jan. 28, 2000).  *See also* Memorandum from Director, Tariff Affairs and Conferences, IATA, to Members Participating in Tariff Coordinating Conferences, at 1 (Aug. 12, 1997).
[45]   Memorandum from Director, Tariff Services, IATA, to Members Participating in Tariff Coordinating Conferences, at 28 (May 29, 1998) [QAL-01-194306]
[46]   Memorandum from Director, Tariff Services, IATA, to Members Participating in Tariff Coordinating Conferences, at 10 (May 29, 1998) [QAL-01-194306] (emphasis added).

41.     In June 1999, UA met to engage in a "Competition Analysis" with representatives from Lufthansa Cargo, Swissair, SAS, Cargolux, Air Canada, VARIG, British Airways, Singapore Air and South African Airways.[48]  The analysis included discussions about the competitive situation in the United States.[49]  Upon information and belief, the Airfreight Carriers discussed implementing the Fuel Surcharge as set forth in Resolution 116ss.

42.     In December 1999, the FPI reached the trigger point for Fuel Surcharges. Without waiting for DOT for approval, Airfreight Carriers began taking steps to implement Resolution 116ss.  For example, on December 13, 1999, a Scandinavian Airlines ("SAS") representative asked a number of carriers, including UA, Air Canada, Lufthansa Cargo, Scandinavian Airlines, and VARIG, "whether [they] would be considering adding a fuel surcharge to [their] prices now that the IATA index has passed the magic limit of 130?"[50]  As discussed below, all of the recipients of the e-mail, subsequently added a Fuel Surcharge to their prices.

43.     In late December 1999, e-mails were exchanged between representatives of UA, Air Canada, Lufthansa Cargo, SAS and VARIG regarding the Fuel Surcharge.  A SAS representative asked the group "whether [they] would be considering adding a fuel surcharge to [their] prices now that the IATA index has passed the magic limit of 130?"[51]  And in fact the Airfreight Carriers, including UA, subsequently added a Fuel Surcharge to their prices.

---

[47]   Memorandum from Director, Tariff Services, IATA, to Members Participating in Tariff Coordinating Conferences, at 28 (May 29, 1998) [QAL-01-194306].
[48]   E-mail from Sales Manager, Asia & Australia, Lufthansa Cargo (June 23, 1999) [LH_CIV_0002173].
[49]   E-mail from Sales Manager, Asia & Australia, Lufthansa Cargo (June 23, 1999) [LH_CIV_0002173].
[50]   E-mail from Robert Skoog, SAS, to representatives of United Airlines, Air Canada, Lufthansa Cargo and VARIG (Dec. 13, 1999) [LH_CIV_0110116].
[51]   E-mail from Robert Skoog, SAS, to representatives of United Airlines, Air Canada, Lufthansa Cargo and VARIG (Dec. 13, 1999) [LH_CIV_0110116].

44.     On December 31, 1999 – prior to IATA's filing for approval of Resolution 116ss with the U.S. DOT – UA informed its competitors that it planned to impose a Fuel Surcharge of USD 0.10 per kilogram effective February 1, 2000.[52]

45.     On January 5, 2000, a group called "Global Cargo Carriers, Inc." or "GCCI" held a "special meeting" to discuss implementation of the Fuel Surcharge.[53]  A representative of UA attended the meeting, along with representatives from Air Macau, Alitalia, Asiana Airlines, Cargolux, Continental Airlines, Continental Micronesia, Emirates, Gulf Air, Japan Airlines, KLM, Korean Air, Kuwait Airlines, Malaysian Airlines System, Nippon Cargo Airlines, Northwest Airlines, Pakistan International Airlines, Philippine Air Lines, Saudi Arabian Airlines, Singapore Airlines, Thai Airways and United Parcel Service ("UPS").[54]  The stated goal of GCCI was "to be able to interact, communicate & share helpful information."[55]  And although GCCI claimed that "[t]he concentration of the meetings does not focus on the pricing/rates of each airline but to discuss what is happening to the group and the industry," one of the key functions of GCCI was to coordinate implementation of the Fuel Surcharge.[56]  Indeed, the purpose of the "special meeting" on January 5 was to discuss how to implement the Fuel Surcharge.[57]

46.     On January 11, 2000, representatives from UA, Air Canada, Air France, Cargolux, KLM, Korean Air, Lufthansa Cargo, Martinair, Nippon Cargo, SAS, Singapore Air, South African Airways, Thai Airways and VARIG attended a "Market Analysis" meeting.[58]

---

[52]   Chart, Lufthansa Cargo, *Treibstoffzuschlag / Fuel Surcharge ab 01.02.2000* (Feb. 1, 2000) [LH_CIV_0002265].
[53]   Minutes of Monthly Meeting, Global Cargo Carriers, Inc. (Jan. 27, 2000) [LH_CIV_0240821].
[54]   Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Jan. 27, 2000) [LH_CIV_0240821].
[55]   Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Jan. 27, 2000) [LH_CIV_0240821].
[56]   Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1-2 (Jan. 27, 2000) [LH_CIV_0240821].
[57]   Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 2 (Jan. 27, 2000) [LH_CIV_0240821].
[58]   E-mail from Sales Manager, Asia & Australia, Lufthansa Cargo, to representatives of United Airlines, Air Canada, Air France, Cargolux, KLM, Korean Air, Lufthansa Cargo, Martinair, Nippon Cargo, SAS, Singapore Air, South African Airways, Thai Airways and VARIG (Jan. 11, 2000) (certified translation) [LH_CIV_0002255].

-19-

Upon information and belief, the attendees, including UA, discussed implementation of the Fuel Surcharge and other competitively sensitive topics.

47.     IATA submitted its application for approval of Resolution 116ss to the U.S. DOT on January 28, 2000, when fuel prices first exceeded the initial threshold of Resolution 116ss.[59]

## III.   Implementation of the Illegal Fuel Surcharges

48.     Without waiting for a response from the U.S. DOT, and in accordance with the joint discussions set forth above, UA and other cartel members started charging DHL a Fuel Surcharge of USD 0.10 per kilogram on February 1, 2000, pursuant to the terms of Resolution 116ss.[60]  The other Airfreight Carriers were not limited to UA's Alliance, and included Air France, British Airways, Cargolux, KLM and Korean Air.  UA and the other Airfreight Carriers charged DHL and DHL paid this Fuel Surcharge for U.S. Airfreight Shipping Services.

49.     The Airfreight Carriers staggered the implementation of the Fuel Surcharge giving the impression to DHL that the Cartel members were acting unilaterally and not pursuant to a cartel agreement.  For example, Lufthansa Cargo's Fuel Surcharge went into effect on February 1, 2000,[61] Asiana's on February 7, 2000,[62] and UA's on February 15, 2000.[63]

---

[59]   IATA, Application for Approval of Agreements by the Int'l Air Transport Ass'n to the U.S. Dep't of Transp., Docket OST-2000-6837-1, at 2 (Jan. 28, 2000).
[60]   Chart, Lufthansa Cargo, *Treibstoffzuschlag / Fuel Surcharge ab 01.02.2000* (Feb. 1, 2000) [LH_CIV_0002265]; Chart, Lufthansa Cargo, *Airlines Übersicht zur Fuel Surcharge* (Feb. 24, 2000) [LH_CIV_0002272].  *See also* Press Release, Air France, *Air France Cargo Implements Fuel Surcharge as from 1st February 2000* (Dec. 20, 1999) [LH_CIV_0104424]; Press Release, Lufthansa Cargo, *Lufthansa Cargo Announces Fuel Surcharge Increase* (Dec. 28, 1999) (unofficial translation) [LH_CIV_0001158]; Letter from Regional Manager Sales, Arabian Peninsula and Iran, Lufthansa Cargo, to Customer (Dec. 29, 1999); Memorandum from a Lufthansa Cargo employee (Jan. 7, 2000) (unofficial translation) [LH_CIV_0001151]; Minutes, Lufthansa Cargo Executive Board Meeting (Dec. 21, 1999) (unofficial translation) [LH_CIV_0001153]; Fax from Nick Jeker, IATA, to All IATA Approved Cargo Agents & Branch Offices, at 4 (Jan. 14, 2000) [LH_CIV_0004408].
[61]   Lufthansa Cargo News, Lufthansa Cargo introducing fuel surcharge Effective from February 2000 for the entire route network (Dec. 28, 1999) [LH_CIV_0031101].
[62]   Chart, GCCI, Fuel Surcharge Update (Mar. 10, 2000) [LH_CIV_0240823].
[63]   *See* ANA00057287

50.    On February 24, 2000, GCCI held another meeting, this time at "Dekkers Lounge."[64]  A representative of UA attended the meeting, along with representatives from Air France, Air Macau, Alitalia, American Airlines, British Airways, Cargolux, Cathay Pacific, China Airlines, Canadian Airlines International, Continental Micronesia, Federal Express, Japan Airlines, Korean Airlines, Kuwait Airlines, Nippon Cargo Airlines, Northwest Airlines, Saudi Arabian Airlines, Thai Airways and UPS.[65]  The first item discussed was the Fuel Surcharge.[66] The Airfreight Carriers also discussed other competitively sensitive issues, such as capacity and flight frequency.[67]  The next GCCI meeting was scheduled for March 16, 2000, and the group planned to meet on the third Thursday of each month thereafter.[68]

51.    On March 14, 2000, the U.S. DOT emphatically rejected IATA's application for approval of Resolution 116ss, stating that the resolution was anticompetitive and was not necessary to cover increased fuel costs:

> We are not inclined to accept this continuing, IATA-agreed worldwide industry mechanism that automatically triggers rate increases when certain criteria are met as a method to offset increased fuel costs. . . .  We have [ ] decided to disapprove Resolution 116ss.
>
> The uniform, industry-wide index mechanism proposed here appears *fundamentally flawed and unfair* to shippers and other users of cargo air transportation.  If the price of fuel spikes long enough to trigger a rate increase and then declines, but not enough to trigger its suspension, then shippers and users could be subjected, through this mechanism, to unjustified and unwarranted rate increases. . . .
>
> Moreover, IATA's proposed index mechanism, which reflects the volatile nature of the spot market, is at best an imperfect measure of the impact of fuel price increases on carriers.  Most carriers

---

[64]    Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Feb. 24, 2000) [LH_CIV_0240825].
[65]    Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Feb. 24, 2000) [LH_CIV_0240825].
[66]    Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Feb. 24, 2000) [LH_CIV_0240825].
[67]    Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Feb. 24, 2000) [LH_CIV_0240825].
[68]    Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Feb. 24, 2000) [LH_CIV_0240825].

employ fuel hedging programs which they use to limit the effects of jet fuel price volatility and thus discipline their costs.  Indeed, under these programs, many prudent carriers manage to hedge between 70-80 percent of their total fuel needs.  To illustrate, . . . the difference between the average actual fuel prices, as reported to the Department [by IATA], measured between June 1996 and November 1999, "increased about six percent, while IATA's index, based on spot market prices, showed a 34 percent increase over the same period.  In these circumstances, the proposed mechanism cannot receive our approval.[69]

52.      Because of the U.S. DOT's rejection, the Airfreight Carriers had no antitrust immunity for charging the Fuel Surcharges to which they had agreed when they approved Resolution 116.

53.      On March 21, 2000, IATA's Director of Tariff Services circulated the U.S. DOT's rejection to members participating in the Tariff Coordinating Conferences,[70] which included UA.  And on April 6, 2000, he told members of the Tariff Coordinating Conferences that IATA would no longer publish an FPI.[71]

54.      On April 14, 2000, IATA's  Managing Director, Distribution Services, sent a letter to Cargo Committee members, including UA,  regarding the potential liability for following the FPI as described in Resolution 116ss:

> The Index has now become tainted by the DoT order finding Resolution 116ss, to which the Index was linked, to be adverse to the public interest and in violation of law.  If the carriers were to coordinate pricing by reference to the Index, whether pursuant to this disapproved Resolution or simply through de facto parallel pricing actions, that could be regarded as an illegal conspiracy in violation of applicable Competition laws, whether the Index is published by IATA, PLATTS, or indeed, simply calculated by each of the carriers independently.  Against that background, IATA has no choice but to discontinue all activity associated with

---

[69]   Order, U.S. Dep't of Transportation, Docket OST-2000-6837-2, at 2 (Mar. 17, 2000) (emphasis added).
[70]   Memorandum from Director, Tariff Services, IATA, to Members Participating in Tariff Coordinating Conferences (Mar. 21, 2000).
[71]   Summary of Action, IATA Cargo Committee 14th Meeting, at 10 (Apr. 4, 2000); Memorandum from Senor Director, Tariff Services, IATA, to Members Participating in Cargo Tariff Coordinating Conferences (Apr. 7, 2000).

the disapproved Resolution, including calculation and dissemination of the Fuel Price Index, and it has done so.  Because any further pricing actions linked to the now tainted Index could expose the carriers engaging in such pricing actions to serious antitrust liability, we must advise that carriers not engage in any pricing actions tied to the Index.  As there is no further legitimate or lawful use to be made of the Index, we also recommend that carriers refrain from approaching any third party requesting them to calculate and publish the Index.[72]

55.     In light of the DOT's emphatic rejection of Resolution 116ss and IATA's response to that rejection, no reasonable observer aware of the DOT's rejection would have believed that the Airfreight Carriers would continue to jointly implement Resolution 116ss, but that is just what UA and the other cartel members did, although they staggered implementation dates, giving the appearance that the increases were the result of unilateral action and not a cartel.

56.     Notwithstanding IATA's warning about antitrust liability, UA, in concert with the other cartel members (including, but not limited to, Air France, British Airways, Cargolux, KLM and Korean Air), continued to charge DHL and other freight forwarders the same Fuel Surcharge as if Resolution 116ss had been approved.  To keep the cartel going, the cartel members secretly agreed that the Lufthansa Cargo FPI would replace the IATA FPI for the purpose of deciding when to increase Fuel Surcharges.  The Lufthansa Cargo FPI was substantially the same as the IATA FPI, although it used different numerical values to prevent detection of the Cartel agreement.  Other Airfreight Carriers either followed the Lufthansa Cargo FPI or published what purported to be their own FPIs, but were substantially the same as the IATA and Lufthansa Cargo FPIs.  In practice, all of the published FPIs resulted in coordinated increases of Fuel

---

[72]   Memorandum from Managing Director, Distribution Services, IATA, to Members, IATA Cargo Committee (Apr. 14, 2000).

Surcharges, although the precise dates of increases by different cartel members were staggered to mask what in substance was illegal cartel conduct.

57.     On March 23, 2000, UA, Asiana, Cargolux, China Airlines, Japan Airlines, Korean Air, Lufthansa Cargo, Malaysian Airlines, Northwest Airlines, Swissair, and Thai, among others, met at a GCCI meeting and discussed, among other things, an "UPDATE ON FUEL SURCHARGE."[73]   The Airfreight Carriers also held a "MARKET UPDATE," during which the attendees shared with each other competitively sensitive information, such as capacity and base-freight rates.[74]

58.     On April 4, 2000, the IATA Cargo Committee met in Vancouver, British Columbia, Canada.[75]   A representative of UA attended the meeting.[76]   Resolution 116ss and the FPI were discussed.[77]   In addition, the Airfreight Carriers, including UA, continued to charge Fuel Surcharges as if the Resolution had been approved by the U.S. DOT.[78]

59.     On April 6, 2000, the Singapore BAR CSC held a meeting to discuss, among other things, the Fuel Surcharge.[79]   The Chairman "informed that [participants] that BAR will not recommend a standard fuel surcharge for all airlines operating in Singapore as it would be construed by the CAAS, the shippers and the public that the airlines are common-pricing their cargo rates."[80]   In fact, however, the participants continued to charge fuel surcharges that were substantially the same pursuant to the cartel agreement – Resolution 116ss.

---

[73]   Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Mar. 23, 2000) (emphasis in original) [LH_CIV_0240815].
[74]   Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 2 (Mar. 23, 2000) [LH_CIV_0240815] (emphasis in original).
[75]   Agenda & Documentation, IATA Cargo Committee, 14th Meeting (Apr. 4, 2000).
[76]   Summary of Action, IATA Cargo Committee 14th Meeting, at 8 (Apr. 4, 2000).
[77]   Summary of Action, IATA Cargo Committee 14th Meeting, at 10 (Apr. 4, 2000).
[78]   Agenda & Documentation, IATA Cargo Committee, 14th Meeting, at 2, 15 (Apr. 4, 2000).
[79]   Minutes, Singapore BAR CSC, at 1 (Apr. 6, 2000) [QAL-01-194703].
[80]   Minutes, Singapore BAR CSC, at 2 (Apr. 6, 2000) [QAL-01-194703].

60.     Later in 2000, UA and the other cartel members – in a coordinated, largely parallel fashion (but with staggered implementation dates to mask the cartel) – increased the Fuel Surcharge to DHL from USD 0.10 per kilogram to USD 0.15 per kilogram in accordance with Resolution 116ss.[81]  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

61.     The Airline Cargo Council of Switzerland ("ACCS") met on January 17, 2001, at the Unique Centre Airport in Zurich, Switzerland.[82]  UA attended the meeting, as did British Airways, KLM, Lufthansa Cargo and other Airfreight Carriers that have pled guilty to criminal price fixing in violation of U.S. law.[83]  One of the topics discussed was whether to decrease the Fuel Surcharge in accordance with the Lufthansa Cargo's FPI and Resolution 116ss when fuel prices dropped.[84]  Ultimately, the Airfreight Carriers implemented – in a coordinated and largely parallel fashion (but with staggered implementation dates) – this Fuel Surcharge decrease to maintain the cartel.[85]  Despite this decrease, the Fuel Surcharge still exceeded – and was unnecessary to recover – the actual fuel-related costs of UA and the other Airfreight Carriers. Air France "unofficially confessed" to Swissair that it regretted decreasing the Fuel Surcharge.[86]

62.     On February 1, 2001, the Singapore BAR CSC held a meeting.[87]  UA, Air France, Asiana Airlines, Cargolux, Cathay Pacific, China Airlines, Japan Airlines, Nippon Cargo

---

[81]   Press Release, United Airlines Cargo, *Fuel Surcharge Increase – U.S.A. / Puerto Rico / Canada* (July 2000) [SIA_CIV_0023809].  *See also* Letter from Larry W. Schneider, Manager, Marketing & Freight Planning, TA, Qantas Airways Ltd., to Steve Concannon, Director of Strategic Alliances, Nippon Express USA, Inc. (May 10, 2000); E-mail between Lufthansa Cargo employees (Nov. 9, 2001) (unofficial translation) [LH_CIV_0000005].
[82]   Minutes, 27th ACCS Meeting (Jan. 17, 2001) [LH_CIV_0007440].
[83]   Minutes, 27th ACCS Meeting, at 1 (Jan. 17, 2001) [LH_CIV_0007440].
[84]   Minutes, 27th ACCS Meeting, at 3 (Jan. 17, 2001) [LH_CIV_0007440].
[85]   E-mail between Swissair employees (Feb. 26, 2001) [LH_CIV_0007440].
[86]   E-mail between Swissair employees (Feb. 26, 2001) [LH_CIV_0007440].
[87]   Minutes, Singapore BAR CSC (Feb. 1, 2001) [QAL-01-195000].

-25-

Airlines, SAS, Singapore Air, and Thai Airways, among others, attended.[88]  The Airfreight

Carriers discussed the Fuel Surcharge.[89]  In addition, the attendees discussed base rates.[90]

**IV.**     **The Agreement to Revise the Fuel Surcharges**

63.     In late 2001, the FPI fell to a level that, under Resolution 116ss, required that the

Fuel Surcharge be suspended.  However, to preserve the supracompetitive profits generated by

the Fuel Surcharge, the Airfreight Carriers engaged in a series of conversations about

recalibrating the FPI mechanism so that the Fuel Surcharges would remain in effect.  UA was

integrally involved in these discussions, which were not limited to Lufthansa Cargo, UA and

SAS, but which also included at least Air France and KLM.[91]

64.     On December 3, 2001, a member of UA's Industry Affairs department wrote to

two Lufthansa Cargo employees.[92]  The UA e-mail referenced UA's Alliance with Lufthansa,

but also noted that Fuel Surcharges have not been limited to the Lufthansa-UA Alliance, stating

that "across the industry we have successfully implemented surcharges."[93]  The UA e-mail

further notes that "although the surcharge was introduced to offset 'real' fuel costs, that revenue

has contributed significantly to our falling revenues" and "bottom line and we are not prepared to

lose it."[94]

---

[88]   Minutes, Singapore BAR CSC, at 1 (Feb. 1, 2001) [QAL-01-195000].
[89]   Minutes, Singapore BAR CSC, at 2 (Feb. 1, 2001) [QAL-01-195000].
[90]   Minutes, Singapore BAR CSC, at 2 (Feb. 1, 2001) [QAL-01-195000].
[91]   *See, e.g.*, E-mail from General Manager of Pricing, Lufthansa Cargo, to Lufthansa Cargo employee (Jan. 15, 2002) [LH_CIV_0000015].
[92]   E-mail from an Industry Affairs employee, United Airlines Cargo, to Lufthansa Cargo employees (Nov. 30, 2001) [LH_CIV_0098468].
[93]   E-mail from an Industry Affairs employee, United Airlines Cargo, to Lufthansa Cargo employees (Nov. 30, 2001) [LH_CIV_0098468].
[94]   E-mail from an Industry Affairs employee, United Airlines Cargo, to Lufthansa Cargo employees (Nov. 30, 2001) (emphasis added) [LH_CIV_0098468].  Although the UA employee attempted to protect this discussion by invoking Lufthansa and UA's "Anti-trust Alliance," as discussed above, joint imposition of a Fuel Surcharge does not qualify for any sort of antitrust immunity.  *See also* All Cargo News, *UAL Cuts Cargo Fuel Surcharge to 10 Cts, Ups Inbound Rates, Jan 1* (Nov. 22, 2001) [LH_CIV_0102577]; All Cargo News, *Swissair Says No Plans to Lower Cargo Fuel Surcharge* (Nov. 22, 2001) [LH_CIV_0102577] ("KLM and Northwest have both said they will scrap

65.     The Airfreight Carriers, after a number of communications, ultimately agreed to alter the mechanism for setting the Fuel Surcharge so that the Fuel Surcharge remained in effect.[95]  The new methodology that the cartel members (including UA) adopted was, like Resolution 116ss, based on the FPI benchmarked to the June 1996 average spot price of aviation fuel as set forth on the Lufthansa website.  But the new methodology had different thresholds for increases and decreases in the Fuel Surcharge.  It worked as follows:

- FPI **exceeds 115** for 2 consecutive weeks:  Fuel Surcharge implemented at $0.05/kg
- FPI **exceeds 135** for 2 consecutive weeks:  Fuel Surcharge adjusted to $0.10/kg
- FPI **exceeds 165** for 2 consecutive weeks:  Fuel Surcharge adjusted to $0.15/kg
- FPI **exceeds 190** for 2 consecutive weeks:  Fuel Surcharge adjusted to $0.20/kg
- FPI **below 170** for 2 consecutive weeks:  Fuel Surcharge reduced to $0.15/kg
- FPI **below 145** for 2 consecutive weeks:  Fuel Surcharge reduced to $0.10/kg
- FPI **below 120** for 2 consecutive weeks:  Fuel Surcharge reduced to $0.05/kg
- FPI **below 100** for 2 consecutive weeks:  Fuel Surcharge suspended[96]

As the FPI subsequently increased, Lufthansa Cargo announced additional thresholds each time the FPI reached the then-highest threshold.

66.     Although the new methodology, like the previous methodology, was based on the FPI published by Lufthansa Cargo, several Airfreight Carriers, including UA, published their own FPIs which were substantially the same as Lufthansa's.[97]  By doing so, UA masked its participation in the Cartel, even though the UA index was merely a reproduction of the Lufthansa Cargo FPI using slightly different numbers to give the appearance of unilateral action.

---

their cargo fuel surcharges on December 1, while United Airlines will cut its surcharge to 10 cents from 15 cents on January 1.").

[95]  E-mail between Lufthansa Cargo employees (Nov. 9, 2001) (unofficial translation) [LH_CIV_0000005].

[96]  E-mail from General Manager of Pricing, Lufthansa Cargo, to Lufthansa Cargo employee (Jan 15, 2002) (unofficial translation) [LH_CIV_0000015]; E-mail from General Manager of Pricing, Lufthansa Cargo, to Vice President of Sales for Asia-Pacific, Lufthansa Cargo (Jan 15, 2002) (unofficial translation) [LH_CIV_0000021]; E-mail from General Manager of Pricing, Lufthansa Cargo, to several Lufthansa Cargo employees (Jan. 16, 2002) [LH_CIV_0000315].

[97]  *See* E-mail between American Airlines employees (Aug. 15, 2005) [AAC0046855].

67.     Lufthansa Cargo's communications with respect to the new methodology were not limited to communications with Alliance members, and UA knew this.  Indeed, one of the e-mails sent by Lufthansa Cargo discussing the new methodology was jointly addressed to UA, Air China, Air France, Cargolux, Cathay Pacific, Japan Airlines, Korean Air, Singapore Air, South African Airways, Thai Airways and VARIG, most of which subsequently pled guilty to criminal price fixing.[98]  Additional coordination regarding implementation of the new methodology took place between and among Air France, British Airways, KLM, Lufthansa Cargo, Qantas, SAS and Singapore Air.[99]

68.     When Lufthansa Cargo publicly announced the new methodology on January 23, 2002, it misleadingly claimed that the new FPI was "much more closely linked to the actual developments of fuel prices than the previous [Fuel Surcharge]" and the new FPI "still leaves Lufthansa Cargo exposed to high financial risks arising from strongly fluctuating fuel prices.[100] In reality, the Fuel Surcharges imposed were not "linked" to fuel costs except in a most superficial way, and the Airfreight Carriers were not "exposed to high financial risks" because the Fuel Surcharges over-recovered for any increases in fuel costs.

---

[98]   E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of United Airlines, Air China, Air France, Cathay Pacific, Cargolux, Japan Airlines, Korean Air, Singapore Air, South African Airways, Thai Airways and VARIG (Jan. 22, 2002) [LH_CIV_0029865].

[99]   E-mail from Michel Iagier, Air France, to representatives of Lufthansa Cargo and Qantas Airways (Apr. 9, 2002); E-mail from General Manager of Pricing, Lufthansa Cargo, to Vice President of Sales for Asia-Pacific, Lufthansa Cargo (Jan. 15, 2002) (unofficial translation) [LH_CIV_0000021]; E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Jan. 25, 2002) (unofficial translation) [LH_CIV_0000027].

[100]  Lufthansa Cargo News, Lufthansa Cargo introduces new fuel surcharge calculation method More closely linked to kerosene price / Risk remains with the airline (Jan 23, 2002) [LH_CIV_0000321]; E-mail between Lufthansa Cargo employees (Jan. 21, 2002) [LH_CIV_0029983] (pasting an announcement of Lufthansa Cargo's new FPI).

**V.**    **Implementation of the Revised Fuel Surcharges**

69.    The new methodology was implemented in a coordinated fashion by Lufthansa

Cargo and UA,[101] as well as by Airfreight Carriers outside UA's Alliance, such as Air France

and Singapore Air, both of which subsequently pled guilty to criminal price-fixing in violation of

U.S. law.[102]  Other Airfreight Carriers adopted the new methodology and also began charging

customers, including DHL, a Fuel Surcharge of USD 0.05 per kilogram but staggered the

implementation dates, concealing the parallel conduct.[103]

70.    To disguise its participation in the cartel, UA adopted its own "Jet Fuel Index" in

July 2002.[104]  The UA index was the same as the IATA/Lufthansa FPI, except UA's index did

not disclose how it actually calculated its index.  For example, UA did not disclose the

geographical markets it used as proxies for the spot price of aviation fuel, nor did UA disclose

the year to which its index is benchmarked.  The UA index was thus a façade to help UA

maintain the appearance of acting unilaterally.

71.    Representatives of eight major Airfreight Carriers, including Air France, British

Airways, KLM and Lufthansa Cargo met confidentially on September 30, 2002, in Japan to

discuss their long term "status, plans and views regarding FSC."[105]  Although UA did not attend

the meeting, its Alliance partner, Lufthansa Cargo, acting as one of the primary facilitators of the

cartel, did.  All eight Airfreight Carriers that attended the meeting mutually agreed that there

---

[101] E-mail from an Industry Affairs employee, United Airlines Cargo, to Lufthansa Cargo employees (Nov. 30, 2001) [LH_CIV_0098468].
[102] See, e.g., E-mail from General Manager of Pricing, Lufthansa Cargo, to Vice President of Sales for Asia-Pacific, Lufthansa Cargo (Jan. 15, 2002) (unofficial translation) [LH_CIV_0000021].
[103] Lufthansa Cargo News, Lufthansa Cargo to introduce Fuel Surcharge of 0.05 euros (Mar. 28, 2002) [LH_CIV_0042858]; Letter from Senior Vice President of Sales, Lufthansa Cargo, to Partners and Customers [LH_CIV_0030639]; Newsflash, British Airways World Cargo, British Airways World Cargo to Implement Fuel Surcharge (Apr. 9, 2002) [QAL-01-209152]; E-mail from Jassim Saif, Emirates (Apr. 9, 20002) [LH_CIV_0148256];  Letter from KLM Cargo Management to Customer (Apr. 3, 2002) [LH_CIV_0192106].
[104] Press Release, United Airlines Cargo (Feb. 25, 2003) [LH_CIV_0040133]; United Airlines Cargo, *Jet Fuel Index* (Aug. 9, 2004).
[105] E-mail between Lufthansa Cargo employees (Sept. 30, 2002) [LH_CIV_0001210].

should be "no exceptions" to the imposition of the Fuel Surcharge because "[a]llowing one

exception [would] defeat the whole industrial movement.  This means, of course, no adjustments

in net/net rates, either whole or partial."[106]  In addition, the Airfreight Carriers established

"[c]lose hotlines . . . with immediate effect among today's participants in case of doubt and

contradicting/misleading market information."[107]

72.    In accordance with the new methodology, the Airfreight Carriers, including UA,

acted in concert by increasing the Fuel Surcharge by USD 0.05 per kilogram to USD 0.10 per

kilogram effective on or about September 23, 2002.[108]  The Airfreight Carriers staggered the

effective date of this Fuel Surcharge increase, conveying the false impression that they were

acting unilaterally.[109]

73.    In February 2003, Lufthansa Cargo held discussions with Air France and KLM

regarding increasing the Fuel Surcharge effective in March 2003.[110]  Following these

discussions, on February 17, 2003, Lufthansa Cargo announced that it would increase its Fuel

---

[106] E-mail between Lufthansa Cargo employees (Sept. 30, 2002) [LH_CIV_0001210].
[107] E-mail between Lufthansa Cargo employees (Sept. 30, 2002) [LH_CIV_0001210].
[108] E-mail from Vice President for Central, Southern & Eastern Europe, Swiss WorldCargo, to ACCS Members (Sept. 11, 2002) [LH_CIV_0005415] (noting that UA had confirmed that it would implement the Fuel Surcharge increase as of September 23, 2001).  See also Press Release, British Airways World Cargo, British Airways World Cargo to Increase Fuel Surcharge (Sept. 6, 2002); Press Release, Lufthansa Cargo, Fuel Surcharge (undated); Press Release, KLM, KLM Cargo Introduces Fuel Surcharge and Security Surcharge Based on Actual Weight Per October 1st (Sept. 16, 2002).
[109] Newsflash, British Airways World Cargo To Increase Fuel Surcharge (Sept. 6, 2002) [QAL-01-176977]; Lufthansa Cargo News, Lufthansa Cargo to introduce Fuel Surcharge of 0.10 euros per kilo of actual freight weight on September 23, 2002 (Sept. 5, 2002) [LH_CIV_0031089];  E-mail from Rolf Holderegger, Air Canada, to ACCS Members (Sept. 12, 2002) [LH_CIV_0005426]; Newsletter, KLM Cargo introduces fuel surcharge and security surcharge based on actual weight per October 1st (Sept. 16, 2002) [QAL-01-214167].
[110] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation) [LH_CIV_0000101]; E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (certified translation) [LH_CIV_0001670]; E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 13, 2003) (unofficial translation) [LH_CIV_0000105]; E-mail between Lufthansa Cargo employees (Feb. 14, 2003) (certified translation) [LH_CIV_0031550] (cutting and pasting an e-mail from Otto Meyer, Air France); E-mail from General Manager of Pricing, Lufthansa Cargo, to Kenneth Marx, SAS Cargo (Feb. 17, 2003) [LH_CIV_0040154].

Surcharge by USD 0.05 per kilogram to USD 0.15 per kilogram effective March 3, 2003.[111]  Air France and KLM also announced that they would impose the same Fuel Surcharge increase on the same date.[112]  The announcement and implementation of this increase was coordinated by e-mails between and among at least the following Airfreight Carriers:  UA, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, LAN Cargo, Lufthansa Cargo, SAS, Singapore Air, South African Airways, Thai Airways and VARIG.[113]

74.    Later that month, in mid-February 2003, UA discussed with Lufthansa Cargo raising the Fuel Surcharge.[114]  At the same time Lufthansa Cargo was also discussing raising the Fuel Surcharge with various Airfreight Carriers, including KLM and Air France.[115]  For example, Lufthansa Cargo's General Manager for Pricing wrote, "I have just spoken to KLM. ([Another Lufthansa Cargo employee] supplied me the name of the contact person there).  They also intend to announce on March 01 or 03. . . .  SAS and United are also doing so."[116]

75.    In furtherance of those February discussions, UA and the other cartel members, in a coordinated fashion, raised the Fuel Surcharge another USD 0.05 per kilogram effective in mid-March 2003 to USD 0.15 per kilogram, and by another USD 0.05 per kilogram in late

---

[111] E-mail between Lufthansa Cargo employees (Feb. 17, 2003) [LH_CIV_0001240].
[112] *See*, *e.g.*, E-mail from General Manager of Pricing, Lufthansa Cargo, to Kenneth Marx, SAS Cargo (Feb. 17, 2003) [LH_CIV_0040154].
[113] *See*, *e.g.*, E-mail from General Manager of Pricing, Lufthansa Cargo, to Kenneth Marx, SAS Cargo (Feb. 17, 2003) [LH_CIV_0040154]; E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of United Airlines, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, LAN Cargo, SAS, Singapore Air, South African Airways, Thai Airways and VARIG (Feb. 17, 2003) (unofficial translation) [LH_CIV_0160688].
[114] *See*, *e.g.*, E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation) [LH_CIV_0001168].
[115] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation) [LH_CIV_0001168]; E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 13, 2003) (unofficial translation) [LH_CIV_0000105].
[116] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation) [LH_CIV_0001168].

March, bringing the Fuel Surcharge to USD 0.20 per kilogram.[117]  As before, the Airfreight

Carriers staggered the precise date of the increase, disguising the cartel.[118]  DHL was subject to

and paid both Fuel Surcharges to UA and its co-conspirators for U.S. Airfreight Shipping

Services.  Prior to the late-March increase, on March 10, 2003, Lufthansa Cargo sent a pre-issue

version of its press release in an e-mail jointly addressed to UA, Air Canada, Air China, Air

France Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, LAN

Cargo, Martinair, SAS, Singapore Air, South African Airways, Thai Airways and VARIG.[119]

Thus, Lufthansa Cargo was facilitating the cartel, and the cartel members, including UA, knew

Lufthansa Cargo was doing so.

76.     On April 1, 2003, as the price of aviation fuel was dropping, Lufthansa Cargo met

with nine other Airfreight Carriers, including Air France, KLM and Korean Air, to discuss

adjusting the Fuel Surcharges downward.[120]  Although UA did not attend the meeting, its

Alliance partner Lufthansa Cargo, serving as one of the primary facilitators of the cartel, did.

Upon information and belief, Lufthansa Cargo discussed with UA the same Fuel Surcharge

issues that it had just discussed with the other Airfreight Carriers.

---

[117] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation) [LH_CIV_0000101]; E-mail from Global Pricing Manager, Lufthansa Cargo, to Distribution List (Apr. 8, 2003); E-mail from Pricing Manager for The Americas, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Mar. 14, 2003) (unofficial translation) [LH_CIV_0001687]. *See also* Press Release, Lufthansa Cargo, *Continuing Rise in Crude Oil Prices Leads to New Increase in Fuel Surcharge* (Mar. 10, 2003) [LH_CIV_0000370]; Customer Newsletter, KLM Cargo, *KLM Cargo Increases Fuel Surcharge, Effective March 24* (Mar. 11, 2003); Press Release, British Airways, *British Airways World Cargo Increases Fuel Surcharge* (Mar. 13, 2003) [LH_CIV_0001173].

[118] Lufthansa Cargo News, Continuing Rise in Crude Oil Prices Leads to New Increase in Fuel Surcharge (Mar. 10, 2003) [LH_CIV_0030098]; Customer Newsletter, KLM Cargo, KLM Cargo Increases Fuel Surcharge, Effective March 24 (Mar. 11, 2003) [QAL-01-168247]; Press Release, British Airways World Cargo, British Airways World Cargo Increases Fuel Surcharge (Mar. 13, 2003) [LH_CIV_0001173]; Agenda, GCCI (Mar. 27, 2003) [LH_CIV_0240795] (showing Saudia charging USD 0.20 effective in April).

[119] E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of United Airlines, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, LAN Cargo, Martinair, SAA, SAS, Singapore Air, Thai Airways and VARIG (Mar. 10, 2003) (unofficial translation) [LH_CIV_0147783].

[120] E-mail between Lufthansa Cargo employees (Apr. 2, 2003) [LH_CIV_0001242].

77.    Shortly after the April meeting, the Airfreight Carriers, including UA, reduced their Fuel Surcharges by USD 0.05 per kilogram to USD 0.15 per kilogram in a coordinated and generally parallel manner.[121]   DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

78.    And in May 2003, the Airfreight Carriers, including UA, again in a coordinated and parallel fashion, reduced their Fuel Surcharge by USD 0.05 per kilogram to USD 0.10 per kilogram.[122]   Despite this reduction, the Fuel Surcharge still exceeded – and was unnecessary to recover – the actual fuel-related costs of UA and the other Airfreight Carriers.  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.  Before the Airfreight Carriers announced this last reduction, Lufthansa Cargo's General Manager for Pricing wrote to UA on April 22, 2003, to inform UA that Lufthansa Cargo would announce the Fuel Surcharge decrease later that day effective May 6, 2003.[123]   UA responded:  "Our date will be May 5, 2003."[124]

79.    When fuel prices subsequently began to rise, Lufthansa Cargo again served as a clearinghouse for communications between the Airfreight Carriers, including, but not limited to, UA.[125]

80.    In early December 2003, Lufthansa Cargo's General Manager for Pricing noted that he had coordinated an increase in the Fuel Surcharge with UA, American Airlines, British

---

[121]  E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Apr. 11, 2003) (unofficial translation) [LH_CIV_0001176].  *See also* Press Release, Lufthansa Cargo, *Reduce Fuel Surcharge* (Apr. 8, 2003); Press Release, British Airways, *British Airways World Cargo Decreases Fuel Surcharge* (Apr. 10, 2003) [LH_CIV_0001176].

[122]  E-mail from General Manager of Pricing, Lufthansa Cargo, to two employees of United Airlines (Apr. 22, 2003) [LH_CIV_0051295].  *See also* Presentation, Lufthansa Cargo, *Cargolux*, at 18 (July 14, 2003) [LH_CIV_0196428].

[123]  E-mail from General Manager of Pricing, Lufthansa Cargo, to two employees of United Airlines (Apr. 22, 2003) [LH_CIV_0051295].

[124]  E-mail from an employee of United Airlines to General Manager of Pricing, Lufthansa Cargo (Apr. 22, 2003) [LH_CIV_0051295].

Airways, Cargolux, Japan Airlines, KLM and SAS.[126]  UA and other Airfreight Carriers imposed – in a coordinated and parallel fashion – a Fuel Surcharge of USD 0.15 per kilogram effective on or about December 16, 2003.[127]  The effective dates of the increase were staggered, thereby disguising the Cartel.  For example, UA implemented the increase to USD 0.15 per kilogram on December 16,[128]  British Airways implemented the increase effective December 18,[129] KLM on January 1,[130] Air France on January 15,[131] and Air Canada on January 19.[132]  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

81.     In late April 2004, Lufthansa Cargo facilitated a coordinated and parallel increase in the Fuel Surcharge among cartel members, including UA, to USD 0.20 per kilogram effective on or around May 2004.[133]  Part of Lufthansa Cargo's coordination included an e-mail jointly addressed to representatives of UA, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, EVA Air, Japan Airlines, KLM, Korean Air, LAN Cargo, Martinair,

---

[125]  E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Dec. 4, 2003) [LH_CIV_0000042].

[126]  E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Dec. 4, 2003) [LH_CIV_0000042].  *See also* E-mail between Lufthansa Cargo employees (Dec. 11, 2003) [LH_CIV_0001197]; E-mail between Lufthansa Cargo employees (Dec. 4, 2003) [LH_CIV_0000042].

[127]  Letter from Tom Wong, Chairman, Hong Kong Board of Airline Representatives, to Amy Poon, Acting Senior Operations Officer (Air Services), Civil Aviation Department, Hong Kong (Dec. 5, 2003) [LH_CIV_0148576] (attaching a list of Airfreight Carriers, including UA, that planned to increase the Fuel Surcharge in December 2003).  *See also* Customer Newsletter, KLM Cargo, *KLM Cargo increases fuel surcharge to Euro 0.15* (Dec. 16, 2003) [LH_CIV_0159207]; Press Release, American Airlines Cargo, *American Airlines Cargo Division Announces Increase in Fuel Surcharge* (Dec. 3, 2003) [LH_CIV_0005544]; E-mail between Swiss WorldCargo employees (Dec. 23, 2003) [LH_CIV_0005622]; E-mail between Swiss WorldCargo employees (Dec. 23, 2003) [LH_CIV_0005624]; E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Dec. 4, 2003) [LH_CIV_0000042]; E-mail between Lufthansa Cargo employees (Dec. 9, 2003) [LH_CIV_0189513].

[128]  See ANA00012369.

[129]  E-mail between Qantas Airways employees (Dec. 5, 2003) [QAL-01-195434].

[130]  Press Release, KLM Cargo increases fuel surcharge to Euro 0.15 (Dec. 16, 2003) [LH_CIV_0159207].

[131]  E-mail between Swiss WorldCargo employees (Dec. 23, 2003) [LH_CIV_0005622].

[132]  E-mail between Lufthansa Cargo employees (Jan. 12, 2004) [LH_CIV_0050736].

[133]  *See*, *e.g.*, E-mail from Walter Burri, Singapore Airlines, to ACCS Members (Apr. 27, 2004) [LH_CIV_0000792]; E-mail from Walter Burri, Singapore Airlines, to ACCS Members (Apr. 27, 2004) [LH_CIV_0000800].

SAS, Singapore Air, South African Airways, Thai Airways and VARIG.[134]  The precise dates of the increase were staggered, helping to conceal the Cartel.  For example, KLM exchanged e-mails with the other ACCS members, stating that KLM would follow the agreed upon Fuel Surcharge increase, but with a slight delay.[135]  Thus, Lufthansa and UA increased their Fuel Surcharges on May 10, 2004, while KLM increased its Fuel Surcharge on May 15, 2004.[136] DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

82.     After the Airfreight Carriers announced the increase to USD 0.20 per kilogram, but before that increase took effect, the FPI reached the next threshold.  According to the FPI mechanism, the Airfreight Carriers, including UA, increased – in a coordinated and generally parallel fashion – the Fuel Surcharge by another USD 0.05 per kilogram to USD 0.25 per kilogram effective in early June 2004.[137]  Prior to announcing the increase, an employee of UA wrote to Lufthansa Cargo's General Manager for Pricing asking him if he had a copy of the Fuel Surcharge press release and stating, "[i]f you [Lufthansa Cargo] don't have one in English, it's OK.  I just want to know when it will be released and the trigger levels."[138]  Lufthansa Cargo's General Manager for Pricing obliged and sent the UA employee a copy of the Fuel Surcharge

---

[134]  E-mail from a Lufthansa Cargo employee to representatives of Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, EVA Air, Japan Airlines, KLM, Korean Air, LAN Cargo, Martinair, SAS, Singapore Air, South African Airways, Thai Airways, UA and VARIG (Apr. 27, 2004) [LH_CIV_0110022].
[135]  E-mail from Susanne Erb, KLM Cargo, to ACCS Members (Apr. 27, 2004) [LH_CIV_0000800]; E-mail from Mike Fuchs, Martinair, to ACCS Members (May 3, 2001) [LH_CIV_0000808].
[136]  *See* ANA00002099; LH_Civ_0043016; SIA_Civ_0037986.
[137]  E-mail from General Manager of Pricing, Lufthansa Cargo to Lufthansa Cargo employee (June 7, 2004) [LH_CIV_0031917]; Lufthansa Cargo, *Fuel Surcharge Competitor Overview* (June 28, 2004) [LH_CIV_0000492]. *See also* Press Release, American Airlines Cargo, *American Airlines Cargo Division Announces Increase in Fuel Surcharge* (May 27, 2004) [LH_CIV_0006428]; Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (May 25, 2004) [LH_CIV_0040025].
[138]  E-mail from an employee of United Airlines, to General Manager of Pricing, Lufthansa Cargo (May 13, 2004) [LH_CIV_0040592].

press release, adding "we [Lufthansa Cargo] will announce today.  (Friday 14MAY0[4])."[139]

Lufthansa Cargo and UA also coordinated this Fuel Surcharge increase with other Airfreight

Carriers.[140]  DHL was subject to and paid the USD 0.25 per kilogram Fuel Surcharge to UA and

its co-conspirators for U.S. Airfreight Shipping Services.

83.     In May 2004, Lufthansa Cargo coordinated the upcoming Fuel Surcharge

thresholds with UA, American Airlines, British Airways, KLM and SAS.[141]

84.     By mid-June 2004, the FPI was increasing so quickly that it exceeded another

threshold.  Apparently concerned that too many rapid increases in the Fuel Surcharge could

undermine the cartel, Lufthansa Cargo coordinated with other Airfreight Carriers to maintain the

current USD 0.25 per kilogram Fuel Surcharge instead of increasing the Fuel Surcharge

according to the FPI mechanism.[142]  As a result of Lufthansa Cargo's coordination, UA and other

Airfreight Carriers did not increase the Fuel Surcharge again until on or about October 4, 2004,

when the Fuel Surcharge moved to USD 0.30 per kilogram.[143]  DHL was subject to and paid this

Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

85.     On July 23, 2004, the Singapore BAR CSC held a meeting at Singapore Air's

cargo sales conference room.[144]  UA, Air France, British Airways, EVA Airways, China

Airlines, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, and Nippon Cargo

---

[139]  E-mail from General Manager of Pricing, Lufthansa Cargo, to an employee of United Airlines (May 14, 2004)
[LH_CIV_0040592].
[140]  *See*, *e.g.*, E-mail from Eugen Renfer, AirPass, to UA and other ACCS Members (June 6, 2004)
[SIA_CIV_0001396].
[141]  E-mail from General Manager of Pricing, Lufthansa Cargo, to Lufthansa Cargo employee (May 19, 2004)
[LH_CIV_0000047].
[142]  *See*, *e.g.*, E-mail from Senior Manager of Pricing, Lufthansa Cargo, to General Manager of Pricing, Lufthansa
Cargo (June 21, 2004) [LH_CIV_0001180].
[143]  E-mail from Eugen Renfer, Air Pass, to ACCS Members (Sept. 24, 2004) [LH_CIV_0005827]; E-mail from Ron
Charles, BAX, to Rick Whitaker, BAX (Aug. 7, 2004) [LH_CIV_0160356]; Lufthansa Cargo, *Fuel Surcharge
Competitor Overview* (Oct. 18, 2004) [LH_CIV_0241189].  *See also* Press Release, Cargolux, *Cargolux Adapts Its
Fuel Surcharge* (Sept. 17, 2004) [LH_CIV_0127299]; E-mail between Lufthansa Cargo employees (Sept. 20, 2004)
[LH_CIV_0110194].
[144]  Minutes of the Singapore BAR CSC Meeting (July 23, 2004) [LH_CIV_0148180].

Airlines, among others, attended.[145]  One of the "matters arising" was the Fuel Surcharge.[146]  The discussion stressed the importance of "cooperation," "transparency," and having in place among the Cartel members "a system of tracking fuel indices that will trigger off a prompt for the carriers to raise the level of fuel surcharge [sic]."[147]  The Chairman instructed the Airfreight Carriers to "exercise some level of co-operation in future exercises, in view of the need for greater transparency with regards to these surcharges."[148]

86.  By mid-September 2004, after further communications, the Airfreight Carriers decided to increase the Fuel Surcharge to USD 0.30 per kilogram and did so effective between late September and early October 2004.[149]  There were communications among the Airfreight Carriers before that increase.  The Fuel Surcharge increase to USD 0.30 per kilogram was staggered to give the misleading impression that the Cartel members' conduct was unilateral.[150]

87.  In late October 2004, the cartel, including UA, increased – in a coordinated and parallel fashion – the Fuel Surcharge by USD 0.05 per kilogram to USD 0.35 per kilogram.[151] This increase was preceded by communication between Lufthansa Cargo, UA and other

---

[145]  Minutes of the Singapore BAR CSC Meeting, at 1 (July 23, 2004) [LH_CIV_0148180].

[146]  Minutes of the Singapore BAR CSC Meeting, at 3 (July 23, 2004) [LH_CIV_0148180].

[147]  Minutes of the Singapore BAR CSC Meeting, at 3 (July 23, 2004) [LH_CIV_0148180].

[148]  Minutes, Singapore BAR CSC meeting, at 7 (Jul. 23, 2004) [LH_CIV_0148180].

[149]  Press Release, Air Canada, Air Canada Fuel Surcharge ab 08.10.2004 (Sept. 27, 2004) [SIA_CIV_0014322]. See also Press Release, KLM Cargo, KLM Cargo Increases Fuel Surcharge to Euro 0.30 Effective September 29th (Sept. 15, 2004) [LH_CIV_0029858]; Press Release, Air France Cargo, Air France Cargo erhöht Fuel Surcharge (Sept. 21, 2004) [LH_CIV_0158260]; Press Release, Martinair Cargo, Martinair Cargo Increases Fuel Surcharge (Sept. 21, 2004) [SIA_CIV_0038047].

[150]  Press Release, Air France Cargo erhöht Fuel Surcharge (Sept. 21, 2004) [LH_CIV_0158260]; Press Release, KLM Cargo increases fuel surcharge to Euro 0.30 effective September 29th (Sept. 15, 2004) [LH_CIV_0029858]; E-mail from Walter Burri, Singapore Air, to ACCS members (Sept. 24, 2004) [LH_CIV_0005822];  Press Release, British Airways World Cargo to Increase Fuel Surcharge (Sept. 24, 2004) [SIA_CIV_0038050]; Press Release, Air Canada Fuel Surcharge ab 08.10.2004 (Sept. 27, 2004) [SIA_CIV_0014322].

[151]  E-mail Exchange Between Employees of Swiss World Cargo (Nov. 4, 2004) [LH_CIV_0005880].  *See also* Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (Oct. 12, 2004) [LH_CIV_0043801]; Press Release, KLM Cargo, *KLM Cargo Adapts Fuel Surcharge Mechanism and Increases Fuel Surcharge to Euro 0.35* (Oct. 12, 2004) [LH_CIV_0029856]; Press Release, Air France Cargo, *Air France Cargo Increases Fuel Surcharge on Oct 28, 2004* (Oct. 13, 2004) (unofficial translation) [LH_CIV_0029934]; Press Release, Martinair Cargo, *Martinair Cargo Increases Fuel Surcharge* (Oct. 13, 2004) [LH_CIV_0043810].

Airfreight Carriers.[152]  Like other Fuel Surcharge increases, the increase to USD 0.35 per

kilogram was staggered, giving DHL the impression that the Cartel members were acting

unilaterally.[153]  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators

for U.S. Airfreight Shipping Services.

88.     When the FPI began to decrease in late 2004, the Airfreight Carriers, including

UA, adhered to the cartel agreement by decreasing – in a coordinated and largely parallel fashion

– the Fuel Surcharge to USD 0.30 per kilogram effective on or around December 29, 2004.[154]

This decrease was staggered and thus appeared to DHL to be unilateral conduct.  UA

implemented its decrease to USD 0.30 on December 29, 2004,[155] Air France implemented its

decrease to USD 0.30 per kilogram on January 1,[156] Lufthansa Cargo on January 3,[157] British

Airways on January 6,[158] and Air Canada on January 10.[159]  DHL was subject to and paid this

Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

89.     In early 2005, the FPI began to increase again and throughout 2005 the Airfreight

Carriers continued to follow the FPI mechanism.  The cartel members, including UA, raised the

Fuel Surcharge in a coordinated and largely parallel (although staggered) fashion.

---

[152] *See*, *e.g.*, E-mail from Eugen Renfer, Airpass, to UA and other ACCS Members (Sept. 24, 2004) [SIA_CIV_0001621].
[153] Press Release, Air Canada Fuel Surcharge Ab 25.10.2004 (Oct. 15, 2004) [LH_CIV_0029039]; Press Release, Martinair Cargo Increases Fuel Surcharge (Oct. 13, 2004) [LH_CIV_0043810]; Press Release, Air France Cargo erhöht Fuel Surcharge (Oct. 13, 2004) [LH_CIV_0029934]; Press Release, British Airways World Cargo to Increase Fuel Surcharge (Oct. 14, 2004) [SIA_CIV_0038065].
[154] Press Release, United Airlines Cargo, *Reduction de la Fuel Surcharge* (Dec. 17, 2004) [LH_CIV_0126122].  *See also* Press Release, Cargolux, *Cargolux Reduces Its Fuel Surcharge* (Dec. 21, 2004) [LH_CIV_0126118].
[155] See LH_CIV_0051295.
[156] Press Release, Air France, Fuel surcharge decrease from 01/01/2005 (Dec. 17, 2004) [SIA_CIV_0038082].
[157] Lufthansa Cargo News, Lufthansa Cargo lowers fuel surcharge (Dec. 20, 2004) [LH_CIV_0042836].
[158] Press Release, British Airways World Cargo to Decrease Fuel Surcharge (Dec. 30, 2004) [SIA_CIV_0038094].
[159] Press Release, Air Canada Cargo Fuel Surcharge (Jan. 4, 2005) [LH_CIV_0126035].

90.     Effective on or about March 21, 2005, the Airfreight Carriers increased the Fuel Surcharge by USD 0.05 per kilogram to USD 0.35 per kilogram.[160]  Once again, the precise implementation dates were staggered with Lufthansa Cargo implementing the increase on March 21, 2005,[161] and UA implementing it on March 23, 2005.[162]  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

91.     Effective on or about April 6, 2005, the Airfreight Carriers increased the Fuel Surcharge by USD 0.05 per kilogram to USD 0.40 per kilogram.[163]  The precise implementation dates were staggered with Lufthansa Cargo's effective date on April 4, 2005[164] and UA's on April 6, 2005.[165]  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

92.     Effective on or about July 12, 2005, the Airfreight Carriers increased the Fuel Surcharge by USD 0.05 per kilogram to USD 0.45 per kilogram.[166]  Once again the implementation dates were staggered with Lufthansa implementing the increase on July 11, 2005[167] and UA implementing it on July 13, 2005.[168]  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

---

[160] *See*, *e.g.* Press Release, American Airlines Cargo, *American Airlines Cargo Division Announces Increase in Fuel Surcharge* (Mar. 9, 2005); Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (Mar. 8, 2005) [LH_CIV_0050618].
[161] LH_CIV_0042836.
[162] ANA000021722.
[163] Announcement, United Airlines Cargo Sales, *Freight Processing & Fuel Fees – Effective 04/06/05* (Mar. 2005); E-mail between Lufthansa Cargo employees (Mar. 29, 2005) [LH_CIV_0001951].  *See also* Press Release, American Airlines Cargo, *American Airlines Cargo Division Announces Increase in Fuel Surcharge* (Mar. 30, 2005); Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (Mar. 22, 2005) [LH_CIV_0050588]; Press Release, Air France, *Air France Increases Fuel Surcharge April 5, 2005* (Mar. 21, 2005).
[164] LH_CIV_0042954.
[165] ANA00022386.
[166] *See*, *e.g.*, Press Release, American Airlines Cargo, *American Airlines Cargo Division Announces Increase in Fuel Surcharge* (June 29, 2005); Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (June 24, 2005) [LH_CIV_0050571]; Press Release, KLM Cargo, *KLM Cargo Increases Fuel Surcharge to Euro 0.45 Effective July 7, 2005* (June 23, 2005).
[167] LH_CIV_0042843.
[168] ANA0001089.

93.     Effective on or about September 7, 2005, the Airfreight Carriers increased the Fuel Surcharge by USD 0.05 per kilogram to USD 0.50 per kilogram.[169]  Lufthansa's effective date was September 5, 2005,[170] while UA's was September 7, 2005.[171]  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

94.     Effective on or about October 20, 2005, the Airfreight Carriers increased the Fuel Surcharge by USD 0.05 per kilogram to USD 0.55 per kilogram.[172]  Once again the implementation dates were staggered with Lufthansa Cargo's on October 17, 2005[173] and UA's on October 20, 2005.[174]  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

95.     Effective on or about October 31, 2005, the Airfreight Carriers increased the Fuel Surcharge by USD 0.05 per kilogram to USD 0.60 per kilogram.[175]  Lufthansa Cargo's implementation date was October 24, 2005,[176] and UA's was October 31, 2005.[177]  DHL was

---

[169] Press Release, United Airlines Cargo, *Fuel Surcharge Fees – Effective September 07th, 2005* (Aug. 30, 2005) [SIA_CIV_0031052].  *See also* Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (Aug. 22, 2005) [LH_CIV_0063811]; Press Release, KLM Cargo, *KLM Cargo Increases Fuel Surcharge to Euro 0.50 Effective September 5, 2005* (Aug. 22, 2005).

[170] LH_CIV_00429787.

[171] SIA_CIV_0031052.

[172] Press Release, United Airlines Cargo, *New Fuel Fees Effective October 31, 2005* (Oct. 18, 2005) [SIA_CIV_0004767].  *See also* Lufthansa Cargo, *Europe Airline Security & Fuel Surcharges* (Nov. 15, 2005) [LH_CIV_0006314]; Press Release, American Airlines Cargo, *American Airlines Increase Fuelsurcharge* (Oct. 19, 2005) [LH_CIV_0063675]; Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (Oct. 5, 2005) [LH_CIV_0050474]; Press Release, KLM Cargo, *KLM Cargo Increases Fuel Surcharge to Euro 0.55 Effective October 17, 2005* (Oct. 5, 2005).

[173] LH_CIV_0043286.

[174] SIA CIV 0004766.

[175] Press Release, United Airlines Cargo, *New Fuel Fees Effective October 31, 2005* (Oct. 18, 2005) [SIA_CIV_0004767].  *See also* Press Release, American Airlines Cargo, *American Airlines Decrease Fuel Surcharge* (Nov. 4, 2005) [LH_CIV_0063620]; Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (Oct. 21, 2005) [LH_CIV_0045847]; Press Release, Air France-KLM, *Air France Cargo-KLM Cargo Increase Fuel Surcharge to Euro 0.60 Effective November 4th, 2005* (Oct. 19, 2005) [LH_CIV_0030887]; Press Release, Martinair Cargo, *Martinair Cargo Increases Fuel Surcharges* (Oct. 19, 2005) [LH_CIV_0063693]; Letter from Bruce McCaffrey, Vice President Freight, The Americas, Qantas Freight, to Customer (Oct. 21, 2005).

[176] LH_CIV_0042922.

[177] SIA_CIV_0004766.

subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

96.     In November 2005, the FPI began to decline, and the Airfreight Carriers, in accordance with the cartel agreement and in a coordinated and parallel fashion, reduced the Fuel Surcharge to USD 0.55 per kilogram effective on or about November 16, 2005;[178] by another USD 0.05 per kilogram effective on or about December 1, 2005;[179] and by another USD 0.05 per kilogram to 0.45 per kilogram effective on or about December 7, 2005.[180]  Despite these reductions, the Fuel Surcharge still exceeded – and was unnecessary to recover – the actual fuel-related costs of UA and the other Airfreight Carriers.  The Airfreight Carriers once again staggered the implementation of these decreases to prevent DHL and other customers from detecting the Cartel, and Lufthansa Cargo's implementation dates were a few days different than UA's.[181]  DHL was subject to and paid each of these Fuel Surcharges to UA and its co-conspirators for U.S. Airfreight Shipping Services.

---

[178]   *See*, *e.g.*, Press Release, American Airlines Cargo, *American Airlines Cargo Division Announces Decrease in Fuel Surcharge* (Nov. 2, 2005); Press Release, Cargolux, *Cargolux Reduces Its Fuel Surcharge* (Nov. 7, 2005) [LH_CIV_0029443]; Press Release, Air France-KLM, *Air France Cargo - KLM Cargo Decreases Fuel Surcharge to Euro 0.55 Effective November 16, 2005* (Nov. 2, 2005) [LH_CIV_0029409]; Press Release, Martinair, *Martinair Cargo Reduces Fuel Surcharge* (Nov. 8, 2005) [LH_CIV_0063610]; E-mail between Lufthansa Cargo employees (Nov. 4, 2005) [LH_CIV_0001243].

[179]   *See*, *e.g.*, Press Release, American Airlines Cargo, *American Airlines Cargo Decrease Fuelsurcharge* (Nov. 18, 2005) [LH_CIV_0063523]; Press Release, Cargolux, *Cargolux Reduces Its Fuel Surcharge* (Nov. 14, 2005) [LH_CIV_0063562]; E-mail from Mike Fuchs, Martinair, to ACCS Members (Dec. 1, 2005) [LH_CIV_0003447]; Press Release, Lufthansa Cargo, *Lufthansa Cargo Lowers Fuel Surcharge to 0.45 Euro/kg* (Nov. 22, 2005) [LH_CIV_0029405].

[180]   *See*, *e.g.*, Press Release, American Airlines Cargo, *American Airlines Cargo Decrease Fuelsurcharge* (Dec. 2, 2005) [LH_CIV_0063393]; Press Release, Cargolux, *Cargolux Reduces Its Fuel Surcharge* (Nov. 21, 2005) [LH_CIV_0063490].

[181]   Press Release, Air France Cargo – KLM Cargo reduces fuel surcharge to Euro 0.50 effective November 28, 2005 (Nov. 15, 2005) [LH_CIV_0030856];  Press Release, Air Canada Cargo FSC Decrease (Nov. 21, 2005) [LH_CIV_0029434];  Press Release, Air France Cargo – KLM Cargo reduces fuel surcharge 01 December (Nov. 22, 2005) [LH_CIV_0063484];  Lufthansa Cargo News, Lufthansa Cargo lowers fuel surcharge to 0.45 Euro/kg (Nov. 21, 2005) [LH_CIV_0042879]; Press Release, Martinair Cargo to Reduce Fuel Surcharge (Nov. 23, 2005) [LH_CIV_0063467]; Press Release, Air Canada Cargo FSC Reduction (Dec. 1, 2005) [LH_CIV_0029432];  Press Release, Emirates SkyCargo Fuel surcharge decrease 09 December (Dec. 2, 2005) [LH_CIV_0063395];  see also LH_Civ_0042882; LH_CIV_0042879; ANA000264880; ANA00026765;  ANA00026847.

97.     In January 2006, the FPI exceeded the relevant threshold, indicating that the Fuel Surcharge should be increased.[182]

98.     On January 25, 2006, Peter Scholten of Martinair sent an e-mail to representatives of Air France, British Airways, Cargolux, Lufthansa Cargo, SAS and Virgin Atlantic, inviting them to a February 2, 2006, meeting at Martinair Cargo's Asia Pacific Continental Headoffice.[183] The explicit topic of discussion was the Fuel Surcharge.[184]  Upon information and belief, each of these Airfreight Carriers attended the meeting and agreed to raise the Fuel Surcharge on or about February 14, 2009.  Moreover, each increased the Fuel Surcharge shortly after the meeting,[185] as did Lufthansa's Alliance partners, UA and SAS.

99.     Also on February 2, 2006, Singapore Air, which had not attended the February 2 meeting mentioned in the preceding paragraph, e-mailed Lufthansa Cargo, Swiss WorldCargo, KLM and British Airways stating its understanding that the Airfreight Carriers would be increasing Fuel Surcharges.[186]  KLM responded that it would be increasing its Fuel Surcharge.[187]Although UA did not attend the February 2 meeting, its Alliance partners, Lufthansa Cargo and SAS, did.  UA followed Lufthansa Cargo and SAS.  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

---

[182]  E-mail from Walter Burri, Singapore Air, to representatives of British Airways, KLM, Lufthansa Cargo and Swiss WorldCargo (Feb. 2, 2006) [LH_CIV_0000869].
[183]  E-mail from Winnie Hui, Management Assistant, Asia Pacific, Martinair Cargo, to representatives of Air France, British Airways, Cargolux, Lufthansa Cargo, SAS and Virgin, among others (Jan. 25, 2006) [LH_CIV_0008577].
[184]  E-mail from Winnie Hui, Management Assistant, Asia Pacific, Martinair Cargo, to representatives of Air France, British Airways, Cargolux, Lufthansa Cargo, SAS and Virgin, among others (Jan. 25, 2006) [LH_CIV_0008577].
[185]  *See*, *e.g.*, Letter from Martinair Cargo to Customers (Feb. 2, 2006) [LH_CIV_0063369]; E-mail from Susanne Erb, KLM Cargo, to representatives of British Airways, Lufthansa Cargo, Singapore Air and Swiss WorldCargo (Feb. 3, 2006) [LH_CIV_0000871]; E-mail from Walter Burri, Singapore Air, to representatives of British Airways, KLM, Lufthansa Cargo and Swiss WorldCargo (Feb. 2, 2006) [LH_CIV_0000869]; Press Release, Air France-KLM, *Air France Cargo – KLM Cargo increases fuel surcharge to Euro 0.50 effective February 14, 2006* (Feb. 1, 2006) [LH_CIV_0030190]; Press Release, Lufthansa Cargo, *Lufthansa Cargo raises fuel surcharge to 0.50 Euro/kg* (Feb. 6, 2006) [LH_CIV_0030185].
[186]  E-mail from Walter Burri, Singapore Air, to representatives of British Airways, KLM, Lufthansa Cargo and Swiss WorldCargo (Feb. 2, 2006) [LH_CIV_0000869].

100.    On February 6, 2006, in furtherance of the cartel, Singapore Airlines sent an e-mail addressed to several Airfreight Carriers, including Air France, American Airlines, British Airways, Japan Airlines, Lufthansa Cargo and Thai Airways, announcing its specific plan regarding the Fuel Surcharge and asking them about their plans for a Fuel Surcharge increase.[188] On the same day, American Airlines,[189] British Airways,[190] Japan Airlines[191] and Malaysian Airlines System[192] responded to the entire group, each stating that they would increase its Fuel Surcharge.  Qantas also announced on that day – February 6 – that its Fuel Surcharge would increase effective February 20, 2006.[193]

101.    In furtherance of the January and February discussions, the cartel members, including UA, increased the Fuel Surcharge in a coordinated and parallel fashion to USD 0.50 per kilogram.[194]  Once again, the Airfreight Carriers staggered their implementation of this increase to give the fraudulent appearance of unilateral conduct. [195]

## VI.    The U.S. DOJ Dawn Raids and Subsequent Class Action Complaints

102.    On February 14, 2006, the DOJ raided the offices of a number of Airfreight Carriers, but not UA's office.

---

[187]  E-mail from Susanne Erb, KLM Cargo, to representatives of British Airways, Lufthansa Cargo, Singapore Air and Swiss WorldCargo (Feb. 3, 2006) [LH_CIV_0000871].
[188]  E-mail from Walter Burri, Singapore Air, to ACCS members (Feb. 6, 2006) [LH_CIV_0004593].
[189]  E-mail from Walter Hintermann, American Airlines, to ACCS Members (Feb. 6, 2006) [LH_CIV_0004593].
[190]  E-mail from Marek Vrany, British Airways, to ACCS Members (Feb. 6, 2006) [LH_CIV_0004591].
[191]  E-mail from Roger Proamer, Sirius Air, GSA for Japan Airlines, to ACCS Members (Feb. 6, 2006) [LH_CIV_0004597].
[192]  E-mail from Andre Berger, MAS Cargo, to ACCS Members (Feb. 6, 2006) [LH_CIV_0004595].
[193]  Letter from Bruce McCaffrey, Qantas Airways, to Customers (Feb. 6, 2006).
[194]  Press Release, Air France-KLM, Air France Cargo – KLM Cargo increases fuel surcharge to Euro 0.50 effective February 14, 2006 (Feb. 1, 2006) [LH_CIV_0030190]; Letter from Martinair Cargo to Customers (Feb. 2, 2006) [LH_CIV_0063369]; E-mail from Susanne Erb, KLM Cargo, to representatives of British Airways, Lufthansa Cargo, Singapore Air and Swiss WorldCargo (Feb. 3, 2006) [LH_CIV_0000871]; E-mail from Walter Burri, Singapore Air, to representatives of British Airways, KLM, Lufthansa Cargo and Swiss WorldCargo (Feb. 2, 2006) [LH_CIV_0000869].
[195]  Press Release, AF-KL Fuel Surcharge Increase 14FEB06 (effective Feb. 14 2006) [LH_CIV_0030190]; Press Release, Martinair Cargo Increases Fuel Surcharge (effective Feb. 15, 2006) [LH_CIV_0063369]; Press Release, British Airways World Cargo to Increase Fuel Surcharge (effective Feb. 15, 2006) [LH_CIV_0030192]; Press Release, Air Canada Cargo Fuel Increase (effective Feb. 20, 2006) [LH_CIV_0063321].

103.    In the month following the DOJ's raids, 21 putative class action complaints were filed against a long list of Airfreight Carriers including UA.  None of these contained any specific factual allegations regarding UA's participation in any agreements, meetings, or communications in furtherance of the cartel.

a.    On February 17, 2006, Animal Land Inc. filed a putative class action complaint against numerous Airfreight Carriers, making general allegations regarding "Defendants," such as "Defendants have coordinated price increases through the use of surcharges."  The complaint did not make any specific allegations regarding UA's participation in the cartel.

b.    On the same day, Fleurchem Inc., filed a putative class action complaint against numerous Airfreight Carriers making the general allegation that "Defendants conspired, contracted or combined amongst themselves and with others, for the purpose of and with the effect of raising, fixing, pegging, maintaining, or stabilizing the price of Surcharges for Air Cargo Services ("Air Cargo Surcharges") which were purchased by the Class." The complaint contained no specific factual allegations against UA regarding its alleged participation in the cartel.

c.    On February 22, 2006, Joan Adams filed a putative class action complaint against numerous Airfreight Carriers including UA.  That complaint merely copied the Fleurchem complaint.

d.    On February 24, 2006, Superior Jewelry Co. filed a putative class action complaint against numerous Airfreight Carriers including UA.  The complaint contained no specific factual allegations against UA regarding its alleged participation in the cartel, other than UA was a member of  Star Alliance and that Star Alliance and IATA "facilitated" the cartel.  The complaint also quoted a UA spokesman who had commented "[w]e charge what everyone else charges" which is just as consistent with unilateral conduct as with cartel conduct.

e.    On the same day, Rock International Transport Inc. filed a putative class action complaint against numerous Airfreight Carriers including UA. There were no specific factual allegations against UA regarding its alleged participation in the cartel.

f.    On the same day, Niagara Frontier Dist. Inc. filed a putative class action complaint against numerous Airfreight Carriers including UA.  There were no specific factual allegations against UA regarding its alleged participation in the cartel other than UA was a member of Star Alliance and that Star Alliance and IATA "facilitated" the cartel.

-44-

g.    On the same day, Helen's Wooden Crafting Co. filed a putative class action complaint against numerous Airfreight Carriers including UA. There were no specific factual allegations against UA regarding its alleged participation in the cartel.

h.    On February 28, 2006, Richard Smith filed a putative class action complaint against numerous Airfreight Carriers including UA. There were no specific factual allegations against UA regarding its alleged participation in the cartel other than UA was a member of Star Alliance and that Star Alliance and IATA "facilitated" the cartel.

i.    On the same day, Sismizi Ltd. filed a putative class action complaint against numerous Airfreight Carriers including UA. There were no specific factual allegations against UA regarding its alleged participation in the cartel.

j.    On the same day, ABM Int'l Inc. filed a putative class action complaint against numerous Airfreight Carriers including UA. There were no specific factual allegations against UA regarding its alleged participation in the cartel.

k.    On March 1, 2006, Bluemex U.S.A. Inc. filed a putative class action complaint against numerous Airfreight Carriers including UA. There were no specific factual allegations against UA regarding its alleged participation in the cartel.

l.    On March 2, 2006, Int'l Sea & Air Shipping Corp. filed a putative class action complaint against numerous Airfreight Carriers including UA. There were no specific factual allegations against UA regarding its alleged participation in the cartel other than UA was a member of Star Alliance and that Star Alliance and IATA "facilitated" the cartel.

m.    On the same day, Americana Flower Brokers filed a putative class action complaint against numerous Airfreight Carriers including UA. There were no specific factual allegations against UA regarding its alleged participation in the cartel other than UA was a member of Star Alliance and that Star Alliance and IATA "facilitated" the cartel.

n.    On March 3, 2006, five other putative class actions were filed, but all of them merely copied the earlier filed actions.

o.    On March 6, 2006, Mitchel Spitz filed a putative class action complaint against numerous Airfreight Carriers including UA. The complaint did not make any specific allegations regarding UA's participation in the cartel.

p.    On March 6, 2006, Bacchus Tech., LLC filed a putative class action complaint against numerous Airfreight Carriers including UA. There were

-45-

no specific factual allegations against UA regarding its alleged participation in the cartel other than UA was a member of Star Alliance and that Star Alliance and IATA "facilitated" the cartel.

q.   On March 7, 2007, Lionheart Group filed a putative class action complaint against numerous Airfreight Carriers including UA.  There were no specific factual allegations against UA regarding its alleged participation in the cartel other than UA was a member of Star Alliance and that Star Alliance and IATA "facilitated" the cartel.

104.   Although some of these complaints alleged that the EU had searched European offices of UA, that only made the absence of any U.S. DOJ dawn raid against UA more significant.

## VII.   UA Continued to Charge Cartel Fuel Surcharges at Least Through May 2006

105.   Notwithstanding the dawn raids and the filing of class-action complaints, certain Airfreight Carriers, including UA, adhered to the agreements made earlier in February to raise the Fuel Surcharge to USD 0.50 per kilogram.  Indeed, the increase in UA's Fuel Surcharge, which took place pursuant to the February agreements and became effective after the dawn raids, significantly outpaced any increase in the publicly reported price of aviation fuel.  DHL was subject to and paid this Fuel Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

106.   In April 2006, UA and other cartel members (including Air France and KLM which later pled guilty to fixing fuel surcharges through "*at least* February 14, 2006"[196]) acting in accordance with the illegal cartel agreement, raised the Fuel Surcharge to 0.55 per kilogram.[197]  They implemented that increase on staggered dates, giving the impression that they were acting unilaterally.[198]

---

[196]   *See* http://www.justice.gov/atr/cases/f234400/234437.htm (emphasis added).
[197]   *See,e.g.*, Press Release, Air France-KLM, *Air France Cargo – KLM Cargo increases fuel surcharge to Euro 0.55 effective May 03, 2006* (Apr. 20, 2006) [LH_CIV_0029392]; Letter from TAP-Portugal Cargo to Customers (Apr. 20, 2006) [LH_CIV_0029394]; Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (Apr. 21, 2006) [LH_CIV_0063276]; Press Release, Lufthansa Cargo, *Lufthansa Cargo raises fuel surcharge to 0.55 Euro/kg* (Apr.

107.     Pursuant to the Cartel FPI, Air Canada and its co-conspirators again increased the Fuel Surcharge to USD 0.60 per kilogram, in accordance with the cartel agreement, effective later in May 2006.[199]  The Airfreight Carriers were careful to stagger the implementation dates of their Fuel Surcharge increases.

108.     On or about May 1, 2006, an employee of UA met with Qantas Airway's Vice President of Freight for the Americas in Las Vegas and discussed rates.[200]  The two individuals had met on a number of prior occasions, including the following:  April 5, 2005 at Café Pinguini; July 22, 2005 at Capistrano's Restaurant; and November 14, 2005, at Los Angeles Airport. Separately, another UA executive met with the same Qantas executive on October 22, 2004. Qantas Airway's Vice President of Freight for the Americas has pled guilty to criminal antitrust violations and paid a $20,000 criminal fine for his participation in the air cargo cartel described in this Complaint.[201]  Moreover, Qantas' plea agreement implicitly acknowledged that the conspiracy did not end in February 2006:  Qantas admitted that it conspired "until *at least* February 14, 2006."[202]

109.     Between May 3 and 11, just a few days after UA's meeting with Qantas, Qantas announced still another increase in the Airfreight Surcharges, putting the Fuel Surcharge at USD

---

24, 2006) [LH_CIV_0029387]; Letter from Bruce McCaffrey, Qantas Airways, to Customers (Apr. 25, 2006); Letter from Korean Air Cargo to Customers (Apr. 25, 2006) [LH_CIV_0029453]; Letter from Martinair Cargo to Customers (Apr. 26, 2006) [LH_CIV_0063251]; Letter from American Airlines Cargo to Customers (Apr. 26, 2006) [LH_CIV_0125834]; Letter from Air Canada to Customers (Apr. 28, 2006) [LH_CIV_0029430].

[198]  Press Release, Air Canada Cargo increases FSC eff 16. May 06 (Apr. 28, 2006) [LH_CIV_0029430].  See also Press Release, Air France-KLM, AF-KL Fuel Surcharge Increase 03MAY06 (Apr. 20, 2006) [LH_CIV_0029392]; Letter from Martinair Cargo to Customers (Apr. 26, 2006) [LH_CIV_0063251].

[199]  Press Release, Air Canada Cargo Fuel Increase (May 17, 2006) [LH_CIV_0063109].  See also Lufthansa Cargo News, Lufthansa Cargo raises fuel surcharge to 0.60 Euro/kg (May 2, 2006) [LH_CIV_0031175]; Press Release, AF-KL Fuel Surcharge Increase 17MAY06 (May 3, 2006) [LH_CIV_0063200]; Press Release, British Airways World Cargo – Fuel Surcharge Newsflash (May 8, 2006) [LH_CIV_0029436].

[200]  Expense Report for Bruce McCaffrey, Qantas Airways, at 5 (May 2006) [QAL-01-080083].

[201]  Press Release, U.S. Dep't of Justice, *Former Qantas Airline Executive Agrees to Plead Guilty to Participating in Price-Fixing Conspiracy on Air Cargo Shipments* (May 8, 2008).

[202]  *U.S. v. Qantas Airways Limited*, Criminal No. 07-322, 3 (D.D.C. Jan. 14, 2008) (Plea Agreement) (emphasis added).

0.60 per kilogram effective on or about May 17, 2006.[203] UA also increased its Fuel Surcharge, as did Air France, Cargolux, KLM and Lufthansa Cargo. These increases were not necessary to cover increased costs of aviation fuel, as the increase in the Fuel Surcharge was disproportionate to any actual increase in the price of aviation fuel. DHL was subject to and paid the increased Fuel Surcharges for U.S. Airfreight Shipping Services.

110. In June 2006, UA received a subpoena from the U.S. Department of Justice requesting information related to certain *passenger* pricing practices and surcharges.

111. The cartel members' Fuel Surcharge remained at USD 0.60 per kilogram until approximately mid-October 2006, when they reduced the Fuel Surcharge to USD 0.55 per kilogram.[204] Despite this decrease, the Fuel Surcharge still exceeded – and was unnecessary to recover – the actual fuel-related costs of UA and the other Airfreight Carriers. DHL was subject to and paid this Fuel Surcharge for U.S. Airfreight Shipping Services.

112. Upon information and belief, UA continued to impose Fuel Surcharges that exceeded – and were unnecessary to recover – its actual fuel-related costs at least through the end of 2006. DHL was subject to and paid these Fuel Surcharges for U.S. Airfreight Shipping Services.

## VIII. The Conspiracy Included Security Surcharges

113. Following the terrorist attacks of September 11, 2001, the Airfreight Carriers, including UA, jointly agreed to charge a coordinated Security Surcharge for the purported purpose of recouping increasing security costs. The Security Surcharge, however, exceeded – and was unnecessary to recover – UA's actual security-related costs (or any increase thereof). In

---

[203] Letter from Bruce McCaffrey, Qantas Airways, to Customers (May 5, 2006).
[204] *See, e.g.*, Press Release, Air France-KLM, *Air France Cargo-KLM Cargo decreases fuel surcharge to Euro 0.55 effective October 9, 2006* (Sept. 25, 2006) [LH_CIV_0063087]; Letter from Martinair Cargo to Customers (Sept. 27, 2006) [LH_CIV_0063081].

addition, the Security Surcharge was not based on actual security costs, but rather on weight for easy administration and implementation. As one airline executive noted, "[t]he calculation on the basis of AW [actual weight] has already been applied in the calculation of the fuel surcharge and is therefore easier to communicate internally and externally. This has been particularly important in the current situation since a fast and successful implementation was important. In addition, the billing procedure is already known from the fuel surcharge and implemented."[205]

114.    Lufthansa Cargo coordinated the Security Surcharge in a manner similar to the way it coordinated the Fuel Surcharge,[206] and UA participated by agreeing with Lufthansa Cargo and other Airfreight Carriers to impose a USD 0.15 per kilogram Security Surcharge.[207] UA's participation was not limited to an agreement with its Alliance members, Lufthansa Cargo and SAS; rather, UA agreed with Alliance and non-Alliance Airfreight Carriers to impose the Security Surcharge.[208]

115.    One of the first known meetings to discuss the Security Surcharge occurred on September 26, 2001, in Hong Kong.[209] Representatives from 33 Airfreight Carriers participated in the meeting, including UA, Lufthansa Cargo, Cathay Pacific, China Airlines, Eva Air, Qantas Airways and Singapore Airlines.[210] Cathay Pacific proposed a Security Surcharge of USD 0.05 per kilogram.[211] The majority of Airfreight Carriers "indicated between 0.10 and 0.15 USD per

---

[205] E-mail between Lufthansa Cargo employees (Oct. 1, 2001) (unofficial translation) [LH_CIV_0000066].
[206] *See*, *e.g.*, E-mail between Lufthansa Cargo employees (Sept. 26, 2001) (unofficial translation) [LH_CIV_0001820]; E-mail from Frank P. de Reij, Senior Vice President, KLM Cargo, to Lufthansa Cargo employee (Oct. 2, 2001) [LH_CIV_0001247]; E-mail between Lufthansa Cargo employees (Oct. 2, 2001) [LH_CIV_0000270]; E-mail between Lufthansa Cargo employees (Oct. 5, 2001) (unofficial translation) [LH_CIV_0000079].
[207] Lufthansa Cargo, *Europe Airline Security & Fuel Surcharges* (Nov. 15, 2005) [LH_CIV_0006314]; E-mail between Lufthansa Cargo employees (Sept. 26, 2001) (unofficial translation) [LH_CIV_0001820].
[208] *See*, *e.g.*, E-mail between Lufthansa Cargo employees (Sept. 26, 2001) (unofficial translation) [LH_CIV_0001820].
[209] *See*, *e.g.*, E-mail between Lufthansa Cargo employees (Sept. 26, 2001) (unofficial translation) [LH_CIV_0001820].
[210] E-mail between Lufthansa Cargo employees (Sept. 26, 2001) (unofficial translation) [LH_CIV_0001820].
[211] E-mail between Lufthansa Cargo employees (Sept. 26, 2001) (unofficial translation) [LH_CIV_0001820].

kg."[212] UA's local representative could not commit at that time to an amount for the surcharge because of the need to check with UA headquarters.[213] UA subsequently implemented the Security Surcharge, and, as with the other Airfreight Carriers, the surcharge applied to shipments worldwide, not just to or from Hong Kong. At the time, DHL believed that UA was acting unilaterally following the lead of other Airfreight Carriers, all of which appeared to be reacting to a common event – the terrorist attacks of September 11, 2001, and the resulting increase in security costs.

116.     A number of Airfreight Carriers also met in Johannesburg on October 2, 2001, at the airport offices of South African Airways to discuss the Security Surcharge and the market's "very negative response" to it.[214] Despite the negative response, the Airfreight Carriers decided, "[i]n agreement with almost all airlines except Egypt Air," to impose a worldwide Security Surcharge of EUR 0.15 per kilogram on their customers effective October 8 or 15, 2001.[215] They also agreed that Lufthansa Cargo would be the first Airfreight Carrier to inform the market of the Security Surcharge, "followed closely by KLM and AF [Air France]."[216] For easy implementation and monitoring, the Security Surcharge did not vary by the distance shipped. The cartel members recognized that they "still need[ed] to do a lot of communication" to keep the cartel functioning,[217] and accordingly a number of them met again in Nairobi, Kenya, on October 4, 2001.[218]

117.     Prior to implementation of the Security Surcharge, Lufthansa Cargo, which was already coordinating with its Alliance members, including UA, coordinated with at least sixteen

---

[212] E-mail between Lufthansa Cargo employees (Sept. 26, 2001) (unofficial translation) [LH_CIV_0001820].
[213] E-mail between Lufthansa Cargo employees (Sept. 26, 2001) (unofficial translation) [LH_CIV_0001820].
[214] E-mail between Lufthansa Cargo employees (Oct. 1, 2001) [LH_CIV_0001284]; E-mail between Lufthansa Cargo employees (Sept. 29, 2001) [LH_CIV_0001284].
[215] E-mail between Lufthansa Cargo employees (Oct. 3, 2001) [LH_CIV_0000074].
[216] E-mail between Lufthansa Cargo employees (Oct. 3, 2001) [LH_CIV_0000074].
[217] E-mail between Lufthansa Cargo employees (Oct. 4, 2001) [LH_CIV_0000074].

Airfreight Carriers, including Air France and KLM, at the CEO level.[219]   At or about the same time, Lufthansa Cargo also communicated with UA regarding the Security Surcharge.[220]   UA knew that Lufthansa Cargo's communications were not limited to UA.[221]

118.   The Airfreight Carriers' Security Surcharge went into effect on or about October 15, 2001, at which time UA began charging and DHL began paying a EUR 0.15 per kilogram Security Surcharge on shipments worldwide, including on shipments to and from the United States.[222]   As with the Fuel Surcharge, the Airfreight Carriers staggered the implementation of the Security Surcharge, giving DHL and other customers the false impression that the Cartel members were acting unilaterally.   For example, Air France's Security Surcharge went into effect on October 8, 2001[223] UA's and KLM's on October 15, 2001[224] and Asiana Airlines' on October 16, 2001.[225]

119.   After the Security Surcharge went into effect, Lufthansa Cargo continued to act as one of the primary facilitators of the conspiracy, coordinating with other Airfreight Carriers, including its Alliance partners.[226]

---

[218]  E-mail between Lufthansa Cargo employees (Oct. 4, 2001) [LH_CIV_0001291].
[219]  E-mail between Lufthansa Cargo employees (Oct. 12, 2001) [LH_CIV_0109445]; E-mail between Lufthansa Cargo employees (Oct. 24, 2001) [LH_CIV_0000283].
[220]  E-mail from Lufthansa Cargo employee, to representatives of United Airlines, Aer Lingus, Air France, Alitalia, Iberia, Japan Airlines, KLM, Qantas and Swissair (Oct. 10, 2001) [LH_CIV_0056878].
[221]  *See, e.g.*, E-mail from Lufthansa Cargo employee, to representatives of United Airlines, Aer Lingus, Air France, Alitalia, Iberia, Japan Airlines, KLM, Qantas and Swissair (Oct. 10, 2001) [LH_CIV_0056878].
[222]  Chart, Lufthansa Cargo, *War Risk/Security Surcharge Update* (Oct. 12, 2001) [LH_CIV_0240802].  *See also* Newsletter, KLM Cargo, *Security Surcharge on KLM Cargo Shipments Effective October 15, 2001* (Oct. 1, 2001) [LH_CIV_0001249]; E-mail between Lufthansa Cargo employees (Oct. 4, 2001) [LH_CIV_0135600].
[223]  E-mail between Lufthansa Cargo employees (Oct. 4, 2001) [LH_CIV_0135600].
[224]  Chart, Lufthansa Cargo, War Risk/Security Surcharge Update (Oct. 12, 2001) [LH_CIV_0240802]; Newsletter, Security Surcharge on KLM Cargo Shipments Effective October 15, 2001 (Oct. 1, 2001) [LH_CIV_0001249].
[225]  Chart, Lufthansa Cargo, War Risk/Security Surcharge Update (Oct. 12, 2001) [LH_CIV_0240802].
[226]  *See, e.g.*, E-mail between Lufthansa Cargo employees (Jan. 26, 2004) [LH_CIV_0000351]; E-mail between Lufthansa Cargo employees (Sept. 13, 2004) [LH_CIV_0051233].

120.    The Security Surcharge was very profitable for the Airfreight Carriers.  For example, Lufthansa Cargo collected 111.1 million Euros from the Security Surcharge in 2002, but incurred only 44.8 million Euros in total security-related costs.[227]

121.    At a January 23, 2003, meeting of the Singapore BAR CSC, Air France, Cathay Pacific and the other Airfreight Carriers in attendance "agreed that there would be no reduction to the [Security] charge."[228]

122.    Upon information and belief, as was the case with Lufthansa Cargo, the Security Surcharges that UA collected exceeded – and were unnecessary to recover – UA's actual security-related costs.

## IX.    The Conspiracy Included Customs Surcharges

123.    In September 2003, a group of Airfreight Carriers, including Air France, British Airways, Cargolux, KLM and Lufthansa Cargo (which was acting as one of the primary facilitators of the cartel and serving as an intermediary between the Alliance and the other non-Alliance Airfreight Carriers) jointly devised a Customs Surcharge.[229]  The purported justification was to recoup the additional cost of electronic submission of manifest data to United States Customs.[230]  The Airfreight Carriers sought "a common approach" to the Customs Surcharge.[231]  Discussions continued in December 2003, when Air France informed Lufthansa Cargo that Air France would impose a EUR 7 Customs Surcharge per manually collected airway bill.[232]

---

[227] Lufthansa Cargo, Presentation, at 1 (June 2003) [LH_CIV_0098929] at 0098940.
[228] Minutes, Singapore Bar Sub-Committee Meeting (Jan. 23, 2003) [QAL-01-195170].
[229] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Sept. 19, 2003) (unofficial translation) [LH_CIV_0000116].
[230] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Sept. 19, 2003) (unofficial translation) [LH_CIV_0000116].
[231] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Sept. 19, 2003) (unofficial translation) [LH_CIV_0000116].
[232] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Dec. 8, 2003) (unofficial translation) [LH_CIV_0000118].

124.    In late January 2004, Air France and Lufthansa Cargo held further discussions regarding the Customs Surcharge.[233]

125.    In May 2004, Air France sent to Lufthansa Cargo the letter that Air France proposed to send to its customers regarding the Customs Surcharge.[234]  Lufthansa Cargo's reaction was that it "[l]ooks like LCAG [Lufthansa Cargo] is right behind AF [Air France] on this communication."[235]  Lufthansa Cargo also noted that "if we decide [to impose a Customs Surcharge]…prewarning [is] crucial as always."[236]  Additional direct communication to coordinate Customs Surcharges occurred later in May 2004 between Air France and Lufthansa Cargo.[237]

126.    In late June or early July 2004, Lufthansa Cargo discussed the Customs Surcharge directly with UA, as well as with Air France, American Airlines, British Airways, Japan Airlines, KLM, SAS and Singapore Air.[238]  Lufthansa Cargo noted that Air France has "clearly communicated charges (EUR 8 [per] manual [airway bill]) and (EUR 2 [per] electronic [airway bill]) for transmission of data since the beginning of the year [2004]. . . .  KL[M] also want to charge [a Customs Surcharge].  They will probably align themselves with [Air France]."[239]

---

[233]  E-mail from General Manager of Pricing, Lufthansa Cargo, to Lufthansa Cargo employee (Jan. 26, 2004) [LH_CIV_0000129].

[234]  E-mail between Lufthansa Cargo employees (May 19, 2004) (unofficial translation) [LH_CIV_0003771].

[235]  E-mail between Lufthansa Cargo employees (May 25, 2004) [LH_CIV_0003771].

[236]  E-mail between Lufthansa Cargo employees (May 26, 2004) [LH_CIV_0003771].

[237]  E-mail from General Manager of Pricing, Lufthansa Cargo, to Jean Dunaux, Air France (May 27, 2004) [LH_CIV_0008223]; E-mail from Jean Dunaux, Air France, to General Manager of Pricing, Lufthansa Cargo (May 27, 2004) [LH_CIV_0128646].

[238]  E-mail from General Manager of Pricing, Lufthansa Cargo, to several Lufthansa Cargo employees (July 2, 2004) (unofficial translation) [LH_CIV_0001353]; E-mail between Lufthansa Cargo employees (July 20, 2004) [LH_CIV_0000495].

[239]  E-mail from General Manager of Pricing, Lufthansa Cargo, to several Lufthansa Cargo employees (July 2, 2004) (unofficial translation) [LH_CIV_0001353].

Lufthansa Cargo, Air France and KLM continued their communications about the Customs Surcharge throughout July 2004.[240]

127.   Shortly after its coordinating discussions with Lufthansa Cargo, on July 6, 2004, Air France announced its Customs Surcharge with an effective date of August 13, 2004.[241]  Air France's announcement of the Customs Surcharge was "almost identical" to Swiss WorldCargo's announcement.[242]  Shortly thereafter, KLM announced that it would implement the same Customs Surcharge as Air France.[243]  The Airfreight Carriers, including UA, imposed this Customs Surcharge on shipments worldwide, including on shipments to and from the United States.

128.   The Airfreight Carriers with which Lufthansa Cargo coordinated the Customs Surcharge included at least the following:  UA, Air France, American Airlines, British Airways, Cargolux and KLM.[244]  UA knew that Lufthansa Cargo was coordinating Customs Surcharges.[245] In addition, UA agreed with Air Canada, Air France, British Airways, Cargolux, Japan Airlines and the IATA Cargo Business Panel to implement agreed-upon charge codes in furtherance of the Customs Surcharge conspiracy.[246]

---

[240] *See*, *e.g.*, E-mail from General Manager of Pricing, Lufthansa Cargo, to several Lufthansa Cargo employees (July 2, 2004) (unofficial translation) [LH_CIV_0001353]; E-mail from General Manager of Pricing, Lufthansa Cargo, to Lufthansa Cargo employee (July 5, 2004) (certified translation) [LH_CIV_0000133]; E-mail between Lufthansa Cargo employees (July 5, 2004) (certified translation) [LH_CIV_0000462]; E-mail between Lufthansa Cargo employees (July 7, 2004) [LH_CIV_0000466]; E-mail between Lufthansa Cargo employees (July 20, 2004) [LH_CIV_0000495].

[241] U.S. Customs Newsletter, Air France Cargo (July 6, 2004) [LH_CIV_0029339].

[242] E-mail from Guy Deschamps, Traxon, to Sebastien Gauthier, Air France, and several Lufthansa Cargo and Traxon employees (July 16, 2004) [LH_CIV_0000134].  Swiss WorldCargo is the cargo subsidiary of Swiss International Air Lines AG ("Swiss").

[243] Press Release, KLM Cargo, *KLM Cargo:  Implementation of US Customs Border and Protection Regulations* (July 27, 2004) [LH_CIV_0029860].

[244] Press Release, KLM Cargo, *KLM Cargo:  Implementation of US Customs Border and Protection Regulations* (July 27, 2004) [LH_CIV_0029860].

[245] *See*, *e.g.*, E-mail from General Manager of Pricing, Lufthansa Cargo, to several Lufthansa Cargo employees (July 2, 2004) (unofficial translation) [LH_CIV_0002890; LH_CIV_0001353].

[246] E-mail from General Manager of Pricing, Lufthansa Cargo, to several Lufthansa Cargo employees (July 2, 2004) (unofficial translation) [LH_CIV_0002890; LH_CIV_0001353].

129.    UA also agreed with Air France, Air Canada, British Airways, Cargolux, Japan Airlines, UA, and the IATA Cargo Business Panel to implement agreed-upon charge codes in furtherance of the Customs Surcharge Cartel.[247]

130.    In accordance with this coordination, the Airfreight Carriers began charging a Customs Surcharge effective on or about August 2004.  DHL was subject to and paid this Customs Surcharge to UA and its co-conspirators for U.S. Airfreight Shipping Services.

131.    On October 28, 2004, Air France, British Airways, KLM, Lufthansa Cargo and Swiss WorldCargo further discussed their "common approach" on the U.S. customs-related issues.[248]  Upon information and belief, Lufthansa Cargo also discussed this common approach with the Alliance, and thus coordinated the Alliance's pricing with the cartel's pricing.

132.    Upon information and belief, the amount that UA charged for the Customs Surcharge exceeded – and was unnecessary to recover – UA's actual customs-related costs.

## X.    The Conspiracy Encompassed Base Freight Rates

133.    The conspiracy was not limited to Surcharges.  It also encompassed base freight rates.  Indeed, the Airfreight Carriers fixed base freight rates prior to the time they instituted Fuel, Security and Customs Surcharges.  Accordingly, base freight rates were already at supracompetitive levels at the time the Fuel Surcharges were implemented.  The Airfreight Carriers continued to fix base freight rates while charging Surcharges, at least in part so as not to undercut the supracompetitive profits generated by the illegal Surcharges.  The fixed base freight rates thus represented a floor above which the Surcharges constituted illegal overcharges.

134.    At the April 15, 1997, meeting of the Singapore BAR CSC, discussed above and which UA attended, there was discussion about how "it [was] an opportune time for members to

---

[247] E-mail from General Manager of Pricing, Lufthansa Cargo, to several Lufthansa Cargo employees (July 2, 2004) [LH_CIV_0002890; LH_CIV_0001353] (unofficial translation).

increase rates especially in high demand sectors" because the "market so far [had] been receptive to the fuel surcharge which [was] effectively a rate increase."[249]

135. On October 31, 1997, Lufthansa Cargo met with Air Canada, SAS, Thai Airways, UA and VARIG under the guise of the Star Alliance.[250] Lufthansa Cargo called the meeting because even though "[a] number of meetings have already taken place at various levels with UA/SK [United Airlines/SAS] and AC [Air Canada]," Lufthansa Cargo believed that it was time to "explore options as a group."[251] The attendees discussed competitively sensitive issues, such as capacity, pricing and marketing.[252] Further, the attending Airfreight Carriers agreed to a "Regular Information Exchange" and "Further expansions of the group."[253]

136. In December 1998, Lufthansa Cargo communicated with UA, Air France, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, Singapore Air and Swissair to discuss rates and to exchange information on prices. On December 16, 1998, Lufthansa Cargo's Sales Manager for Germany sent an e-mail jointly addressed to those nine Airfreight Carriers, including UA, stating the following:

> [T]he euro is coming and nothing is going to change that. as [sic] a result it would be useful – as previously discussed with some of you already – for all of us to meet soon. it [sic] is certainly in our interest, as well as in the interest of our partners and customers, that we ensure a somewhat uniform transition from the dm to the euro. some [sic] of you are already publishing your rate sheets for 01 January 1999 in euros. others, [sic] such as Lufthansa cargo, will be doing this on 01 April 1999. In addition there are various options for rounding up and down with the framework of the

---

[248] E-mail between Swiss WorldCargo employees (Oct. 28, 2004) [LH_CIV_0006950].
[249] Minutes, Extraordinary BAR Cargo Sub-Committee Meeting (Apr. 15, 1997) [SIA_CIV_0028170].
[250] Letter from Regional Director, UK & Ireland, Lufthansa Cargo, to representatives of Air Canada, SAS, Thai Airways, United Airlines and VARIG (Aug. 7, 1997) [LH_CIV_0143895].
[251] Letter from Regional Director, UK & Ireland, Lufthansa Cargo, to representatives of Air Canada, SAS, Thai Airways, United Airlines and VARIG (Aug. 7, 1997) [LH_CIV_0143895].
[252] Letter from Regional Director, UK & Ireland, Lufthansa Cargo, to representatives of Air Canada, SAS, Thai Airways, United Airlines and VARIG (Aug. 7, 1997) [LH_CIV_0143895].
[253] Letter from Regional Director, UK & Ireland, Lufthansa Cargo, to representatives of Air Canada, SAS, Thai Airways, United Airlines and VARIG (Aug. 7, 1997) [LH_CIV_0143895].

conversation.  there [sic] are bound to be other topics, which we
should discuss.  so [sic] I am inviting you all to have an
opportunity to exchange information

> on:      08 January 1999
>
> from:  9AM to 12 Noon (possible 1 PM)
>
> at:      Gasaurant restaurant

on [sic] behalf of Lufthansa.  I would very much appreciate it if
each airline would send a representative.[254]

137.   Lufthansa Cargo's Sales Manager for Germany organized another meeting on

January 25, 1999, described as a "new year reception," at Lufthansa Cargo's headquarters.[255]

The e-mail invitation to the meeting from Lufthansa Cargo was jointly addressed to

representatives of UA, Air China, Air France, Cargolux, Cathay Pacific, Japan Airlines, KLM,

Korean Air, Lufthansa Cargo, SAS, Singapore Air, Swissair and VARIG.[256]  The purpose of the

meeting was to discuss capacity developments in the various traffic areas, as well as "other

popular discussion topics," which, upon information and belief, meant rates.[257]  In any event,

discussions about capacity necessarily involve rates.

138.   On February 18, 1999, UA, Alitalia, Canadian Airlines, Cargolux, China Airlines,

Japan Airlines, KLM, Lufthansa Cargo, Martinair, Nippon Cargo Airlines, Saudi Arabian

Airlines, and Thai Airways, among others, attended a meeting at "Cafe Adriatico, Malate."[258]

---

[254]  E-mail from Sales Manager for Germany, Lufthansa Cargo, to representatives of United Airlines, Air China, Air France, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, Lufthansa Cargo, Singapore Air, South African Airways, Swissair and VARIG (Dec. 16, 1998) (certified translation) [LH_CIV_0002164].

[255]  E-mail from Sales Manager for Germany, Lufthansa Cargo, to representatives of United Airlines, Air China, Air France, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, SAS, Singapore Air, Swissair and VARIG (Jan. 20, 1999) (unofficial translation) [LH_CIV_0130477].

[256]  E-mail from Sales Manager for Germany, Lufthansa Cargo, to representatives of United Airlines, Air China, Air France, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, SAS, Singapore Air, Swissair and VARIG (Jan. 20, 1999) (unofficial translation) [LH_CIV_0130477].

[257]  E-mail from Sales Manager for Germany, Lufthansa Cargo, to representatives of United Airlines, Air China, Air France, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, SAS, Singapore Air, Swissair and VARIG (Jan. 20, 1999) (unofficial translation) [LH_CIV_0130477].

[258]  Minutes of the GCCI Meeting, Global Cargo Carriers, Inc. (Feb. 18, 1999) [LH_CIV_0240849].

The attending Airfreight Carriers were reminded of the importance of sharing production statistics and engaged in an "Airline Update," during which each attendee exchanged capacity information.[259]  There was also discussion of base rates."[260]

139.   In April 1999 the GCCI held a meeting where this yield improvement program was discussed on a per sector basis, including to the United States, in order to combat increasing operational costs.[261]  UA, Cathay Pacific, China Airlines, Korean Airlines, and UA attended.[262]  At this meeting, the GCCI President encouraged all members to "organize themselves by sector to discuss . . . a yield improvement program."[263]  One of the sectors discussed was the United States.[264]

140.   On May 26, 1999, UA, Alitalia, Asiana Airlines, Cargolux, Cathay Pacific, China Airlines, Emirates, Eva Air, Japan Airlines, Korean Air, Nippon Cargo Airlines, Saudi Arabian Airlines, and Thai Airways, among others, met at a GCCI meeting at the "PSI Lounge."[265]  The attending Airfreight Carriers discussed how they would "submit sales reports" to share between and among GCCI members.[266]  There was also an "Airline Update," during which the attendees exchanged capacity and base freight rate information.[267]

141.   On June 18, 1999, Lufthansa Cargo sent a private e-mail jointly addressed to representatives of UA, Air Canada, SAS, Singapore Air, Thai Airways, and VARIG.[268]

[259] Minutes of the GCCI Meeting, Global Cargo Carriers, Inc., at 1-2 (Feb. 18, 1999) [LH_CIV_0240849].
[260] Minutes of the GCCI Meeting, Global Cargo Carriers, Inc., at 2 (Feb. 18, 1999) [LH_CIV_0240849].
[261] Minutes of the meeting, Global Cargo Carriers, Inc., at 1 (April 27, 1999) [LH_CIV_0240846].
[262] Minutes of the meeting, Global Cargo Carriers, Inc., at 1 (April 27, 1999) [LH_CIV_0240846].
[263] Minutes of the meeting, Global Cargo Carriers, Inc., at 1 (April 27, 1999) [LH_CIV_0240846].
[264] Minutes of the meeting, Global Cargo Carriers, Inc., at 1 (April 27, 1999) [LH_CIV_0240846].
[265] Minutes of Monthly Meeting, Global Cargo Carriers, Inc. (May 26, 1999) [LH_CIV_0240842].
[266] Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (May 26, 1999) [LH_CIV_0240842].
[267] Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 2 (May 26, 1999) [LH_CIV_0240842].
[268] E-mail from Lufthansa Cargo to Air Canada, SAS, Singapore Air, Thai Airways, United Airlines and VARIG (June 18, 1999) [LH_CIV_0102474].

Lufthansa Cargo inquired as to when those Airfreight Carriers "plan to introduce pricing and rating in EURO . . . ."[269]

142. On July 8, 1999, GCCI (the same organization that helped facilitate the Fuel Surcharge conspiracy) held a secret meeting at "Pan Pacific."[270] UA, Alitalia, Asiana Airlines, Cargolux, EVA Airways, Japan Airlines, Korean Airlines, Lufthansa Cargo, Malaysian Airlines, Martinair, Singapore Air, Thai Airways, and Emirates attended.[271] Each attendee participated in an "AIRLINE UPDATE," during which capacity and base-freight rate information was exchanged.[272]

143. In furtherance of the cartel's efforts to increase base freight rates, on August 30, 1999, Global Cargo Carriers, Inc. ("GCCI"), the group that also helped facilitate the Fuel Surcharge conspiracy, met at the "Miascor Lounge."[273] A UA representative attended, along with representatives from American Airlines, Asiana Airlines, Canadian Airlines, Cargolux, Continental Airlines, Continental Micronesia, Emirates, Eva Air, Japan Airlines, KLM, Korean Airlines, Lufthansa Cargo, Malaysian Airlines System, Northwest Airlines, Pakistan International Airlines, Philippine Air Lines, Royal Brunei Airlines, Thai Airways and UPS.[274] KLM "raised the feedback [it] got from some agents that GCCI pushed for the rate increase. . . . [T]he rate increase came from airlines' respective head offices."[275] The Airfreight Carriers also discussed other competitively sensitive issues, including flight frequency and capacity.[276]

---

[269] E-mail from Lufthansa Cargo to Air Canada, SAS, Singapore Air, Thai Airways, United Airlines and VARIG (June 18, 1999) [LH_CIV_0102474].

[270] Minutes of Monthly Meeting, Global Cargo Carriers, Inc. (July 8, 1999) [LH_CIV_0240835].

[271] Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (July 8, 1999) [LH_CIV_0240835].

[272] Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 2 (July 8, 1999) [LH_CIV_0240835].

[273] Minutes of Monthly Meeting, Global Cargo Carriers, Inc. (Aug. 30, 1999) [LH_CIV_0240830].

[274] Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Aug. 30, 1999) [LH_CIV_0240830].

[275] Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Aug. 30, 1999) [LH_CIV_0240830].

[276] Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 2 (Aug. 30, 1999) [LH_CIV_0240830].

144.    Shortly after the September 1999 rate increase went into effect, Dirk Rabanus of Air France exchanged e-mails with Lufthansa Cargo's Sales Manager for Germany about residual capacity.[277]  In this exchange, Mr. Rabanus explained how Air France priced its capacity on short notice, to which Lufthansa Cargo's Sales Manager for Germany responded that it is counterproductive to offer special rates to destinations that are affected by the recent increase in rates.[278]  In particular, Lufthansa Cargo's Sales Manager for Germany stated that he "would very much appreciate it if you [Mr. Rabanus] could take the north american [sic] destinations especially out of the [Air France marketing] campaign."[279]  Lufthansa Cargo's Sales Manager for Germany then forwarded the conversation to Bernd von Seelen of KLM and a Swissair employee.[280]

145.    On September 28, 1999, UA, Alitalia, Asiana Airlines, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Airlines, Lufthansa Cargo, Martinair, Nippon Cargo Airlines, Northwest Airlines, and Thai Airways, among others, met at a GCCI meeting held at the "Pacific Rim."[281]  The Airfreight Carriers exchanged competitively sensitive information, including flight frequency, capacity and base freight rates.[282]

146.    The coordination of base freight rates between and among Airfreight Carriers continued during and after the initial implementation of the Fuel Surcharge in February 2000. Because the base freight rates were fixed prior to the implementation of the Fuel Surcharge, the

---

[277]  E-mail from Dirk Rabanus, Air France, to Sales Manager for Germany, Lufthansa Cargo (Sept. 9, 1999) (certified translation) [LH_CIV_0002237]; E-mail from Sales Manager for Germany, Lufthansa Cargo, to Dirk Rabanus, Air France (Sept. 9, 1999) (certified translation) [LH_CIV_0002237].
[278]  E-mail from Dirk Rabanus, Air France, to Sales Manager for Germany, Lufthansa Cargo (Sept. 9, 1999) (certified translation) [LH_CIV_0002237]; E-mail from Sales Manager for Germany, Lufthansa Cargo, to Dirk Rabanus, Air France (Sept. 9, 1999) (certified translation) [LH_CIV_0002237].
[279]  E-mail from Sales Manager for Germany, Lufthansa Cargo, to Bernd von Seelen, KLM Cargo (Sept. 9, 1999) (certified translation) [LH_CIV_0002237].
[280]  E-mail from Sales Manager for Germany, Lufthansa Cargo, to Bernd von Seelen, KLM Cargo, and a Swissair employee (Sept. 9, 1999) [LH_CIV_0002237].
[281]  Minutes of Monthly Meeting, Global Cargo Carriers, Inc. (Sept. 28, 1999) [LH_CIV_0240828].

already-inflated base freight rates represented a floor above which any Surcharge constituted an illegal overcharge.

147. On March 23, 2000, UA, Asiana, Cargolux, China Airlines, Japan Airlines, Korean Air, Lufthansa Cargo, Malaysian Airlines, Northwest Airlines, Swissair, and Thai Airways, among others, attended a GCCI meeting and shared competitively sensitive information, such as capacity and base-freight rates.[283] The Airfreight Carriers received an update on the Fuel Surcharge and engaged in a "Market Update," during which carriers exchanged competitively sensitive information, including capacity and base freight rates.[284]

148. On July 19, 2000, Bernd von Seelen of KLM e-mailed KLM's rates from Germany to various destinations to Otto Meyer of Air France and to Lufthansa Cargo's Sales Manager for Germany.[285] Mr. von Seelen stated that, "after discussions with our [KLM's] headquarters, we will have to [ ] adjust our German general rate sheet" for the listed destinations.[286] "As a result," explained Mr. von Seelen, "there is little room for special agreements."[287] Upon information and belief, at the same time that Lufthansa Cargo was receiving this competitively sensitive information from KLM, it was also coordinating UA's prices through the Alliance and ensuring that UA's base freight rates were coordinated with those of other cartel members.

149. On April 6, 2001, Cargolux e-mailed Air France, British Airways, Lufthansa Cargo, Swissair and Turkish Airlines, stating that "we [Cargolux] received an inquiry for [ ]

---

[282] Minutes of Monthly Meeting, Global Cargo Carriers, Inc. (Sept. 28, 1999) [LH_CIV_0240828].
[283] Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 2 (Mar. 23, 2000) (emphasis in original) [LH_CIV_0240815].
[284] Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 2 (Mar. 23, 2000) [LH_CIV_0240815].
[285] E-mail from Bernd von Seelen, KLM Cargo, to Otto Meyer, Air France, and Sales Manager for Germany, Lufthansa Cargo (July 19, 2000) (certified translation) [LH_CIV_0004306].
[286] E-mail from Bernd von Seelen, KLM Cargo, to Otto Meyer, Air France, and Sales Manager for Germany, Lufthansa Cargo (July 19, 2000) (certified translation) [LH_CIV_0004306].

regular [business] [to Los Angeles] for which we offered USD 1.95/k net _plus_ [Fuel Surcharge] and which is _in line with our talks_. . . .  However, we had to learn that the best offer came from one of our round with USD 1.80 incl[uding] FSC [repeat] incl[uding] FSC [sic]. . . ."[288]  A subsequent e-mail from Turkish Airlines added that "[w]e find it dangerous for all carriers to play with [the Fuel Surcharge]."[289]  Through its monitoring activity, the cartel minimized cheating on the cartel.  To be sure, from time to time a cartel member would charge a low spot rate, but the cartel discouraged such conduct and prevented it from becoming sufficiently widespread as to undermine the cartel.

150.    On June 8, 2001, a Lufthansa Cargo employee told a representative of Japan Airlines, "[o]ne thing which I would not like to see is a competition and price war against each other.  We have worked together for such a long time, to our mutual satisfaction, that I would like to see a joint approach [ ] continue."[290]  Mindful of prior experience, Lufthansa Cargo was worried that in a competitive environment, prices would fall to the detriment of the air carriers' profits.

151.    On September 20, 2001, M. Eraltan of Air France met with representatives from Cargolux, Lufthansa Cargo, MNG Airlines and Turkish Airlines in Istanbul, Turkey.[291]  The attendees agreed to "new rates to North America," which were the same for Canada and the

---

[287] E-mail from Bernd von Seelen, KLM Cargo, to Otto Meyer, Air France, and Sales Manager for Germany, Lufthansa Cargo (July 19, 2000) (certified translation) [LH_CIV_0004306].

[288] E-mail from Henry Templin, Country Manager, Cargolux (Apr. 6, 2001) (emphasis added) [LH_CIV_0001418].

[289] E-mail from Nasug Cetin, Turkish Airlines (Apr. 9, 2001) [LH_CIV_0001418].

[290] E-mail from Senior Vice President of Sales, Lufthansa Cargo, to T. Fukuchi, Japan Airlines (June 8, 2001) [LH_CIV_0000245].  Further evidence of this effort was Japan Airline's criticism of Lufthansa Cargo for Lufthansa Cargo's failure to increase its rates to Japan.  E-mail from Senior Vice President of Sales, Lufthansa Cargo, to Head of Sales for Hannover, Lufthansa Cargo (Sept. 14, 2001) (unofficial translation) [LH_CIV_0000249].

[291] E-mail from Henry Templin, Country Manager, Turkey, Cargolux, to M. Eraltan, Air France, and representatives of Lufthansa Cargo, MNG Airlines and Turkish Airlines (Sept. 19, 2001) [LH_CIV_0055591].

United States.[292]  The plan to which the attendees agreed was for Cargolux to announce the new rates first and for the other Airfreight Carriers to follow.[293]  This had the effect of making the cartel look like mere unilateral follow-the-leader conduct, when in reality it was a coordinated price increase.  The effective date of the rate increase to which the Airfreight Carriers agreed was October 15, 2001.[294]  The Lufthansa Cargo representative noted that "[w]e are quite confident that this mutual agreements [sic] will lead us to prosperous times."[295]

152.    In the meantime, Lufthansa Cargo also coordinated base freight rates with UA. For example, on or about June 2002, Lufthansa Cargo asked UA to raise base freight rates out of Europe.  An employee of UA responded to Lufthansa Cargo's General Manger for Pricing regarding "UA-L[ufthansa Cargo] Pricing Coordination,"[296] stating the following:

> I am writing because [another UA employee] from United met recently with [a Lufthansa Cargo employee] and a topic of conversation was differences in rates between LH [Lufthansa Cargo] and UA.  In that meeting the LH representative indicated that UA was "dragging down" the pricing out of Europe.  This comes as a bit of a surprise since our impression is that we are on the high side [out of] Europe.  However, if you were to have said that out of the United States we were low priced, I would have agreed.
>
> Can you confirm that this was what was meant . . . that we are priced on the low side out of Europe and are dragging down rates? If you could give me some specific examples I would be more than happy to address them with our European sales force.[297]

---

[292]  E-mail from Henry Templin, Country Manager, Turkey, Cargolux, to M. Eraltan, Air France, and representatives of Lufthansa Cargo , MNG Airlines and Turkish Airlines (Sept. 19, 2001) [LH_CIV_0055591].

[293]  E-mail from Henry Templin, Country Manager, Turkey, Cargolux, to M. Eraltan, Air France, and representatives of Lufthansa Cargo, MNG Airlines and Turkish Airlines (Sept. 19, 2001) [LH_CIV_0055591].

[294]  E-mail from Henry Templin, Country Manager, Turkey, Cargolux, to M. Eraltan, Air France, and representatives of Lufthansa Cargo, MNG Airlines and Turkish Airlines (Sept. 19, 2001) [LH_CIV_0055591].

[295]  E-mail from Global Account Manager, Lufthansa Cargo, to M. Eraltan, Air France, and representatives of Cargolux, MNG Airlines, and Turkish Airlines (Sept. 20, 2001) [LH_CIV_0055591].

[296]  E-mail from an employee of United Airlines, to General Manager of Pricing, Lufthansa Cargo (June 14, 2002) [LH_CIV_0001660].

[297]  E-mail from an employee of United Airlines, to General Manager of Pricing, Lufthansa Cargo (June 14, 2002) [LH_CIV_0001660].

-63-

This communication was not immune from U.S. antitrust laws under the UA-Lufthansa Alliance. As mentioned above, the purpose of the Alliance was "globally integrat[ing]" complementary air transportation services to provide benefits to consumers.[298]  In contrast, the effect of the above communication was to keep prices above competitive levels on competitive routes, thereby harming consumers.  Moreover, Lufthansa Cargo's efforts to keep rates high were not limited to Alliance members.

153.    On July 12, 2002, representatives from Lufthansa Cargo, Air France, Alitalia, British Airways, Cathay Pacific, China Airlines, Dragonair, EVA Air, Finnair, KLM, Martinair, Malaysian Airlines System, SAS, Singapore Air and Virgin Atlantic met in Hong Kong to discuss base freight rate increases and capacities.[299]  The attending Airfreight Carriers agreed "to go for a general rate increase . . . ."[300]  In particular, KLM agreed to an initial rate increase effective August 1, 2002, and "2 more rate increases if market situation allows;" Air France agreed to an initial rate increase on July 1, 2002, with "one more planned for Sep[tember];" and Martinair agreed to "go for a rate increase in AUG / SEP [2002] . . . ."[301]

154.    In August 2002, Lufthansa Cargo and KLM discussed fixing base freight rates to the United States at a ten percent higher level than current rates.[302]  Upon information and belief, Lufthansa Cargo shared this information with UA through the Alliance and coordinated the same ten percent price increase among the Alliance member carriers.

155.    On September 30, 2002, representatives of eight major Airfreight Carriers, including Lufthansa Cargo, Air France, British Airways and KLM, met confidentially in Japan

---

[298]  Coordination Agreement between Lufthansa, SAS and UA, at 1 (Aug. 9, 1996).
[299]  E-mail from Regional Manager of Sales for South China & Taiwan, Lufthansa Cargo, to several Lufthansa Cargo employees (July 12, 2002) [LH_CIV_0051730].
[300]  E-mail from Regional Manager of Sales for South China & Taiwan, Lufthansa Cargo, to several Lufthansa Cargo employees (July 12, 2002) [LH_CIV_0051730].
[301]  E-mail from Regional Manager of Sales for South China & Taiwan, Lufthansa Cargo, to several Lufthansa Cargo employees (July 12, 2002) [LH_CIV_0051730].

and reiterated that there should be "no adjustments in net/net rates, either whole or partial."[303]  In addition, the Airfreight Carriers established "[c]lose hotlines . . . with immediate effect among today's participants in case of doubt and contradicting/misleading market information."[304]  Upon information and belief, Lufthansa Cargo, purporting to act through the Alliance, made sure that UA's prices were coordinated with the other cartel members.

156.    For example, in February 2003, Lufthansa Cargo discussed with UA a potential rate increase for flights to the United States, and Lufthansa Cargo shared the substance of that communication with at least British Airways and KLM.[305]  In particular, Lufthansa Cargo's General Manager for Pricing wrote as follows:

> Rate Increase:
> BA [British Airways] no opinion on +9-this
> UA sees potential for U.S. inbound (from Europe and Asia)[306]

Lufthansa Cargo also noted that "KL[M] is aware of our signal and is surprised that we take this step in the summer during low season etc . . . (don't have the courage in this respect in my opinion)."[307]  The email warned that it "would be good if you do not forward this mail."[308]

157.    On February 11, 2003, Lufthansa Cargo's Regional Sales Director for Germany sent Lufthansa Cargo's planned pricing measures for the upcoming summer season in an e-mail jointly addressed to UA, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay

---

[302] E-mail between Lufthansa Cargo employees (Aug. 20, 2002) [LH_CIV_0000342].

[303] E-mail between Lufthansa Cargo employees (Sept. 30, 2002) [LH_CIV_0001210].

[304] E-mail between Lufthansa Cargo employees (Sept. 30, 2002) [LH_CIV_0001210].

[305] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation) [LH_CIV_0000101].

[306] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation) [LH_CIV_0000101].

[307] E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation) [LH_CIV_0000101].

[308] E-mail from General Manager for Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation) [LH_CIV_0000101]

Pacific, Japan Airlines, KLM, Korean Air, LAN Cargo and VARIG.[309]  All of these Airfreight Carriers were thus jointly aware of Lufthansa Cargo's plan before it was implemented and they were, in substance, invited to do the same.  The press release sent by Lufthansa Cargo had not been released publicly when it was sent to UA and the other Airfreight Carriers.[310]

158.    On May 15, 2003, Lufthansa Cargo and Air France held discussions that included the topic of "price increases [in the] fall," among other competitively sensitive issues.[311]

159.    On November 25, 2003, the Korea BAR Cargo Committee met.[312] Representatives of UA, Air France, Alitalia, Asiana, Cathay Pacific, Japan Airlines, KLM, Korean Air, Lufthansa Cargo, Northwest Airlines, Polar Air Cargo, Singapore Air, and Thai Airways attended the meeting.[313]  The attendees again engaged in "Information Sharing" and discussed the "Price Policy During High Demand Seasons."

160.    On March 11, 2004, the BLACKS initiative met again in Singapore.[314]  CEOs of each of the represented airlines attended the meeting.[315]  One of the topics discussed was "harmonisation [sic] between the states."  In addition, one of the attendees noted that "[a]s a group, we have to make it or die."[316]  This meeting evidences the involvement of senior management in the Cartel.

---

[309]  E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of United Airlines, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, LAN Cargo and VARIG (Feb 11, 2003) (unofficial translation) [LH_CIV_0147653].
[310]  E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of United Airlines, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, LAN Cargo and VARIG (Feb 11, 2003) (unofficial translation) [LH_CIV_0147653].
[311]  Meeting Notes, Lufthansa Cargo (May 15, 2003) [LH_CIV_0001762].
[312]  Notice of Cargo Committee Meeting, Korea BAR (Nov. 25, 2003) [LH_CIV_0245027].
[313]  Notice of Cargo Committee Meeting, Korea BAR (Nov. 25, 2003) [LH_CIV_0245027].
[314]  E-mail between Swiss WorldCargo employees (Mar. 15, 2004) [LH_CIV_0006805].
[315]  E-mail from Martine Lamandè, Direction Operations & Logistics, Air France Cargo, to General Manager, Process & Claims, Swiss WorldCargo (Mar. 30, 2003) [LH_CIV_0006805].
[316]  E-mail from Martine Lamandè, Direction Operations & Logistics, Air France Cargo, to General Manager, Process & Claims, Swiss WorldCargo (Mar. 30, 2003) [LH_CIV_0006805].

161.    In August 2004, Basil Baramki of Air France spoke with Swiss WorldCargo's Vice President of Area Management for Europe and stated that "AF [Air France] has forseen [sic] to increase certain rates" effective November 1, 2004.[317]  To further coordinate the planned rate increase, Mr. Baramki met with Swiss WorldCargo's Vice President of Area Management for Europe and Lufthansa Cargo's Manager of Sales and Marketing for Switzerland on August 31, 2004, at 8:30 a.m. in Lufthansa Cargo's offices in Zurich, Switzerland.[318]

162.    At least as early as November 2004, Lufthansa Cargo employees in Los Angeles, California, had been given a password to a proprietary and confidential website where KLM posted its rates for internal use.[319]

163.    During the first week of November 2004, Lufthansa Cargo and UA discussed "pricing issues ex CHI [Chicago, Illinois]."[320]  At the same time, Lufthansa Cargo was also communicating with other Airfreight Carriers not in the Alliance concerning base freight rates for U.S. Airfreight Shipping Services.  For example, at least as early as November 2004, Lufthansa Cargo employees in Los Angeles, California, had a password that gave them access to the private and confidential website on which KLM kept its rates.[321]

164.    On December 6, 2004, representatives from UA and Lufthansa Cargo met at UA's offices at Chicago's O'Hare International Airport.[322]  The representatives in attendance from UA were UA's Cargo Vice President of Sales and Marketing, Director of Finance, and Manager of

---

[317]  E-mail from Vice President, Area Management Europe, Swiss WorldCargo, to Basil Baramki, Air France, and representatives of Lufthansa Cargo (Aug. 26, 2004) [LH_CIV_0007268].
[318]  E-mail from Vice President, Area Management Europe, Swiss WorldCargo, to Basil Baramki, Air France, and representatives of Lufthansa Cargo (Aug. 26, 2004) [LH_CIV_0007268]; E-mail from Vice President, Area Management Europe, Swiss WorldCargo, to Manager of Sales and Marketing for Switzerland, Lufthansa Cargo, and several Swiss WorldCargo employees (Aug. 26, 2004) [LH_CIV_0007268].
[319]  Minutes, LAX FS Weekly Conference Call, Lufthansa Cargo (Nov. 3, 2004) [LH_CIV_0034261].
[320]  E-mail between Lufthansa Cargo employees (Oct. 28, 2004) [LH_CIV_0131089].
[321]  Minutes, LAX FS Weekly Conference Call, Lufthansa Cargo (Nov. 3, 2004) [LH_CIV_0034261].
[322]  E-mail between Lufthansa Cargo employees (Dec. 14, 2004) [LH_CIV_0003890].

Cargo Revenue Management.[323]  Lufthansa Cargo described the details of the meeting as

follows:

> UA first presented us with their Joint Cargo Pricing proposal.  It
> was quite ambitious without any concrete actions for realization.
> My impression was that their Finance and Revenue mgmt people
> did not have much knowledge about cargo pricing matters.
>
> Highlights of the UAL proposal:
> 1. Joint rate setting in US to Germany I like it lets work on it ... we
> need to increase our yield by 8 Euro/Cent ..keep that in mind
> 2. Ability to raise yields by as much as $0.20 / kg. See above ..I
> like it
> 3. UA to act as GSA to sell LH's [Lufthansa Cargo's] less
> desirable lanes. . . .  No interest at this point in time
> 4. Monthly joint rate review to verify rate structure and
> performance.  Yes!
> 5. Structure to develop and set market rates on a monthly basis.
> Yes!
> 6. UA and LH to provide their respective rate and market sales
> data.  Yes!
> 7. LH westcoast freighters make stops in IAD in both directions
> (re-route), their commitment would be maximum of entire lower
> deck capacity.  No chance![324]

UA and Lufthansa Cargo also discussed the possibility of a future meeting on January 11 at

UA's offices in Chicago.[325]  At this time, Lufthansa Cargo was acting as one of the primary

facilitators of a horizontal cartel, coordinating prices for UA and other competing Airfreight

Carriers.  The cartel members, including UA, were aware that Lufthansa Cargo was playing that

role and participated in the cartel with that knowledge.

164.    On March 18, 2005, a the Managing Director of Finance and Revenue

Management for UA's cargo division wrote to a representative of Lufthansa Cargo to discuss

increasing rates on flights from the United States to Germany:  "Is there any interest on LH

[Lufthansa Cargo] part to restart discussions on getting rates up US to Germany. . . .  We are

---

[323] E-mail between Lufthansa Cargo employees (Dec. 14, 2004) [LH_CIV_0003890].
[324] E-mail between Lufthansa Cargo employees (Dec. 14, 2004) [LH_CIV_0003890].
[325] E-mail between Lufthansa Cargo employees (Dec. 14, 2004) [LH_CIV_0003890].

very much interested in reengaging in discussions and get some quick hits like ORD [O'Hare International Airport in Chicago, Illinois to] FRA [Frankfurt Airport in Frankfurt, Germany]."[326] Although the UA executive attempted to protect this discussion under the cover of an "Anti-trust Proposal," such a clear attempt to increase rates on consumers violates the purpose of the Coordination Agreement and therefore falls outside the limited antitrust protection of the Alliance.

166.    On March 23, 2005, UA and other Airfreight Carriers, including Air France, All Nippon Airways, Asiana, Cathay Pacific, Japan Airlines, KLM, Korean Air, Lufthansa Cargo, Nippon Cargo Airlines, Northwest Airlines, Polar Air Cargo, Singapore Air, and Thai Airways exchanged competitively sensitive information at a Korea BAR Cargo Committee meeting.[327]

167.    On June 27 and 28, 2005, "Aviainform," an organization organized by Lufthansa and other Carriers to facilitate the Cartel, hosted a meeting at the Hotel Alte Amtsgericht in Braunfels, Germany.  The attendees, who included competing Airfreight Carriers, discussed "Recent Issues on Volume and Prices," including "Pricing Models with selected Freight Forwarders segments."[328]  The Airfreight Carriers also exchanged competitively-sensitive information, such as prices, volumes, capacities, yields, Fuel Surcharges and fuel prices.[329]  In addition to the written information exchanged, one of the purposes of the Aviainform meetings was to set ad hoc rates, which are the base-freight rates for any Airfreight Shipping Services purchased outside the context of a contract.  The routes upon which the attendees agreed to fix ad

---

[326]  E-mail from Managing Director, Finance and Revenue Management, United Airlines Cargo, to a Lufthansa Cargo employee (Mar. 18, 2005) [LH_CIV_0138261].
[327]  Notice of Cargo Committee Meeting, Korea BAR (Mar. 23, 2005) [LH_CIV_0245051].
[328]  Presentation, Aviainform, 2005 Pricing Strategy Workshop Germany, at 2 (June 27-28, 2005) [LH_CIV_0135433].
[329]  Presentation, Aviainform, 2005 Pricing Strategy Workshop Germany (June 27-28, 2005) [LH_CIV_0135433].

hoc rates included routes to and from the United States.  The same Airfreight Carriers met again at "marketing workshops" for the same purposes in August 2005 and February 2006.[330]

168.   In late November 2005, a Lufthansa Cargo executive "had a long chat" with M. Eraltan of Air France about base freight rates.[331]  The two men "agreed" to increase rates to the United States.[332]  Upon information and belief, Lufthansa Cargo also coordinated increased rates for the Alliance members including UA.

169.   On or about May 1, 2006, a United Airlines executive met with Qantas Airways' Vice President of Freight for the Americas in Las Vegas and discussed rates.  Upon information and belief, the two carriers not only exchanged competitively-sensitive information regarding rates, but also coordinated a rate increase that went into effect shortly after the meeting.  Qantas Airways' Vice President of Freight for the Americas subsequently pled guilty to criminal antitrust violations and paid a $20,000 criminal fine for his participation in the air cargo cartel described in this Complaint.[333]

## XI.   Airfreight Carriers Monitored the Cartel to Maximize Compliance and Minimize Cheating

170.   In addition to agreeing on Surcharges and base freight rates, the cartel members monitored each other's rates and Surcharges to minimize cheating on the cartel and preserve supracompetitive profits.  To that end, the Airfreight Carriers had various in-person meetings and

---

[330] E-mail from Dirk Steiger, Aviainform (Nov. 29, 2005) [LH_CIV_0001782]; E-mail from Dirk Steiger, Principal & Managing Director, Aviainform, to representatives of Air Canada, Air Canada, Air New Zealand, Cargolux, LAN Cargo, Lufthansa Cargo, Martinair, Singapore Air, South African Airways and Swiss WorldCargo (June 30, 2005) [LH_CIV_0000643]; E-mail from Nicole Dommermuth, Aviainform, to representatives of Air Canada, Air New Zealand, Cargolux, LAN Cargo, Lufthansa Cargo, Martinair, Singapore Air, South African Airways and Swiss WorldCargo (Aug. 17, 2005) [LH_CIV_0000702]; E-mail from Lo Gaumer, Aviainform, to representatives of Air Canada, Air New Zealand, Cargolux, LAN Cargo, Lufthansa Cargo, Martinair, South African Airways and Swiss WorldCargo (Aug. 11, 2005) [SIA_CIV_0037807]; E-mail from Martin Bittner, Air Canada, to representatives of Air Canada, Air Canada, Air New Zealand, Aviainform, Cargolux, LAN Cargo, Lufthansa Cargo, Martinair, Singapore Air, South African Airways and Swiss WorldCargo (June 30, 2005) [LH_CIV_0000649].
[331] E-mail between Lufthansa Cargo employees (Nov. 24, 2005) [LH_CIV_0055596].
[332] E-mail between Lufthansa Cargo employees (Nov. 24, 2005) [LH_CIV_0055596].

other communications during the Cartel Period during which they discussed competitively sensitive information, including prices, capacity and Surcharges.

171. Consistent with its role as one of the primary facilitators of the cartel, Lufthansa Cargo played the lead role in monitoring cartel prices and keeping them coordinated. As one Lufthansa Cargo employee told a representative of Japan Airlines, "[o]ne thing which I would not like to see is a competition and price war against each other. We have worked together for such a long time, to our mutual satisfaction, that I would like to see a joint approach [ ] continue."[334]

172. In furtherance of the cartel, a series of meetings, known as "coffee rounds," took place during the Cartel Period. For example, on May 22, 2000, a core group of cartel members – Air France, British Airways, KLM, Lufthansa Cargo and Swissair – held a "coffee round" at Lufthansa Cargo's meeting room in Toronto.[335] Upon information and belief, the purpose of the "coffee round" meetings was to exchange competitively sensitive information to monitor the cartel and prevent "cheating" on the cartel.[336] Upon information and belief, Lufthansa Cargo coordinated Alliance pricing activity with that of the participants in the "coffee rounds."

173. In late May 2000, three months after the Airfreight Carriers first implemented the Fuel Surcharge, Air France suspected that KLM and Lufthansa Cargo might have waived the

---

[333] Press Release, U.S. Dep't of Justice, *Former Qantas Airline Executive Agrees to Plead Guilty to Participating in Price-Fixing Conspiracy on Air Cargo Shipments* (May 8, 2008).
[334] E-mail from Senior Vice President of Sales, Lufthansa Cargo, to T. Fukuchi, Japan Airlines (June 8, 2001) [LH_CIV_0000245]. Further evidence of this effort was Japan Airline's criticism of Lufthansa Cargo for Lufthansa Cargo's failure to increase its rates to Japan. E-mail from Senior Vice President Sales, Lufthansa Cargo, to Head of Sales for Hannover, Lufthansa Cargo (Sept. 14, 2001) (unofficial translation) [LH_CIV_0000249].
[335] E-mail from Sales Manager for Germany, Lufthansa Cargo, to Otto Meyer, Air France, Bernd von Seelen, KLM Cargo, and representatives of British Airways and Swissair (Apr. 20, 2000) [LH_CIV_0004304]. *See also* E-mail from a Swissair employee, to Sales Manager for Germany, Lufthansa Cargo (Apr. 24, 2000) [LH_CIV_0004304].
[336] *See* E-mail from Sales Manager for Germany, Lufthansa Cargo, to Otto Meyer, Air France, Bernd von Seelen, KLM Cargo, and representatives of British Airways and Swissair (Apr. 20, 2000) [LH_CIV_0004304]. *See also* E-mail from a Swissair employee, to Sales Manager for Germany, Lufthansa Cargo (Apr. 24, 2000) [LH_CIV_0004304].

Fuel Surcharge on large shipments.[337]  Accordingly, Otto Meyer of Air France wrote to Bernd

von Seelen of KLM Cargo and Lufthansa Cargo's Sales Manager for Germany, stating "this

morning my colleague from France told me that LH [Lufthansa Cargo] and KL[M] are

dispensing with the fuel surcharge in France in the case of bigger shipments.  Can you confirm

this?  This apparently applies to BA [British Airways] and MP [Martinair] as well.  AF [Air

France] has charged every shipment to date."[338]  Mr. von Seelen responded that KLM was not

engaged in cheating on the cartel:

> KLM is charging the basic fuel charges in accordance with our
> Head Office and our responsible regional directors of sales for
> south Europe.  This is strict KLM policy.  If there were any
> exceptions, then this took place at the local level and without the
> knowledge of the responsible directors.  If you should have an
> example, then please let us know.  We will and want to look into
> this issue.[339]

174.    A similar exchange took place between Bernd von Seelen of KLM Cargo and

Lufthansa Cargo's Sales Manager for Germany in August 2000.  On August 25, 2000, Lufthansa

Cargo's Sales Manager for Germany wrote to Mr. von Seelen stating that "[i]t was brought to my

attention today by my colleagues in the USA that KLM will suspend the fuel-surcharge in the

remaining summer months from the USA, aside from the fact that from the east coast freight is

being offered for 0.50 $/kg.  Can you confirm this?"[340]  After investigating the matter,[341] Mr. von

Seelen responded to Lufthansa Cargo's Sales Manager for Germany by noting that KLM's

"management USA confirms that the fuel surcharges are being applied fully and without

---

[337]  E-mail from Otto Meyer, Air France, to Sales Manager for Germany, Lufthansa Cargo, and Bernd von Seelen, KLM Cargo (May 31, 2000) (certified translation) [LH_CIV_0002281].
[338]  E-mail from Otto Meyer, Air France, to Sales Manager for Germany, Lufthansa Cargo, and Bernd von Seelen, KLM Cargo (May 31, 2000) (certified translation) [LH_CIV_0002281].
[339]  E-mail from Bernd von Seelen, KLM Cargo, to Otto Meyer, Air France, and Sales Manager for Germany, Lufthansa Cargo (June 2, 2000) (certified translation) [LH_CIV_0002281].
[340]  E-mail from Sales Manager for Germany, Lufthansa Cargo, to Bernd von Seelen, KLM Cargo (Aug. 25, 2000) (certified translation) [LH_CIV_0002287].

exceptions.  The rate of about $0.50 mentioned by you is also not at the KLM level."[342]
Moreover, Mr. von Seelen informed Lufthansa Cargo's Sales Manager for Germany that KLM's
"director 'Americas', Michael Steen, has planned a meeting with [Lufthansa Cargo's Vice
President of Sales for The Americas], perhaps the subjects can be broached locally at this
talk."[343]  Prior to the planned meeting, Lufthansa Cargo's Vice President of Sales for The
Americas contacted KLM to discuss Fuel Surcharges.[344]

175.    Dror Harel of KLM met with two Lufthansa Cargo employees in January 2001,
but brought two additional KLM employees:  Sanjay Tiwari and Marianne van Wessen, the
Manager of Business Development for KLM's Air Mail Services unit.[345]  Lufthansa Cargo was
concerned that having three representatives from KLM would hinder the purpose of the meeting,
which was to have an informal exchange of competitively-sensitive information.[346]  One of the
Lufthansa Cargo employees wanted "to keep the group small, otherwise everyone thinks three
times before he says anything and we actually want an information exchange."[347]

176.    On April 6, 2001, a representative of Turkish Airlines reassured Lufthansa Cargo
that it had not been cheating and agreed that "[w]e find it dangerous for all carriers to play with
[the Fuel Surcharge]."[348]

177.    In September 2001, Erdogan Artuna of British Airways wrote to Henry Templin
of Cargolux, copying Lufthansa Cargo, to note that

---

[341]  E-mail from Bernd von Seelen, KLM Cargo, to Sales Manager for Germany, Lufthansa Cargo (Aug. 28, 2000)
(certified translation) [LH_CIV_0002287].
[342]  E-mail from Bernd von Seelen, KLM Cargo, to Sales Manager for Germany, Lufthansa Cargo (Aug. 29, 2000)
(unofficial translation) [LH_CIV_0002287].
[343]  E-mail from Bernd von Seelen, KLM Cargo, to Sales Manager for Germany, Lufthansa Cargo (Aug. 29, 2000)
(unofficial translation) [LH_CIV_0002287].
[344]  E-mail between Lufthansa Cargo employees (Sept. 1, 2000) (unofficial translation) [LH_CIV_0061037].
[345]  E-mail from Dror Harel, KLM Cargo, to a Lufthansa Cargo employee (Jan. 3, 2001) [LH_CIV_0003325].
[346]  E-mail between Lufthansa Cargo employees (Jan. 8, 2001) (certified translation) [LH_CIV_0003325].
[347]  E-mail between Lufthansa Cargo employees (Jan. 8, 2001) (certified translation) [LH_CIV_0003325].
[348]  E-mail from Nasug Cetin, Turkish Airlines (Apr. 9, 2001) [LH_CIV_0001418].

> Our [British Airways'] rate to LAX [Los Angeles International Airport] is 1.90 plus FSC .15 p/k [per kilogram].  On the other hand, as everybody, we are giving spot rate for some of our flights where we have capacity.
>
> You may say that this is not done by you [Cargolux]. . . but I hear the same stories for some airlines.   So why dont [sic] we have a board of managers who will quote [th]e rates for the airlines operating from IST [Atatürk International Airport].  If this is what we are [aft]er, please note BA [British Airways] will not participate.
>
> Pls can you relay this message to the mailing list as my system does not allow to do so. . .[349]

Henry Templin of Cargolux forwarded the message to other Airfreight Carriers, including a representative from Lufthansa Cargo.[350]  Thus, the Airfreight Carriers monitored each other's net prices and tolerated only limited exceptions to the agreed upon prices.

178.    On May 15, 2002, Lufthansa Cargo and Air France met and discussed measures "undertaken to <u>strictly</u> observe the Fuel Surcharge," as well as capacity issues.[351]

179.    On September 30, 2002, representatives of eight major Airfreight Carriers, including Air France, KLM and Lufthansa Cargo, met confidentially in Japan to discuss their "status, plans and views regarding FSC [Fuel Surcharge]."[352]  All eight Airfreight Carriers mutually agreed that there should be "no exceptions . . . .  Allowing one exception [would] defeat the whole industrial movement.  This means, of course, no adjustments in net/net rates, either whole or partial."[353]  In addition, the Airfreight Carriers established "[c]lose hotlines . . . with immediate effect among today's participants in case of doubt and contradicting/misleading

---

[349]  E-mail from Erdogan Artuna, British Airways, to Henry Templin, Cargolux (Apr. 9, 2001) [LH_CIV_0001420].
[350]  E-mail from Henry Templin, Cargolux, to representatives of Air France, Lufthansa Cargo and MNG Air Cargo (Apr. 11, 2001) [LH_CIV_0001420].
[351]  Notes, Lufthansa Cargo (May 15, 2002) (unofficial translation) (emphasis in original) [LH_CIV_0001771].
[352]  E-mail from Toshiyuki Tanaka, Lufthansa Cargo, to several Lufthansa employees (Sept. 30, 2002) [LH_CIV_0001210].
[353]  E-mail from Toshiyuki Tanaka, Lufthansa Cargo, to several Lufthansa employees (Sept. 30, 2002) [LH_CIV_0001210].

market information."[354]  Upon information and belief, Lufthansa Cargo used the Alliance to ensure that UA also adhered to this agreement not to allow exceptions or adjustments to rates.

180.    In January 2003, an Air France regional manager reassured Lufthansa Cargo that Air France did not discount its Fuel or Security Surcharges.[355]  Upon information and belief, Lufthansa Cargo received commitments from Alliance members not to discount Fuel or Security Surcharges.

181.    Lufthansa Cargo made sure that UA's prices were in line with the cartel prices using the Alliance as cover.  For example, in 2003, an Italian Lufthansa Cargo employee informed Lufthansa Cargo's General Manager for Pricing that UA was not imposing the Fuel Surcharge on shipments to and from Italy.[356]  To ensure UA's compliance with the cartel agreement to impose Fuel Surcharges worldwide (including on routes to and from the United States), Lufthansa Cargo's General Manager for Pricing wrote to an executive of UA stating "from the pressrelease [sic] I learned that UA Cargo introduced the next stage of the Fuel Surcharge.  Do you also charge this on a world wide level?  I learned from our organisation [sic] in Italy that you are not doing it there?"[357]  The UA executive responded on the same day:  "We [UA] have implemented the surcharge worldwide, including Italy.  The communication has gone out to our GSA in Italy and it is surprising that that was the message you received.  I will follow up."[358]  As a result of the e-mail from Lufthansa Cargo's General Manager for Pricing, the UA executive followed up with a UA representative in Italy, who noted that "the information you

---

[354] E-mail from Toshiyuki Tanaka, Lufthansa Cargo, to several Lufthansa employees (Sept. 30, 2002) [LH_CIV_0001210].
[355] E-mail between Lufthansa Cargo employees (Jan. 24, 2003) [LH_CIV_0000931].
[356] E-mail from General Manager of Pricing, Lufthansa Cargo, to an employee of United Airlines (Dec. 10, 2003) [LH_CIV_0002311].
[357] E-mail from General Manager of Pricing, Lufthansa Cargo, to an employee of United Airlines (Dec. 10, 2003) [LH_CIV_0002311].
[358] E-mail from an employee of United Airlines, to General Manager of Pricing, Lufthansa Cargo (Dec. 10, 2003) [LH_CIV_0002311].

have received by Lufthansa is not correct."[359]  The UA executive then sent an e-mail to

Lufthansa Cargo's General Manager for Pricing stating that "[t]his is confirmation that we [UA]

are indeed increasing our fuel surcharge in Italy."[360]

## XII.   Lufthansa's Leniency Application

182.   In or around December 2005, Lufthansa entered the corporate leniency program

with the DOJ, "Lufthansa was conditionally accepted [into the leniency program] after it

disclosed its role in the international cargo conspiracy . . . ."[361]  Lufthansa also obtained

conditional leniency from the European Commission and other cartel authorities in other

countries.[362]  Upon information and belief, Lufthansa, with the permission of the DOJ, continued

to participate in the conspiracy so that the DOJ could obtain more information about the cartel.

183.   Pursuant to the Justice Department's corporate leniency policy, Lufthansa could

only have been afforded conditional leniency if it confessed its wrongdoing and "report[ed] the

wrongdoing with candor and completeness."[363]

184.   In 2006, Lufthansa agreed to pay $85 million to settle certain of its liability

exposure to class plaintiffs in a United States class action pending in the United States District

Court for the Eastern District of New York, *In re Air Cargo Shipping Services Antitrust

Litigation* (MDL No. 1775).  DHL timely opted out of that proposed class-action settlement.[364]

---

[359] E-mail between employees of United Airlines (Dec. 11, 2003) [LH_CIV_0002313].
[360] E-mail from an employee of United Airlines to General Manager of Pricing, Lufthansa Cargo (Dec. 11, 2003) [LH_CIV_0002313].
[361] Press Release, U.S. Department of Justice, *at* http://www.justice.gov/atr/public/press_releases/2007/224928.htm (Aug. 1, 2007).
[362] *See* Lufthansa Annual Report 2006, at 71 (available at http://www.lufthansa-financials.de/servlet/PB/menu/ 1019373_l2/index.html).
[363] *See* DOJ, Corporate Leniency Policy *at* http://www.usdoj.gov/atr/public/guidelines/0091.htm.
[364] *See* DOJ, Corporate Leniency Policy *at* http://www.usdoj.gov/atr/public/guidelines/0091.htm.

XIII.   **Other Airfreight Carriers' United States Fines**

185.    To date, twenty of Defendant's co-conspirator Airfreight Carriers and six

executives have pled guilty and paid criminal fines in connection with the DOJ's investigation of

the price-fixing Cartel described in this Complaint.  The following chart provides a summary of

the guilty pleas entered and the fines paid by the Airfreight Carriers and their executives:

| Carrier | Date | Details |
|---------|------|---------|
| Aerolinhas Brasileiras S.A. | 2/19/2009 | Carrier pled guilty and paid a joint fine (with LAN Cargo) of $109 million |
| Air France-KLM | 7/22/2008 | Carrier pled guilty and paid a fine of $350 million |
| | 4/26/2011 | An indictment was returned against Marc Boudier, former Executive VP of Air France's Cargo Division, and Jean Charles Foucault, former VP of Air France's Cargo Division of Sales & Marketing |
| All Nippon Airways Co. Ltd. | 12/6/2010 | Carrier pled guilty and paid a fine of $73 million (for price fixing in both the air cargo and air passenger industries) |
| | 11/16/2010 | Indictments were returned against Yoshio Kunugi and Naoshige Makino, both former senior executives – the charges are still pending |
| Asiana Airlines Inc. | 5/5/2009 | Carrier pled guilty and paid a $50 million fine (for price fixing in both the air cargo and air passenger industries) |
| British Airways Plc. | 8/23/2007 | Carrier pled guilty and paid a $300 million fine – $100 million for passenger and $200 million for cargo |
| | 11/10/2008 | Keith Packer, a British citizen and former Commercial General Manager for British Airways World Cargo, pled guilty and agreed to an eight-month prison sentence and a $20,000 fine |
| Cargolux Airlines International S.A. | 5/12/2009 | Carrier pled guilty and paid a $119 million fine |
| | 12/8/2011 | Indictments were returned against Ulrich Ogiermann, president and CEO, and Robert Van de Weg, senior vice president of sales and marketing – the charges are still pending |
| Cathay Pacific Airways Ltd. | 7/22/2008 | Carrier pled guilty and paid a $60 million fine |
| China Airlines Ltd. | 11/3/2010 | Carrier pled guilty and paid a $40 million fine |
| El Al Israel Airlines Ltd. | 2/4/2009 | Carrier pled guilty and paid a $15.7 million fine |

| Carrier | Date | Details |
|---|---|---|
| EVA Airways Corporation | 6/24/2011 | Carrier pled guilty and paid a $13.2 million fine |
| Japan Airlines International Co. Ltd. | 5/7/2008 | Carrier pled guilty and paid a $110 million fine |
| | 11/16/2010 | Takao Fukuchi, former president of JAL Cargo Sales, was indicted – the charges are still pending |
| Korean Air Lines Co. Ltd. | 8/24/2007 | Carrier pled guilty and paid a $300 million fine (for price fixing in both the cargo and passenger industries) |
| LAN Cargo S.A. | 2/19/2009 | Carrier pled guilty and paid a joint fine (with Aerolinhas Brasileiras ) of $109 million |
| Martinair Holland N.V. | 7/22/2008 | Carrier pled guilty and paid a $42 million fine |
| | 6/26/2009 | Franciscus Johannes de Jong, former vice president of cargo sales in Europe, pled guilty and agreed to a $20,000 fine and an eight-month prison sentence |
| | 9/21/2010 | Maria Christina "Meta" Ullings, senior vice president of Cargo Sales and Marketing, was indicted – the charges are still pending |
| Nippon Cargo Airlines Co. Ltd. | 5/8/2009 | Carrier pled guilty and paid a $45 million fine |
| Northwest Airlines LLC | 8/27/2010 | Carrier pled guilty and paid a $38 million fine |
| Polar Air Cargo LLC | 10/15/2010 | Carrier pled guilty and paid a $17.4 million fine |
| Qantas Airways Ltd. | 1/14/2007 | Carrier pled guilty and paid a $61 million fine |
| | 5/15/2008 | Bruch McCaffrey, former Vice President of Freight for the Americans, pled guilty and agreed to serve eight months in jail and to pay a $20,000 fine. |
| SAS Cargo Group A/S | 7/21/2008 | Carrier pled guilty and paid a $52 million fine |
| | 8/29/2008 | Timothy Pfeil, SAS's former highest-ranking U.S. cargo executive, pled guilty and agreed to a $20,000 fine and a six-month prison sentence |
| Singapore Airlines | 2/8/2011 | Carrier pled guilty and paid a $48 million fine |

186.    The size of these fines reflects considerable consumer overcharges, for which UA is jointly and severally liable.

-78-

## XIV.  UA's Bankruptcy

187.    UA filed its Chapter 11 bankruptcy petition on December 9, 2002, and the bankruptcy court approved a plan of reorganization on January 20, 2006, and it became effective on February 1, 2006.

188.    UA continued operations during the bankruptcy, and its management was not replaced by a trustee.

189.    During the bankruptcy, UA continued to participate in the cartel and engaged in overt acts that concealed its involvement in the cartel.  For example, UA issued press releases which in words or substance gave DHL the impression that the UA Fuel Surcharges had been set unilaterally and merely recovered increased fuel costs.[365]  Moreover, in July 2002, UA issued its own "Jet Fuel Index" in July 2002, concealing its participation in the cartel.[366]

190.    Similarly, the announcements of UA's Security and Customs Surcharges gave DHL the impression that UA's Security and Customs Surcharges had been unilaterally set and merely recovered increased security- and customs-related costs.

191.    At no time during its bankruptcy or thereafter did UA disclose to DHL or anyone else that UA had charged Surcharges that were the result of cartel agreements.  Nor did UA disclose to DHL that UA had engaged in discussions and reached agreements on prices with its competitors outside the Alliance.  Nor did it disclose that UA had charged Fuel Surcharges that were unnecessary to recover UA's actual fuel-related costs.  Indeed, UA never notified DHL that DHL had an antitrust claim of any kind against UA, and DHL did not learn that it had a claim against UA until after July 5, 2010 , when it reached a settlement with an Airfreight Carrier that

---

[365] *See*, *e.g.*, Press Release, United Airlines Cargo (Dec. 17, 2004) [LH_CIV_0126122].
[366] Press Release, United Airlines Cargo (Feb. 25, 2003) [LH_CIV_0040133]; United Airlines Cargo, *Jet Fuel Index* (Aug. 9, 2004).

had admitted participating in the cartel and that provided confidential information to DHL showing UA's participation .

192.     The bankruptcy bar date for filing all claims against UA "arising on or before December 9, 2002" (the bankruptcy petition date) was May 12, 2003.

193.     The bankruptcy court approved the plan of reorganization on January 20, 2006, with an effective date of February 1, 2006.

194.     Distributions to creditors of shares of stock in the reorganized UA began on February 1, 2006.

195.     After the effective date of the plan of reorganization, UA continued to participate in the cartel, and UA engaged in post-effective date affirmative, overt acts in furtherance of the conspiracy as set forth in this Complaint, included increasing the Fuel Surcharges on three occasions until the Fuel Surcharge reached USD 0.60.  Indeed, after emerging from bankruptcy, UA overcharged DHL by at least $2.2 million in Surcharges.

## FRAUDULENT CONCEALMENT

196.     UA engaged in a successful, self-concealing price-fixing cartel from at least February 2000 through at least May 2006.  In addition, UA and its co-conspirators took steps to actively conceal the cartel.  During the course of the cartel and thereafter, UA and other Cartel members represented to DHL that its Fuel, Security and Customs Surcharges were intended to, and necessary to, cover increasing fuel-, security- and customs-related costs.  Moreover, UA's Surcharges appeared to be consistent with public events.  For example, UA's Fuel Surcharges was highly correlated to spot prices for jet fuel, and UA implemented the Security Surcharges in the aftermath of September 11, 2001, when security costs were in fact increasing.

197.     UA and its co-conspirators affirmatively and fraudulently concealed their unlawful conduct from DHL, by, among other things, engaging in secret communications, giving

false and pre-textual reasons for the various Surcharges, staggering their implementation of changes in the Fuel and Security Surcharges, and instructing recipients of Cartel e-mails to keep them "strictly CONFIDENTIAL especially for anti-trust reasons" and to "delete" them.  As one e-mail written by a Cartel member on May 19, 2005 stated, "IT GOES WITHOUT SAYING THAT CARRIERS MEETINGS HAVE TO BE TREATED IN A VERY CONFIDENTIAL WAY."[367]  Indeed, a February 2003 Lufthansa Cargo email summarizing a discussion with UA regarding a potential rate increase for flights to the United States, warned that it "would be good if you do not forward this mail."[368]

198.    UA publicly posted its own "Jet Fuel Index" in July 2002, giving the appearance that its Fuel Surcharges were unilateral.[369]

199.    Pursuant to the cartel, the other Airfreight Carriers'  also fraudulently concealed the Cartel to the benefit of all the participants in the cartel including UA:

a.    In a June 1999 e-mail exchange between Air France and KLM discussing the fixing of base-freight rates, Mr. Meyer of Air France noted that rates were not supposed to be included in Air France's faxes.[370]

b.    A July 25, 2001, Lufthansa Cargo email discussing a meeting with Cargolux in furtherance of the Cartel warned "Confidential . . . .  Please do not use externally."[371]

c.    On September 30, 2002, representatives of eight major Airfreight Carriers, "met confidentially" to exchange their "status, plans, and views regarding FSC."[372]

---

[367]  E-mail between Swiss WorldCargo employees (May 19, 2005) [LH_CIV_0006520] (emphasis in original).
[368]  E-mail from General Manager for Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation) [LH_CIV_0000101].
[369]  Press Release, United Airlines Cargo (Feb. 25, 2003) [LH_CIV_0040133]; United Airlines Cargo, *Jet Fuel Index* (Aug. 9, 2004).
[370]  E-mail from Otto Meyer, Air France, to representatives of KLM Cargo, Lufthansa Cargo and Swissair (June 23, 1999) [LH_CIV_0002172] (certified translation).
[371]  E-mail between Lufthansa Cargo employees (July 25, 2001) (emphasis in original) [LH_CIV_0001362].
[372]  E-mail between Lufthansa Cargo employees (Sept. 30, 2002) [LH_CIV_0001210].

     d.       Members of the BLACKS initiative, including Defendants Air France and KLM, "agreed [on the] confidentiality of meetings/group existance [sic]."[373]

     e.       A February 26, 2004, Lufthansa Cargo email regarding discussion of rates with rival carriers stated, "THIS MESSAGE IS STRICTLY CONFIDENTIAL, AND IS NOT INTENDED FOR DISTRIBUTION OR FORWARDING."[374]

     f.       A May 19, 2004 e-mail between Lufthansa Cargo employees regarding the Cartel contains the notation "please delete."[375]

200.    Each of the Cartel members' Surcharge announcements during the Cartel Period constituted an implicit, if not explicit, representation that the Surcharges in question were unilaterally imposed in response to competitive market forces.

201.    The fraudulent concealment was so effective that the cartel only came to light after one of its members Lufthansa Cargo disclosed it to the DOJ and sought to avail itself of the DOJ's amnesty program.

202.    After the Department of Justice raided the offices of several Airfreight Carriers (but not UA), UA made statements in its public SEC filings indicating that UA had not participated in the cartel.  In its Form 10-Q for the quarterly period ending March 31, 2006, UA stated that it was not a "target" of the Department of Justice's investigation:

> On February 14, 2006, the European Commission and the U.S. Department of Justice commenced an international investigation into what government officials describe as a possible price fixing conspiracy relating to certain surcharges included in tariffs for carrying air cargo.  United appears to be considered as a source of information for the investigation at this time, not as a target.  In addition to the federal grand jury investigation, United and other air cargo carriers have been named as defendants in over twenty punitive class actions in various jurisdictions of the United States alleging civil damages as a result of the purported conspiracy. Penalties for violating competition laws can be severe, involving

---

[373] E-mail between Lufthansa Cargo employees (Nov. 22, 2004) [LH_CIV_0061034].

[374] E-mail between Lufthansa Cargo employees (Feb. 26, 2004) (unofficial translation) [LH_CIV_0001406].

[375] E-mail between Lufthansa Cargo employees  (May, 19, 2004) [LH_CIV_0000047]

both criminal and civil liability.  The Company is cooperating with the investigation while carrying out its own internal review of cargo pricing practices, and is not in a position to evaluate the potential financial impact of this litigation at this time.  However, a finding that the Company violated either U.S. antitrust laws or the competition laws of some other jurisdiction could have a material adverse impact on the Company.

203.    In its Form 10-Q for the quarterly period ending June 30, 2006, UA stated as

follows:

In February 2006, the European Commission and the U.S. Department of Justice commenced an international investigation into what government officials describe as a possible price fixing conspiracy relating to certain surcharges included in tariffs for carrying air cargo.  In June 2006, United received a subpoena from the U.S. Department of Justice requesting information related to certain passenger pricing practices and surcharges applicable to international passenger routes.  The Company is cooperating fully. United is considered a source of information for the investigation, not as a target.  In addition to the federal grand jury investigation, United and other air cargo carriers have been named as defendants in over ninety class action lawsuits alleging civil damages as a result of the purported conspiracy.  Those lawsuits have been consolidated for pretrial activities in the United States Federal Court for the Eastern District of New York.  More than twenty additional putative class actions have been filed subsequently alleging violations of the antitrust laws with respect to passenger pricing practices.  Penalties for violating competition laws can be severe, involving both criminal and civil liability.  The Company is cooperating with the investigation while carrying out its own internal review of cargo pricing practices, and is not in a position to evaluate the potential financial impact of this litigation at this time.  However, a finding that the Company violated either U.S. antitrust laws or the competition laws of some other jurisdiction could have a material adverse impact on the Company.

204.    In its Form 10-Q for the quarterly period ending September, 30, 2006, UA stated

as follows:

In February 2006, the European Commission and the U.S. Department of Justice commenced an international investigation into what government officials describe as a possible price fixing conspiracy relating to certain surcharges included in tariffs for carrying air cargo.  In June 2006, United received a subpoena from

the U.S. Department of Justice requesting information related to certain passenger pricing practices and surcharges applicable to international passenger routes.  The Company is cooperating fully. United is considered a source of information for the investigation, not a target.  In addition to the federal grand jury investigation, United and other air cargo carriers have been named as defendants in over ninety class action lawsuits alleging civil damages as a result of the purported conspiracy.  Those lawsuits have been consolidated for pretrial activities in the Eastern District of New York.  United has entered into an agreement with the majority of the private plaintiffs to dismiss the class action lawsuits in return for an agreement to cooperate with the plaintiffs' factual investigation. . . .  The Company is cooperating with the grand jury investigation while carrying out its own internal review of its pricing practices, and is not in a position to evaluate the potential financial impact of this litigation at this time.

205.    For the foregoing reasons, DHL did not and could not have discovered UA's participation in the cartel until after July 5, 2010, when DHL obtained access to confidential documents that describe the scope of the cartel and UA's participation in it.

## **VIOLATION OF SHERMAN ACT § 1**

### **COUNT I**
### **Violation of Section 1 of the Sherman Act**

(Conspiracy to Fix Prices)

206.    DHL restates and incorporates by reference each and every allegation contained in the preceding paragraphs.

207.    From at least January 14, 1997, until at least September 2006, UA participated in an unlawful and continuing agreement, understanding and conspiracy with competing Airfreight Carriers to artificially raise, fix and maintain the price of U.S. Airfreight Shipping Services in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

> a.    From at least February 2000 through at least September 2006, UA price-fixed its Fuel Surcharges with its competitors, including, but not limited to, Lufthansa Cargo, Air France, British Airways, Cargolux and KLM. UA knew that Lufthansa Cargo was discussing Fuel Surcharges not only with UA but also with other Airfreight Carriers that had no Alliance with

-84-

either UA or Lufthansa Cargo.[376]  Similarly, those other non-Alliance Airfreight Carriers knew that Lufthansa Cargo was communicating information about their Surcharges to UA.  UA, knowing that concerted action was contemplated, adhered to the scheme and participated in it.

b.   From at least September 2001 through at least September 2006, UA price-fixed its Security Surcharges with its competitors, including, but not limited to, Lufthansa Cargo, Air France, Cathay Pacific, KLM, Lufthansa Cargo, Qantas Airways and Singapore Airways.  UA knew that Lufthansa Cargo was discussing Security Surcharges not only with UA, but also with other Airfreight Carriers that were not parties to the Alliance.[377]  Similarly, those other non-Alliance Airfreight Carriers knew that Lufthansa Cargo was communicating information about their Surcharges to UA.[378]  UA, knowing that concerted action was contemplated, adhered to the scheme and participated in it.

c.   From at least August 2004 through at least September 2006, UA price-fixed its Customs Surcharges with competitors, including, but not limited to, Lufthansa Cargo, Air France, British Airways, Cargolux and KLM.  UA knew that Lufthansa Cargo was discussing Customs Surcharges not only with UA but also with other Airfreight Carriers that were not parties to the Alliance.  Similarly, the other non-Alliance Airfreight Carriers knew that Lufthansa Cargo was communicating information about their Surcharges to UA.  Knowing that concerted action was contemplated, UA adhered to the scheme and participated in it.

d.   From at least December 1998 through at least May 2006, UA price-fixed its base rates with its competitors, including, but not limited to, Lufthansa

---

[376]  *See*, *e.g.*, E-mail from an SAS employee to representatives of UA, Air Canada, Lufthansa Cargo, Thai Airways and VARIG (Dec. 13. 1999) [LH_CIV_0110116]; E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of United Airlines, Air China, Air France, Cathay Pacific, Cargolux, Japan Airlines, Korean Air, Singapore Air, South African Airways, Thai Airways and VARIG (Jan. 22, 2002) (certified translation) [LH_CIV_0029865]; E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of United Airlines, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, LAN Cargo and VARIG (Feb 11, 2003) (unofficial translation) [LH_CIV_0147653]; E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of United Airlines, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, LAN Cargo, SAS, Singapore Air, South African Airways, Thai Airways and VARIG (Feb. 17, 2003) (unofficial translation) [LH_CIV_0160688]; E-mail from General Manager of Pricing, Lufthansa Cargo, to two employees of United Airlines (Apr. 22, 2003) [LH_CIV_0051295]; E-mail from an employee of United Airlines to General Manager of Pricing, Lufthansa Cargo (Apr. 22, 2003) [LH_CIV_0051295]; E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, EVA Air, Japan Airlines, KLM, Korean Air, LAN Cargo, Martinair, SAS, Singapore Air, South African Airways, Thai Airways, UA and VARIG (Apr. 27, 2004) [LH_CIV_0110022]; E-mail from a Lufthansa Cargo employee to an employee of United Airlines, and representatives of Aerolinhas Brasileiras, Air France, American Airlines, Iberia, Japan Airlines, KLM, TAM Cargo and VARIG (Oct. 13, 2005) (unofficial translation) [SIA_CIV_0000230].

[377]  *See*, *e.g.*, *ibid*.

[378]  *See*, *e.g.*, E-mail from a Lufthansa Cargo employee to an employee of United Airlines, and representatives of Aer Lingus, Air France, Alitalia, Iberia, Japan Airlines, KLM, Qantas Airways and Swissair (Oct. 10, 2001) [LH_CIV_0056878].

-85-

Cargo, Air France, British Airways, Cargolux, KLM and Singapore Air. UA knew that Lufthansa Cargo was discussing base freight rates not only with UA but also with other Airfreight Carriers that were not parties to the Alliance.[379]  Similarly, the other non-Alliance Airfreight Carriers knew that Lufthansa Cargo was communicating information about their base freight rates to UA.[380]  UA, knowing that concerted action was contemplated, adhered to the scheme and participated in it.  In this context, UA's charging of supracompetitive prices in line with its conspirators constituted assent to price fixing.

208.    During the course of the cartel, UA participated directly and/or indirectly in numerous meetings and communications in furtherance of the conspiracy to fix prices.  UA's participation in the cartel is described more completely above and included, but was not limited to, the following:

a.    Meeting with Air France, Cargolux, Cathay Pacific, KLM, Korean Air Lufthansa Cargo, Singapore Air and other Airfreight Carriers in 1999 and to discuss and coordinate base freight rates;

b.    Agreeing with Lufthansa Cargo, SAS, Cargolux, Air Canada, British Airways, Singapore Air, Asiana Airlines, KLM, Korean Air, Air France and others to adopt Resolution 116ss, and then, in February 2000, to implement Fuel Surcharges pursuant to IATA Resolution 116ss even though there had been no governmental approval – and thus no government immunity – for those Fuel Surcharges;

c.    Discussing existing and future Fuel Surcharges with rivals, including but not limited to, Air France, American Airlines and British Airways in February 2000, shortly after implementing the initial Fuel Surcharge; and doing so again in April in Vancouver;

d.    Discussing and coordinating Fuel Surcharges with British Airways, KLM, Lufthansa Cargo and other Airfreight Carriers in January 2001 in Zurich, Switzerland;

---

[379]  *See, e.g.*, E-mail from Sales Manager for Germany, Lufthansa Cargo, to representatives of United Airlines, Air China, Air France, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, SAS, Singapore Air, Swissair and VARIG (Jan. 20, 1999) (unofficial translation) [LH_CIV_0130477]; E-mail from Sales Manager for Germany, Lufthansa Cargo, to representatives of United Airlines, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, LAN Cargo and VARIG (Feb 11, 2003) (unofficial translation) [LH_CIV_0147653].
[380]  *See, e.g., ibid.*

e.      Discussing and coordinating Fuel Surcharges with Cathay Pacific, Lufthansa Cargo, Qantas Airways and Singapore Air in September and October 2001;

f.      Acting in concert with Lufthansa Cargo, Air France, KLM, Singapore Air, Korean Air and other Airfreight Carriers in December 2001 and January 2002 to modify the prior Fuel Surcharge agreement in order to maintain Fuel Surcharges rather than eliminating them, as would have occurred if the Airfreight Carriers had adhered to Resolution 116ss;

g.      Discussing and coordinating increases in Fuel Surcharges with Lufthansa Cargo, Air France, KLM, Air Canada, Cargolux, Cathay Pacific, KLM, Singapore Air and other Airfreight Carriers in February 2003;

h.      Discussing and coordinating base freight rates and Surcharges with Lufthansa Cargo, British Airways and Korean Airlines in 2003;

i.      Adjusting Fuel Surcharges in 2002-2006 in coordination with its rivals after communicating in advance with its rivals about its intentions;

j.      Discussing, coordinating, and implementing a Security Surcharge in concert with other Airfreight Carriers, including non-Alliance members;

k.      Discussing, coordinating and implementing Customs Surcharges in concert with other Airfreight Carriers, including non-Alliance members;

l.      Repeatedly exchanging competitively sensitive information about its future prices with cartel members in the expectation that the cartel members would adhere to the prices prescribed by the cartel;

m.      Repeatedly raising Surcharges on or about the same time that the other cartel members did so even though the Surcharge increases were not necessary to recover any increased fuel-, security- or customs-related costs; and

n.      Charging supracompetitive, fixed prices to DHL between at least February 2000 and at least September 2006 in coordination with competing Airfreight Carriers.

209.   Lufthansa Cargo's overt acts in furtherance of the cartel are attributable to UA when Lufthansa Cargo set Alliance prices. Indeed, Lufthansa referred to the other Alliance members as its "partners."[381] Lufthansa and UA acted as partners under their Alliance with

---

[381] *See, e.g.*, E-mail from General Manager of Pricing, Lufthansa Cargo, to Vice President of Sales for Asia-Pacific, Lufthansa Cargo (Jan. 15, 2002) (unofficial translation) [LH_CIV_0000021].

respect to pricing issues, even though such conduct exceeded the scope of the Alliance immunity.

210. The cartel to fix the price of U.S. Airfreight Shipping Services continued after the effective date of UA's plan of reorganization, which was February 1, 2006. In particular, UA engaged in a number of overt acts in furtherance of the conspiracy, including but not limited to, the following:

  a. UA's continued affirmatively charging Fuel and Security Surcharges that had been set in accordance with the cartel agreement;

  b. UA increased its Fuel Surcharge on at least two occasions after February 1, 2006, in accordance with the cartel agreement;

  c. UA's exchange of competitively sensitive rate information with Qantas on or about May 1, 2006, and its subsequent increase in its price to DHL and other customers; and

  d. UA's affirmative steps to conceal its involvement in the cartel as discussed in the Fraudulent Concealment section above.

211. These overt acts were not mere reaffirmations of pre-plan-of-reorganization agreements, but rather were affirmative, overt acts evidencing an agreement to fix prices going forward. Each time UA overcharged DHL, UA inflicted new and accumulating injury on DHL.

212. Subsequent to February 1, 2006, other members of the cartel also engaged in overt acts in furtherance of the conspiracy. Those overt act included, but were not limited to, the following:

  a. On February 2, 2006, Lufthansa Cargo, met with Air France, Martinair, British Airways, Cargolux and SAS and discussed raising Fuel Surcharges;

  b. On February 2, 2006, Singapore Air, which had not attended the February 2 meeting mentioned in the preceding paragraph, e-mailed Lufthansa Cargo, Swiss World Cargo, KLM, and British Airways stating its understanding that the Airfreight Carriers would be increasing Fuel

Surcharges,[382] and KLM responded that it would be increasing its Fuel Surcharge;[383]

    c.    On February 6, 2006, Singapore Airlines sent an e-mail addressed to several Airfreight Carriers, including Air France, American Airlines, British Airways, Japan Airlines, Lufthansa Cargo and Thai Airways, announcing its specific plan regarding the Fuel Surcharge and asking them about their plans for a Fuel Surcharge increase,[384] and on the same day, American Airlines,[385] British Airways,[386] Japan Airlines[387] and Malaysian Airlines System[388] responded to the entire group, each stating that it would increase its Fuel Surcharge.

213.    UA's post-February 1, 2006, conduct also involved coordinated, parallel and interdependent pricing combined with plus factors, such as the following, which preclude the possibility that UA's pricing was unilateral from February 1, 2006 through at least May 2006:

    a.    A prior and continuing cartel in which UA participated.

    b.    Subsequent guilty pleas from twenty Airfreight Carriers, which admitted that the cartel existed and operated during the time period after January 20, 2006.

    c.    The February 2, 2006, meeting between UA's Alliance partners, Lufthansa Cargo and SAS, and competitors Air France, Martinair, British Airways, Cargolux and other Airfreight Carriers to discuss increases in the Fuel Surcharge.

    d.    UA's subsequent increase in the Fuel Surcharge by an amount that significantly exceeded the increased cost of aviation fuel during the same period.

    e.    UA's May 2006 meeting with Qantas (whose plea agreement implicitly acknowledged that the cartel did not end on February 14, 2006) concerning rates.

---

[382] E-mail from Walter Burri, Singapore Air, to representatives of British Airways, KLM, Lufthansa Cargo and Swiss WorldCargo (Feb. 2, 2006) [LH_CIV_0000869].

[383] E-mail from Susanne Erb, KLM Cargo, to representatives of British Airways, Lufthansa Cargo, Singapore Air and Swiss WorldCargo (Feb. 3, 2006) [LH_CIV_0000871].

[384] E-mail from Walter Burri, Singapore Air, to ACCS members (Feb. 6, 2006) [LH_CIV_0004593].

[385] E-mail from Walter Hintermann, American Airlines, to ACCS Members (Feb. 6, 2006) [LH_CIV_0004593].

[386] E-mail from Marek Vrany, British Airways, to ACCS Members (Feb. 6, 2006) [LH_CIV_0004591].

[387] E-mail from Roger Proamer, Sirius Air, GSA for Japan Airlines, to ACCS Members (Feb. 6, 2006) [LH_CIV_0004597].

[388] E-mail from Andre Berger, MAS Cargo, to ACCS Members (Feb. 6, 2006) [LH_CIV_0004595].

214.    Although UA's post-January 20, 2006, conduct was part of a continuing conspiracy to coordinate prices with its competitors, it also is sufficient standing alone to constitute an independent conspiracy to fix prices.  Knowing that concerted action was contemplated and invited, and that other Airfreight Carriers were participating, UA's adherence to the cartel scheme and participation in it after it was discharged from bankruptcy constituted its assent to price fixing.

215.    Throughout the Cartel Period, the prices charged by UA and the cartel were interdependent because, if UA had charged Fuel Surcharges unilaterally, other Airfreight Carriers would have taken business from it, as Lufthansa Cargo experienced when it tried to impose a unilateral fuel surcharge in 1996 and had to abandon it in less than six months later.

216.    UA has never disclosed its participation in the cartel and never took any public action to end its involvement in the cartel.

## DHL'S DAMAGES

217.    During the Cartel Period (February 1, 2000 through at least February 14, 2006), DHL purchased at least $3.7 billion in U.S. Airfreight Shipping Services from Airfreight Carriers that have pled guilty in the United States.

218.    DHL was overcharged on its purchases from the Cartel members that have pled guilty in the United States by at least $655.5 million.  These overcharges include at least $314.2 million in Fuel Surcharges, and at least $38.7 million in Security Surcharges that DHL paid to Cartel members that have pled guilty in the United States.  The base-freight rates that DHL paid to the Cartel members that pled guilty also included approximately $302.5 million in overcharges.

219.    The Airfreight Carriers were unable to justify to the DOT the need for the proposed Fuel Surcharge.  According to the DOT, the Fuel Surcharge mechanism was

-90-

"fundamentally flawed and unfair to shippers and other users of cargo air transportation" and would resulted in "unjustified and unwarranted rate increases."[389]  The DOT reasoned, in relevant part, that the "proposed index mechanism, which reflects the volatile nature of the spot market, is at best an imperfect measure of the impact of fuel price increases on carriers."[390] Moreover, the DOT noted that "[m]ost carriers employ fuel hedging programs which they use to limit the effects of jet fuel price volatility and thus discipline their costs" and "many prudent carriers manage to hedge between 70-80 percent of their total fuel needs."[391]  The Airfreight Carriers were unable to present any information to persuade the DOT to change its mind.

220.    Moreover, much of the U.S. Airfreight Shipping Services that DHL purchased from the Cartel members, including Defendant, was for shipments in the belly of passenger planes, for which passenger fares, including at various times passenger fuel and security surcharges, covered all fuel costs.

221.    None of the Surcharges imposed by UA on DHL was calculated unilaterally based on an Airfreight Carrier's actual costs.  UA did not set the amount of its Surcharges according to any contemporaneous internal calculation of its actual costs.

222.    As a direct and proximate result of UA's unlawful conduct and the unlawful conspiracy alleged herein, DHL has suffered injury and damage to its business and property. DHL's injuries flow directly from the unlawful price-fixing agreements between UA and its co-conspirators to:

---

[389]  Order, U.S. Dep't of Transportation, Docket OST-2000-6837-2, at 2 (Mar. 17, 2000), *available at* http://perma.cc/08YkrDUHXpg.
[390]  Order, U.S. Dep't of Transportation, Docket OST-2000-6837-2, at 2 (Mar. 17, 2000), *available at* http://perma.cc/08YkrDUHXpg.
[391]  Order, U.S. Dep't of Transportation, Docket OST-2000-6837-2, at 2 (Mar. 17, 2000), *available at* http://perma.cc/08YkrDUHXpg.

a.      Fix prices for U.S. Airfreight Shipping Services, including certain components of those prices, such as Fuel Surcharges, Security Surcharges and Customs Surcharges, at supracompetitive levels;

b.      Diminish and/or eliminate free and open competition for the sale of U.S. Airfreight Shipping Services to DHL and other purchasers.

223.    From the time of the confirmation of UA's plan or reorganization to September 2006, cartel members that have pled guilty in the United States charged DHL and DHL paid at least $151 million in illegal Fuel and Security Surcharges, for which UA is jointly and severally liable, before trebling.

224.    But for the continuing cartel activity after UA's bankruptcy plan of reorganization was adopted, prices for U.S. Airfreight Shipping Services would not have remained at supracompetitive levels for as long as they did; rather, they would have returned much more quickly to competitive levels.  The prices did not begin to drop toward competitive levels until after the third quarter of 2006, and even those prices were significantly above prices that would have prevailed but-for the cartel.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to:

a.      Declare that the contract, combination and conspiracy alleged herein is an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act;

b.      Order that judgment be entered against UA, and in favor of DHL, for injunctive relief prohibiting further overcharges and damages as determined to have been sustained by DHL, including joint-and-several damages, and for the statutory trebling of all such damages as permitted under the antitrust laws;

c.      Order that each of UA's successors, assigns, parents, subsidiaries, affiliates and transferees, and its officers, directors, agents and employees, and other persons acting or claiming to act on behalf of UA or in concert with it, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing any contracts, combinations, conspiracies, agreements, understanding or concert of

-92-

action, or adopting any practice, plan, program or design having a similar purpose or effect of restraining competition;

d.      Award DHL its attorneys' fees and reasonable costs, and pre-judgment and post-judgment interest, to the fullest extent permitted by law; and

e.      Award such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

Dated:  May 6, 2014

Respectfully submitted,

**ORRICK, HERRINGTON
 & SUTCLIFFE LLP**

/s/ J. Peter Coll, Jr.

J. Peter Coll, Jr.
51 W. 52d St.
New York, New York 10019
Tel:  (212) 506-5000
Fax:  (212) 506-5151

/s/ Garret G. Rasmussen

Garret G. Rasmussen
Antony P. Kim
1152 15th Street, N.W.
Washington, D.C. 20005
Tel:  (202) 339-8400
Fax:  (202) 339-8500

*Attorneys for Plaintiff DHL*