UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                        :
DPWN HOLDINGS (USA), INC.,                              :
                                                        :
                                    Plaintiff,          :        **MEMORANDUM**
                                                        :        **<u>DECISION AND ORDER</u>**
                     - against -                        :
                                                        :        11 Civ. 0564 (BMC) (PK)
UNITED AIR LINES, INC. d/b/a UNITED                     :
AIRLINES; UNITED CONTINENTAL                            :
HOLDINGS, INC. f/k/a UAL CORP,                          :
                                                        :
                                    Defendants.         :
                                                        :
------------------------------------------------------- X

**COGAN,** District Judge.

      Before the Court is a motion for partial summary judgment by defendant United Airlines,

Inc. ("United"), seeking dismissal of most of the antitrust claim that plaintiff DPWN Holdings

(USA), Inc. ("DHL") has brought against it, on the basis that the challenged portion of the claim

was discharged upon confirmation of United's Chapter 11 plan of reorganization.[1]  For the

reasons discussed below, United's motion for partial summary judgment is granted.

## BACKGROUND

      The following undisputed facts are taken from the parties' Local Rule 56.1 Statements.

**I.**     **<u>United's Bankruptcy</u>**

      On December 9, 2002, United filed its petition for relief under Chapter 11 of the

Bankruptcy Code in the Northern District of Illinois.  After filing its petition, United identified

and sent notices and claim forms to more than 300,000 potential creditors.  The bar date for the

---

[1] United acknowledges that to the extent it engaged in illegal antitrust conduct after the confirmation date of its plan of reorganization, any claim by DHL arising from that conduct is not discharged.  Accordingly, the Court has construed the motion as one for partial summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a) (recognizing that summary judgment is available to dismiss "part" of a claim).

submission of pre-petition proofs of claim was May 12, 2003 (the "Pre-Petition Claim Bar Date"). United received more than 44,000 proofs of claim against its estate. United scheduled DHL as a disputed unsecured creditor because, at the time, DHL was holding more than twenty disputed claims, including claims related to two pending environmental lawsuits (the "Disputed Claims"). DHL received actual notice of United's bankruptcy filing, and the notice identified the relevant deadlines.[2] Sixteen separate DHL entities filed proofs of claim by the Pre-Petition Claim Bar Date. Among the dates also provided in the notice was March 3, 2006, the bar date for filing "administrative claims" (the "Administrative Bar Date").

On January 20, 2006 (the "Confirmation Date"), the Bankruptcy Court confirmed United's reorganization plan by means of a Confirmation Order, which became effective February 1, 2006 (the "Effective Date"). The reorganization plan discharged all "Claims and Causes of Action of any nature whatsoever, . . . whether known or unknown," including all "Causes of Action that arose before the Confirmation Date." The Bankruptcy Court continued to adjudicate disputed claims for several years until United's bankruptcy ultimately closed on December 8, 2009.

## II. The Alleged Anticompetitive Conduct

The International Air Transport Association ("IATA") is an organization of air carriers whose goal is "to represent, lead and serve the airline industry." Mission & Vision, IATA, http://www.iata.org/about/Pages/mission.aspx (last visited Mar. 30, 2017). IATA presently has 265 airline members in 117 countries. United was a member throughout the relevant period and continues to be a member. Two DHL affiliates, DHL Air and DHL Aviation, were also

---

[2] DHL notes that not all of its affiliates received notice, but that is immaterial. There is no genuine dispute that the entities holding Disputed Claims received notice. Moreover, DHL had previously acknowledged at a hearing before Judge Gleeson that "[t]here is clearly, we don't dispute, there is notice that they were bankrupt."

members of IATA during the relevant period. IATA permits any active member to participate in the IATA Tariff Coordinating Conference, which negotiates cargo rates and fares for freight shipping.

In August 1997, IATA members, as part of the Tariff Coordinating Conference, adopted Resolution 116ss. This resolution allowed carriers to impose a fuel surcharge that varied depending on the changes in the price of fuel. In January 2000, IATA publicly filed Resolution 116ss as a fuel surcharge index proposal with the U.S. Department of Transportation ("DOT"). Resolution 116ss provided that it would not go into effect without an affirmative grant of antitrust immunity from DOT. In March 2000, DOT publicly rejected Resolution 116ss. Nonetheless, at least as early as February 2000, several of the air carriers, United included, implemented fuel surcharges. Moreover, several air carriers, United included, published their own fuel surcharge indices, some pegged to IATA's Resolution 116ss.

DHL was aware that several air carriers had implemented Resolution 116ss despite DOT's rejection. This knowledge is reflected in several emails. In one email, dated October 25, 2001, DHL recognized that "[i]t also appears that [Air Canada] use[s] the IATA index." Another email, dated November 28, 2001, shows that a DHL predecessor company, Exel plc,[3] had written almost identical letters to dozens of air carriers, including United, asking the carriers to lower their fuel surcharges because "the IATA index being followed by most carriers" warranted a reduction in the fuel surcharge. In another email a few months later in January 2002, Exel wrote to United, urging United to reduce its fuel surcharge because it felt United's surcharge was higher than market levels, explaining: "With 0,17/kg [sic] already being out of market, several

---

[3] DPWN acquired Exel plc in 2005. DPWN then merged DHL Logistics and Exel to create DHL Supply Chain.

airlines are now taking steps to remove the FSC [fuel surcharge] 100%, especially those following the historic IATA index."

Other carriers were also aware of air carrier reliance on IATA's Resolution 116ss and notified DHL of that fact. For example, in January 2003, airfreight carrier VARIG LOG, in explaining its own fuel surcharge increase, informed DHL: "We must point out that most carriers have been collecting this surcharge abroad since February 2000 according to IATA (International Air Transport Association) 116ss resolution." And in June 2004, Saudi Arabian Airlines sent DHL its announcement of a fuel surcharge increase, explaining that "the surcharge is based on IATA fuel price index guidelines."

United imposed its first fuel surcharge on February 15, 2000, two weeks after other major carriers had done so and before DOT's rejection of Resolution 116ss. United published its own index in 2002. From approximately February 2000 through at least the end of 2005, United and several carriers, acting within relatively short time frames of each other, effected fuel surcharge changes. The Court need not recount every fuel surcharge change, but, as an example, from approximately October 2004 to November 2005, United announced nine surcharge changes, which are illustrative of the timing and amount of the surcharge movements that occurred. For each of those nine changes, United changed surcharges (1) +$.05 along with 24 carriers, all occurring within a 19-day period; (2) +$.05 along with 9 carriers, all occurring within a 16-day period; (3) -$.05 along with 16 carriers, all occurring within a 12-day period; (4) +$.05 along with 26 carriers, all occurring within a 16-day period; (5) +$.05 along with 41 carriers, all occurring within a 15-day period; (6) +$.05 along with 17 carriers, all occurring within an 11-day period; (7) +$.05 along with 26 carriers, all occurring within a 10-day period; (8) +$.05

along with 19 carriers, all occurring within a 9-day period; and (9) -$.05 along with 45 carriers, all occurring within a 13-day period.

These surcharge changes did not go unnoticed, either within DHL or by DHL's customers. First, starting in 2000, DHL tracked the surcharge level changes and dates of implementation, maintaining them on an internal report. DHL regularly distributed summaries of these internal reports. These internal reports showed, among other things, the information recounted in the previous paragraph, as well as the surcharge changes for other time periods.

Second, DHL's customers believed the surcharges to be suspicious. In addition to demanding that DHL obtain information regarding the basis for the surcharge changes and "the math on how they arrive at the actual rate per kilo,"[4] customers also complained about alleged cartel activity by the air carriers. As early as 2002, some customers were complaining. For example, in April 2002, 3M asked DHL, "Have the airlines decided on some kind of trigger point for re-introducing Fuel Surcharges? They appear to be working as a cartel as they can't all have had the same idea at the same time." In May 2005, Xerox complained to DHL "that the airlines are acting as a cartel and there is a lack of transparency about the [fuel surcharges]." In August 2005, Nokia told DHL, "I find the [fuel surcharge] mechanism as a cartel within the industry, which cannot be acceptable anymore." One DHL employee testified in his deposition that NCR also complained to DHL because "they felt there was cartel activity." Another DHL employee, testifying as DHL's Rule 30(b)(6) witness, stated that he recalled GlaxoSmithKline had sent an email to DHL stating in sum and substance that the air carriers were acting in collusion.

---

[4] DHL's employees also had their own questions about the calculations behind the surcharges. In fact, DHL employees suspected that United's fuel surcharge was greater than its actual fuel costs.

In response to these complaints, DHL executives admitted to being suspicious and inquiring about carrier conduct. One DHL executive testified, "It made me suspicious in the fact that . . . [w]hat I didn't understand is 'Are you, in fact, covering your cost, or are you making money?' . . . But there was never anything that they could show me or willing [sic] to show me that 'This is what our cost is and this is why we're doing this.'" Another DHL executive testified he was suspicious of the parallel increases: "[I]t raised a suspicion, yes, and I – I accused the airline of . . . following suit, you know, somebody signals that they're increasing, and – and they followed to the same level."

## III.  **The Law Enforcement Raids**

In the early hours of February 14, 2006, authorities in Europe, with support from the U.S. Department of Justice ("DOJ") and other government bodies from Europe and Asia, conducted raids, or "surprise inspections," on numerous air cargo offices, including one of United's offices in Europe (the "Dawn Raids"). The Dawn Raids were part of an ongoing investigation into an alleged anticompetitive, price-fixing conspiracy by numerous air cargo companies and airlines. There was widespread publicity of the Dawn Raids, and DHL became aware that United had been raided in Europe.

DHL received several articles and news reports regarding the Dawn Raids. Among them were articles reporting that investigators had contacted United in connection with the Dawn Raids. However, United's public statements indicated that it was not a target of the investigations. For example, United's Form 10-Q for the quarterly period ending March 31, 2006, stated that United was not a "target" of either the DOJ's or the European Commission's investigations.

Three days after the Dawn Raids, on February 17, 2006, private plaintiffs filed the first of several class actions in the United States, alleging a price-fixing conspiracy in the air industry by, among other actors, United. DHL knew that the plaintiffs had named United as a defendant in several of the civil suits filed after the Dawn Raids, including the first action filed on February 17, 2006.

After the Dawn Raids and the filing of the class actions, DHL retained counsel to monitor the developments in the DOJ investigation and class actions. DHL did this so that it could independently assess its legal options as the investigation and lawsuits progressed, including whether DHL had any claims of its own. DHL made the decision to let DOJ and the class action lawyers act, in its own words, as DHL's "eyes and ears," which is to say that DHL would not independently investigate its claims, but would await progress in the DOJ investigation and class actions before pursuing its claims. In that way, DHL planned, again in its own words, to "shadow the class action itself," opting not to pursue settlement until a class action defendant settled with the class. When a defendant settled with the class, DHL would then contact the defendant to negotiate and determine whether it could receive more money if it opted out of the class settlement and settled directly.

DHL relied on this modus operandi with all of the air carriers. As the former General Counsel for DHL's parent company, Deutsche Post AG, averred:

> DHL did not believe it would be efficient to negotiate settlements against a carrier prior to evaluating the class settlement with the carrier since [DHL] had the option of opting out of individual settlements and since, if any claim were deemed to have existed at the time, the statute of limitations would have been tolled during the pendency of the class action.

Further, when a carrier pleaded guilty in connection with the DOJ investigation, DHL would then seek information from that carrier.

In June 2006, four months after the Dawn Raids, DHL received its own Grand Jury subpoena from DOJ related to the price-fixing conspiracy investigation. DHL retained separate counsel to conduct an internal investigation into DHL's conduct and potential exposure. DHL ultimately sought and obtained amnesty from DOJ and other regulators related to its own anticompetitive conduct, which included membership in a downstream cartel in which freight forwarders, like DHL, had agreed to pass on certain fees and surcharges to customers rather than absorb them.

In September 2006, class counsel declined to seek damages from United in connection with the antitrust class action. In February 2007, class counsel filed an amended complaint, omitting United as a defendant, pursuant to a non-monetary agreement reached between the class and United. The record does not disclose why class counsel dropped United, but one fair inference is that plaintiff's counsel realized that the pursuit of money damages would raise bankruptcy discharge issues that were not worth pursuing.

DOJ's investigation continued through at least 2010. As part of this investigation, DOJ indicted 21 companies and 19 individuals and imposed criminal fines of more than $1.8 billion. United was not indicted. Foreign authorities also assessed fines in connection with the alleged cartel. United was similarly not targeted by the European Commission authorities.

In July 2010, DHL learned that Lufthansa was settling with the class. Thereafter, DHL, in furtherance of its strategy, instructed its private counsel to contact Lufthansa and determine if DHL could receive more money if it opted out of the class settlement and settled directly with Lufthansa. As a result of these inquiries, Lufthansa provided DHL with access to internal Lufthansa documents that suggested United's complicity in the alleged cartel. Worth noting is that DHL learned that Lufthansa was seeking amnesty from DOJ in approximately September

2006, but it did not contact Lufthansa until 2010, after DHL learned of the Lufthansa settlement with the class.

## IV.    Procedural History

On February 4, 2011, DHL commenced this antitrust action against United.  DHL's stated impetus for bringing the action was the information it discovered in the Lufthansa documents it received in July 2010, which reflected alleged cartel conduct by United.  In May 2011, United moved to dismiss DHL's complaint, arguing that the complaint failed to state a claim, was barred by the applicable statute of limitations, and that conduct prior to the Confirmation Date was discharged by the confirmation of United's reorganization plan.

Judge Gleeson, who had previously presided over this matter, denied the motion, accepting as true DHL's allegation that "DHL could not have discovered its antitrust claim against United" in time to raise it in United's bankruptcy.  Judge Gleeson further held that to treat DHL's claim as discharged by United's bankruptcy would violate DHL's due process rights.

United filed an interlocutory appeal, and the Second Circuit reversed Judge Gleeson's Order.  See DPWN Holdings (USA), Inc. v. United Air Lines, Inc., 747 F.3d 145 (2d Cir. 2014). The Second Circuit remanded three issues for reconsideration:  "[1] what aspects of United's alleged price-fixing conduct were known by DHL, or reasonably ascertainable, prior to plan confirmation[;] [2] whether the allegations of the class action complaint were sufficient to alert DHL to its antitrust claim, and whether a post-confirmation claim would have been entertained[;]" and "[3] "[i]f DHL lacked such knowledge, . . . whether United knew or should have known of its potential antitrust liability such that due process required it to notify DHL of the potential claim."  DPWN, 747 F.3d at 153.

On remand, DHL filed an amended complaint, and United renewed its motion to dismiss. Judge Gleeson denied the motion to dismiss and ordered limited discovery to resolve the question of DHL's knowledge regarding its potential claim. With discovery complete on this issue, United now moves for partial summary judgment, arguing that DHL's pre-petition antitrust claim and post-petition, pre-confirmation antitrust claim were discharged in United's bankruptcy.

## DISCUSSION

### I. <u>Legal Principles</u>

"[S]ummary judgment may be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Marvel Characters, Inc. v. Kirby</u>, 726 F.3d 119, 135 (2d Cir. 2013) (internal quotation marks omitted). "In determining whether there is a genuine dispute as to a material fact, [the court] must resolve all ambiguities and draw all inferences against the moving party." <u>Id</u>. In ruling on a motion for summary judgment, a district court "may rely on any material that would be admissible at a trial." <u>Lyons v. Lancer Ins. Co.</u>, 681 F.3d 50, 57 (2d Cir. 2012) (internal quotation marks omitted); <u>see also</u> <u>Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp.</u>, 635 F.3d 48, 52 (2d Cir. 2011) ("[T]he nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." (internal quotation marks omitted)). A dispute is not "genuine" if no reasonable jury "could return a verdict for the nonmoving party." <u>Nabisco, Inc. v. Warner-Lambert Co.</u>, 220 F.3d 43, 45 (2d Cir. 2000) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

"A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." <u>Major</u>

League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (citations omitted).  Moreover, the Second Circuit "has observed that [b]y avoiding wasteful trials and preventing lengthy litigation that may have a chilling effect on pro-competitive market forces, summary judgment serves a vital function in the area of antitrust law."  In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 61 (2d Cir. 2012) (internal quotation marks omitted).

Under the Bankruptcy Code, confirmation of a Chapter 11 reorganization plan "discharges the debtor from any debt that arose before the date of . . . confirmation."  11 U.S.C. § 1141(d)(1)(A).  The word "debt" is defined to mean liability on a claim, and the term "claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  Congress intended to give the term "claim" the broadest possible scope in order to facilitate comprehensive proceedings dealing with all of a debtor's obligations in bankruptcy.  See In re Mazzeo, 131 F.3d 295, 302 (2d Cir. 1997).

The discharge of claims, which occurs when the debtor emerges from bankruptcy, "operates as an injunction against the commencement or continuation of an action."  11 U.S.C. § 524(a)(2).  "However, a claim cannot be discharged if the claimant is denied due process because of lack of adequate notice."  DPWN, 747 F.3d at 150.  Whether adequate notice complies with due process requirements turns on the reasonableness of the notice, see Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950), which itself is a "flexible standard that often turns on what the debtor or the claimant knew about the claim or, with reasonable diligence, should have known," DPWN, 747 F.3d at 150 (citing Chemetron Corp. v. Jones, 72 F.3d 341, 345-46 (3d Cir. 1995)).

A potential claimant is on notice of its claim when available facts "would have prompted a reasonably diligent plaintiff to begin investigating" and thereby discover the facts underlying its claim, "irrespective of whether the actual [potential creditor] undertook a reasonably diligent investigation." Merck & Co. v. Reynolds, 559 U.S. 633, 653 (2010). And importantly, in this context, "claim" does not have to rise to the level of facts that would establish a "sufficient antitrust" cause of action in federal court; instead, the inquiry centers on whether there is a set of facts that would allow for "exploration and adjudication" in the bankruptcy court. DPWN, 747 F.3d. at 152.

Like many issues where the reasonableness of a party's conduct is based on undisputed facts, whether a party is on actual or inquiry notice of its claims can be either a question of law or a question of fact. Inquiry notice is a question of law if "no reasonable fact finder[,] analyzing the circumstances as presented, could determine that inquiry notice did not exist." In re Executive Telecard, Ltd. Sec. Litig., 913 F. Supp. 280, 283 (S.D.N.Y. 1996) (citing Dodds v. Cigna Sec., Inc., 12 F.3d 346 (2d Cir. 1993); Menowitz v. Brown, 991 F.2d 36 (2d Cir. 1993)); see also In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 60 (2d Cir. 1998); Johnson v. NYFIX, Inc., 399 F. Supp. 2d 105, 120 (D. Conn. 2005). "Where the only issues remaining concern the legal consequences of undisputed facts, summary judgment is appropriate." S.E.C. v. Credit Bancorp, Ltd., 738 F. Supp. 2d 376, 392 (S.D.N.Y. 2010). Here, the material facts are undisputed, and what is left are the legal implications of those facts.

The Second Circuit was clear when it remanded the matter back to this Court: The inquiry as to whether DHL, as a claimant, knew or should have known that it had an antitrust claim against United is the first inquiry. Only if this Court were to find that DHL did not have such knowledge nor, with reasonable diligence, the ability to gain such knowledge, would the

inquiry "shift to whether United knew or should have known of its potential antitrust liability such that due process required it to notify DHL of the potential claim." DPWN, 747 F.3d at 153.

It is also worth noting that the Second Circuit was "skeptical" of DHL's position that it did not know or could not have known about its antitrust claim to assert it in the bankruptcy court. With the benefit of discovery on the facts available to DHL, it is clear that the Circuit's skepticism was well-founded. Here, DHL had a litany of facts that should have excited its suspicion – and, in fact, did excite the suspicion of some of its executives – but no one followed up with a diligent investigation into those suspicions.

Based on the undisputed facts and the applicable law, I hold that (i) DHL could have filed its antitrust claim in the bankruptcy court, either as a timely proof of claim before the Pre-Petition Claim Bar Date, as a late proof of claim, or as a timely administrative claim before the Administrative Bar Date, and (ii) United's knowledge or lack of knowledge regarding its antitrust liability is therefore irrelevant.

**II.**  **DHL Had Inquiry Notice of Its Antitrust Claim to Assert It as a Timely Proof of Claim by the Pre-Petition Claim Bar Date.**

DHL had actual knowledge of sufficient facts to put it on inquiry notice prior to the Pre-Petition Claim Bar Date. By May 12, 2003, DHL knew that IATA, of which some of its affiliates were members, had publicly filed with DOT its Resolution 116ss, which stated that it would not go into effect unless DOT granted the carriers antitrust immunity. Before the Pre-Petition Claim Bar Date, DHL also knew that DOT had rejected Resolution 116ss in its entirety. And DHL knew that, notwithstanding the rejection, air carriers, including United, began to increase their fuel surcharges and publish their own fuel surcharge indices, several of which bore a striking resemblance to Resolution 116ss. For its part, United began imposing its own fuel surcharges on February 15, 2000, and filed its own fuel surcharge index later in 2002.

DHL also knew that many air carriers, United included, were announcing fuel surcharge changes, sometimes the same surcharge, within brief windows of a few weeks. And DHL, undoubtedly prompted by the parallel conduct of the air carriers, began an internal spreadsheet to track the surcharge changes – including when, who, and how much. DHL internally circulated reports of these changes, or at least the information contained in them. If this activity was not suspicious to DHL, it should have been – at least one of its customers, 3M, complained to DHL in April 2002 that the air carriers "appear to be working as a cartel as they can't all have had the same idea at the same time."

DHL does not dispute that it knew of these facts. Instead, DHL points to other air carriers that announced their changes first in time and last in time, thus attempting to extend the timeframe spread, and to the high-end and low-end of the announced surcharges, thus attempting to create a larger monetary spread. However, the actions of other airlines are irrelevant because DHL's claims are against United. DHL also argues that it reasonably construed the parallel conduct as permissible follow-the-leader behavior, but I see no reason why DHL was entitled to give United the benefit of the doubt as a means of excusing itself from inquiry notice.

One of the most probative facts, of course, was that DHL had actual knowledge of United's bankruptcy, which was no small event in the air cargo industry. That, in itself, is of great significance, yet DHL's current opposition to United's motion ignores the monumental importance of one of its major air transportation providers having sought bankruptcy protection. The filing of a significant bankruptcy and the setting of a Pre-Petition Claim Bar Date should have acted as a "red flag" to customers and vendors of United. A diligent creditor would have undertaken a thorough inquiry to see what claims to file, knowing that if it omitted anything, it might have a substantial burden to overcome in filing a late claim.

DHL not only had an important relationship with United that the Chapter 11 filing could have affected, but DHL also had over twenty Disputed Claims that United had scheduled. Under those circumstances, it would have been rather absurd for a company with the resources of DHL to not do a thorough investigation of other potential claims with the Pre-Petition Claim Bar Date looming.

Thus, DHL had plenty of information to file a proof of claim before the Pre-Petition Claim Bar Date, and the fact that it did not was either the product of a deliberate decision or an approach so recklessly carefree that the law considers it the equivalent of a deliberate decision. Once a debtor notifies its creditor of a Chapter 11 filing, it is incumbent on the creditor to pursue its rights if it has a reasonable basis to do so. It cannot rely on the debtor to protect it from an unasserted claim. See generally Eisenberg Bros., Inc. v. Clear Shield Nat'l, Inc. (In re Envirodyne Indus., Inc.), 214 B.R. 338, 350 (N.D. Ill. 1997) ("[A]ppellants' antitrust allegations against appellee Clear Shield were capable of detection prior to their being discharged by the Confirmation Order.").

DHL's attempt to escape its inquiry notice and its responsibility to file a proof of claim is unpersuasive. It argues that, notwithstanding the facts showing the high level of knowledge of a potential antitrust claim, it could not have met the pleading standards for filing a proof of claim under the standard set forth in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Putting aside the fact that Bell Atlantic was decided over four years after the Pre-Petition Claim Bar Date, and that the pleading standard for a complaint at the time consisted of a prohibition against dismissing a case "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," Conley v. Gibson, 355 U.S. 41, 45-46 (1957), it is important to note that we are talking about a proof of claim, not a complaint.

Although in the few situations in which a creditor must commence an adversary proceeding in the bankruptcy court, see Fed. R. Bankr. P. 7001, the Bankruptcy Rules do incorporate the pleading standards of Federal Rules of Civil Procedure 8 and 9, see Fed. R. Bankr. P. 7008, 7009, these rules would not have applied to DHL's antitrust proof of claim. Rather, Bankruptcy Rule 3001(a) defines the requirements for a proof of claim in the following way: "Form and Content. A proof of claim is a written statement setting forth a creditor's claim. A proof of claim shall conform substantially to the appropriate Official Form." Fed. R. Bankr. P. 3001(a). The official form for a proof of claim, Official Form 410, is a checkbox list of questions that is similar in design to the complaint templates that this Court offers to *pro se* litigants seeking to commence a case – one just fills in the blanks. And while Bankruptcy Rule 3001(c) does impose particularity requirements as to some kinds of claims, DHL's antitrust claim would not have triggered these particularity requirements. See Fed. R. Bankr. P. 3001(c).

To be sure, in some instances, the requirements for a proof of claim can be more exacting than a complaint in a civil litigation because the former is intended to serve both as the statement of the claim and its evidentiary support. Comparing the requirements for each pleading is therefore somewhat of an apples-and-oranges exercise. However, because the definition of a "claim" in bankruptcy is so much broader than a "claim upon which relief may be granted" under Federal Rule of Civil Procedure 12(b)(6) – with the bankruptcy claim encompassing, for example, contingent and unmatured claims that would be dismissed in civil litigation on ripeness or case-or-controversy grounds – the amount of detail required in a proof of claim as a procedural matter is actually quite low, as Official Form 410 suggests.[5] As Judge Gleeson noted

---

[5] I recognize that DHL's claim was not contingent or unmatured. However, the point is that since a creditor is expected to assert claims that may never come into being because of contingencies, it is not too much to ask a creditor like DHL, which has knowledge of facts suggesting a presently actionable claim, to file a claim as well.

previously, "a claim may have arisen for purposes of a bankruptcy discharge even if it could not yet be asserted as a viable claim in a non-bankruptcy proceeding." DPWN Holdings (USA), Inc. v. United Air Lines, Inc., 871 F. Supp. 2d 143, 151 (E.D.N.Y. 2012), remanded on other grounds, DPWN, 747 F.3d 145.

If a debtor disputes a proof of claim, its objection will generally not challenge the adequacy of the allegations, but rather the substance of the claim. And if the facts that would support the claim are particularly within the knowledge of the debtor, then the creditor can obtain discovery against the debtor or third parties pursuant to Bankruptcy Rules 2004, 9002(1), and 9014(c).[6] This is consistent with the well-established practice in bankruptcy of filing a "protective" claim, where a creditor thinks it might have a claim but is unsure. "Creditors with reason to believe they may have a claim but do not yet know the amount of that claim may file a protective proof of claim." In re Trocom Constr. Corp., No. 1-15-42145, 2016 WL 4575546, at *2 (Bankr. E.D.N.Y. Sept. 1, 2016); see also Sec. Inv'r Prot. Corp v. Bernard Madoff Inv. Sec. LLC, No. 08 Civ. 1789, 2009 WL 458769, at *2 (Bankr. S.D.N.Y. Feb. 24, 2009) ("Bar dates apply to creditors who have reason to believe they have a claim, even if the claim has not yet accrued.").

It is no response for DHL to argue, as it does in opposing this motion, that the airlines' parallel behavior could have had an innocent explanation. It was for United to defend the claim, not for DHL to give United the benefit of the doubt. The facts that DHL knew before the Pre-Petition Claim Bar Date essentially ensured that any antitrust proof of claim that it filed would

---

[6] Because of the distinction between a claim in bankruptcy and a claim upon which relief can be granted, DHL's reliance on In re Copper Antitrust Litigation, 436 F.3d 782 (7th Cir. 2006), is misplaced. As a practical matter, In re Copper Antitrust was not a bankruptcy case. Thus, the Seventh Circuit's statement that "it is not enough . . . to point to facts which might have caused a plaintiff to inquire, or could have led to evidence supporting his claim," 436 F.3d at 792, is not the standard in determining whether to allow a proof of claim.

not be subject to objection for lack of sufficient detail.  United's bankruptcy court would have permitted DHL to proceed with discovery as only United had much of the evidence that could have proven (or refuted) DHL's antitrust claim.

### III.  DHL Had Inquiry Notice of Its Antitrust Claim to Assert It as a Late Proof of Claim.

Even if we assume for the sake of argument that the analysis set forth above is wrong, *i.e.*, that DHL did not have sufficient inquiry notice by the Pre-Petition Claim Bar Date to file a proof of claim, DHL would certainly have been able to file a late proof of claim.  By the end of 2005, or eighteen months after the Pre-Petition Claim Bar Date, months before United emerged from bankruptcy, and four years before United's bankruptcy closed, the record before me shows that not only had the airlines continued and intensified the parallel price increases, but also that both DHL customers and executives were aflame with suspicion of antitrust conduct.  Yet DHL continued to sit on its rights and refused to put two and two together.

It is also at this point, at the latest, that DHL came to believe that the surcharges, whether pegged to Resolution 116ss or outlined in the air carriers' own indices, reflected increases at a greater rate than the actual increases in the price of fuel.  Further, as explained above, DHL's own customers, including 3M, Xerox, Nokia, NCR, and GlaxoSmithKline, were complaining to DHL about the increased costs and calling the behavior collusive or cartelized.  DHL did not dismiss these complaints, but rather, DHL did actually inquire about carrier conduct:  One DHL executive testified that even though he inquired, United would never give him information as to what its costs were relative to the surcharges, while another executive even expressed suspicion regarding the parallel increases in surcharges.  But DHL never followed up on what an objective industry player should have seen as potentially illegal conduct; it asked a few questions, received incomplete answers, and decided not to investigate further.

A basic piece of advice relating to antitrust claims is this: If the dominant participants in an industry raise prices in near-unison and there is no market explanation for those price increases, then those paying the price increases might want to consider whether an antitrust violation has occurred. DHL strains credibility by arguing that, even though its own customers were on inquiry notice, DHL, on which the surcharges were actually imposed and which occupied the only level in the supply chain with standing to bring an antitrust action, see Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), was not. DHL's bare assertions that it did not have any knowledge or that the facts available were not sufficient to trigger an investigation are objectively unreasonable. See Miner v. Clinton Cty., 541 F.3d 464, 472 (2d Cir. 2008) (holding "that a District Court is required to examine whether a defendant's belief was objectively reasonable under the circumstances.").

All of these events provided more than enough notice for DHL to have investigated its claim and to have sought leave from the bankruptcy court to file a late proof of claim. Federal Rule of Bankruptcy Procedure 9006(b) provides a mechanism permitting a late proof of claim. Rule 9006(b) states that

> when an act is required to be done at or within a specified period . . . the court for cause shown may at any time in its discretion . . . on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

Fed R. Bankr. P. 9006(b)(1). The Supreme Court has made it clear that "excusable neglect" in this context includes not only carelessness by a party, or intervening circumstances beyond a party's control, but also a "faultless omission to act." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 388 (1993). The standard is flexible – "the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." Id. at 395. I cannot think of any scenario more suited to characterization as a

"faultless omission to act," where equity would dictate leave to file a late proof of claim, than one involving a creditor who lacked sufficient facts to constitute inquiry notice to file a timely proof of claim and only acquired such notice after the pre-petition bar date. See In re Pettibone Corp., 162 B.R. 791, 814 (Bankr. N.D. Ill. 1994) ("[I]ntervening circumstances beyond [the claimant's] control" permitted a late proof of claim because the claimant "had no claim capable of timely assertion when the bar date passed.").

The excusable neglect analysis turns on four factors: "[1] the danger of prejudice to the debtor, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." Pioneer, 507 U.S. at 395. Here, and in any situation where inquiry notice was triggered after the pre-petition bar date, the inquiry will virtually always be subsumed by the third factor, *i.e.*, when inquiry notice came to exist. This is because to prohibit a late proof of claim when the creditor does not have inquiry notice would deprive the creditor of due process of law. See Williams v. KFC Nat'l Mgmt. Co., 391 F.3d 411, 415-16 (2d Cir. 2004) (holding that the third factor "predominates[] and the other three are significant only in close cases"); In re KMart Corp., 381 F.3d 709, 715 (7th Cir. 2004) (finding that the third factor can be "immensely persuasive").

And that, essentially, is what DHL argues in opposing this motion. It portrays itself as caught between Scylla and Charybdis, lacking inquiry notice before the Pre-Petition Claim Bar Date and then unable to file a late proof of claim after the Pre-Petition Claim Bar Date. However, there is no Catch-22 under the Bankruptcy Code. If DHL was not on inquiry notice at the time of the Pre-Petition Claim Bar Date (putting aside the earlier discussion that it was), then it had good cause to file a late proof of claim. Conversely, if it was on inquiry notice when the

Pre-Petition Claim Bar Date passed, then there would be no good cause for approving a late proof of claim. I am not going to presume, in the former scenario, that United's bankruptcy judge would have denied due process to DHL, or that the Seventh Circuit would have affirmed such an errant ruling if the judge had done so. DHL had clear grounds to file a late proof of claim (again, assuming that it lacked inquiry notice prior to the Pre-Petition Claim Bar Date).

The last point I will make as to a late proof of claim is to address DHL's contention that the ability to file a late proof of claim would not have satisfied due process. Without any legal support, DHL contends that, by the time it filed the claim, it would not have had the opportunity to participate in the bankruptcy, for example, by joining the creditors' committee, replacing United's management, or objecting to the reorganization plan.

Even if I accepted DHL's argument that there is a constitutional dimension to the collateral opportunities that DHL lost, the answer is no different. For purposes of analyzing this argument, I will suspend disbelief that a trade creditor with the hide-and-seek strategy of DHL would want to take on the fiduciary and leadership responsibilities attendant to being a member of a creditors' committee or would move the bankruptcy court to remove the debtor's management. It takes some resolve on my part to do that, especially given that a DHL executive testified that he would have been "laughed out of court by DHL" if he had internally requested that DHL remove the management of any of the admitted cartelists.

But even with this suspension of disbelief, the fact is that these "missed" opportunities do not raise any due process concerns. First, the language of 11 U.S.C. § 1102(b)(1), authorizing the formation of a creditors' committee, "is precatory and nonbinding and affords no right of membership." In re Park W. Circle Realty, LLC, No. BKR. 10-12965, 2010 WL 3219531, at *1 (Bankr. S.D.N.Y. Aug. 11, 2010) (internal quotation marks omitted) (citing In re Drexel

Burnham Lambert Group, Inc., 118 B.R. 209, 212 (Bankr. S.D.N.Y. 1990) (citing H.R. Rep. No. 95-595, at 401 (1977))).  Second, the removal of management is not an absolute right afforded by the Bankruptcy Code.  Under § 1104(a), the removal of management and the appointment of a trustee is determined by the bankruptcy judge "after notice and hearing" where there has been a demonstration of "cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management."  11 U.S.C. § 1104(a).  Moreover, none of the 44,000 United creditors were successful in removing management, and DHL gives no reason why it would have achieved a different result.  Indeed, DHL has not even identified the factual basis that would have supported such a request for relief.

Similarly, regarding DHL's ability to object to the confirmation of United's plan of reorganization, DHL provides no argument or even speculation regarding the basis on which it would have objected.  Even assuming *arguendo* that the right to object to a plan of reorganization triggers due process concerns, cf. Mullane, 339 U.S. at 314 (holding that the settlement of a trust proceeding required more than publication notice to known beneficiaries and that notice had to be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"), DHL's purely speculative statement that it could have objected is insufficient.  There is no due process issue because, in fact, DHL had actual notice of the bankruptcy and, through its scheduled affiliates, the plan of reorganization.  It was DHL's decision not to move for leave to file a late proof of claim, not a lack of notice from United regarding its claim, that caused the loss of any right to object to the plan of reorganization.[7]

---

[7] Moreover, even if I accepted DHL's position that it lacked inquiry notice before the Confirmation Date, the Bankruptcy Code provides for a motion to modify the confirmation plan if DHL had any late objections to it.  See 11 U.S.C. § 1329; In re McBride, 337 B.R. 451, 455 (Bankr. N.D.N.Y. 2006).

Because DHL failed to file its proof of claim, its pre-petition antitrust claim has been discharged.  See LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478 (2d Cir. 1995).

**IV.    DHL Had Inquiry Notice of Its Antitrust Claim to Assert It as an Administrative Expense by the Administrative Bar Date.**

The facts discussed previously should not only have triggered DHL's inquiry notice as to its pre-petition claim, but they also should have triggered DHL's inquiry notice as its administrative claim for post-petition, pre-confirmation conduct.  Allowable administrative expenses include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case."  11 U.S.C. § 503(b)(1)(A).  The Supreme Court has held that tort claims arising during a reorganization period may be actual and necessary expenses of the reorganization and therefore entitled to the priority status of administrative expenses.  See Reading Co. v. Brown, 391 U.S. 471, 483-85 (1968) (finding that the fire damage resulting from the negligence of the receiver was an "actual and necessary" expense of reorganization).

As a result, based on Reading, bankruptcy courts have permitted post-petition "tort claims arising from the continued operation of the bankrupt business."  In re Res. Tech. Corp., 662 F.3d 472, 476 (7th Cir. 2011).[8]  Reading has also prompted courts to modify the traditional test for determining whether an expense is an allowable administrative expense; pursuant to Reading's modified torts approach, a claimed tort debt is administrative where the debt "(1) arise[s] from a transaction with the debtor-in-possession" and (2) is "ordinarily incident to operation of a business" and fairness dictates that the claim receive administrative priority.  In re Old Carco LLC, No. 09-50002, 2010 WL 4455648, at *4 (S.D.N.Y. Nov. 2, 2010) (quoting

---

[8] Antitrust claims are considered tort claims.  See Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 634 (1981).

Reading, 391 U.S. at 483); see also In re Kmart Corp., No. 08 C 2101, 2008 WL 5070306, at *3 (N.D. Ill. Nov. 20, 2008).

Here, United's alleged conduct arose from a transaction with DHL and would be an expense incident to the operation of United's business, *i.e.*, the provision of air cargo services, and fairness would dictate that a claimant damaged by a debtor-in-possession's post-petition, pre-confirmation antitrust violations be allowed to file an administrative claim for those damages.

It should seem obvious that any creditor would prefer to have an administrative claim over a pre-petition unsecured claim covering the same conduct. This is because administrative claims have priority under the Bankruptcy Code, and generally the debtor must pay them in full before it can distribute any remaining value to pre-petition unsecured creditors. See 11 U.S.C. § 507(a)(2). Thus, administrative claimants stand to recover 100% of their allowed claims, while pre-petition creditors will receive, for example, ten cents on the dollar, or whatever pro-rata distribution the reorganization plan provides.

To the extent United continued its illegal anticompetitive conduct in the post-petition, pre-confirmation time period, those injured by it, including DHL, enjoyed the right to file an administrative claim. There can simply be no question that by the time of the Administrative Bar Date, DHL had inquiry notice of such a claim in spades. Not only did the previously-known facts continue to inform the potential of an administrative claim, but by the time of the Administrative Bar Date, the Dawn Raids had occurred. In fact, the date of the Dawn Raids is precisely the point in time when, as DHL admitted during a deposition in this matter, DHL thought it might have claims against air cargo carriers.

Anyone familiar with class action litigation would have known that class action complaints would follow promptly on the heels of the Dawn Raids, and they did. By February 17, 2006, a mere three days after the Dawn Raids, plaintiffs' attorneys began to file class actions against air cargo carriers, including United. Moreover, a DHL representative testified that by mid-February 2006, DHL believed it had claims against "airlines that had been raided" and "airlines that had been included in the first [class action] complaint." It is undisputed that United's offices in Europe had been raided, that United was named in the first complaint, and that DHL knew about both facts.[9]

And if there remains any doubt about the viability of an administrative claim, it is dispelled by the fact that one day before the Administrative Bar Date on March 2, 2006, another United creditor, Independence Airway, filed an administrative claim for antitrust damages it allegedly suffered as a result of United's post-petition antitrust violations.[10] The bankruptcy court allowed this claim as an administrative expense.

Rather than file its administrative claim, DHL continued its wait-and-see approach. DHL made the calculated, strategic decision to leverage the work being done by the class plaintiffs and DOJ in the hopes of getting more money by opting out of the class and settling directly with a carrier whenever a class settlement was announced. DHL's decision was with full knowledge of

---

[9] For this reason, DHL's reliance on Morton's Market, Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823 (11th Cir. 1999), is misplaced – it is simply an example of one set of facts where the issue of reasonableness was not clear as a matter of law. Here, as explained, the issue is clear. Indeed, it is significant that the Morton's Market court, by way of contrast to its own facts, highlighted a situation where there are "widely publicized earlier investigations of exactly the same antitrust violations," as an example of when investigations are "held to constitute adequate notice to others of their possible claims." Id. at 833. As the background facts demonstrate, a widely publicized investigation was exactly DHL's situation with respect to its antitrust claim.

[10] Independence Airway's antitrust claim arose from a different set of alleged anticompetitive conduct than the conduct alleged by DHL. This distinction is of no moment; the important fact is that the bankruptcy court permitted Independence Airway's antitrust claim as an administrative expense.

United's bankruptcy and the deadlines it presented. A DHL representative even testified that DHL "assumed that the DOJ and the class also knew about the bankruptcy, so if there was anything to be filed or anything to be done with respect to the bankruptcy they would have been on that as much as we were on it." In other words, DHL would have acted on its antitrust claim in the bankruptcy court had either the class plaintiffs or DOJ acted on their antitrust claims in the bankruptcy court.

DHL's response to this is to suggest that antitrust claims never succeed in Chapter 11 cases, citing In re Aspen Limousine Service, Inc., 193 B.R. 325 (D. Colo. 1996), where such an antitrust claim failed. Putting aside the Independence Airway claim in United's case, which defeats DHL's argument, I see nothing in the Bankruptcy Code that excludes antitrust claims, and the fact that another court twenty years ago may have refused to allow an antitrust claim as an administrative claim has no relevance to this case.

In its Mandate, the Second Circuit did not direct me to ascertain whether DHL would prevail on its antitrust claim had it filed the claim in bankruptcy court. That would be a daunting and speculative endeavor. Rather, it directed me to determine whether the bankruptcy court would have "entertained" the antitrust claim. DPWN, 747 F.3d at 153. I interpret "entertained" to mean would the bankruptcy court have considered the claim on the merits or for purposes of estimation under 11 U.S.C. § 502(c), and not disallowed it for timeliness or other procedural reasons. For the reasons set forth above, I see no procedural impediments to the consideration of DHL's administrative claim except that DHL never filed it.

Given DHL's failure to file its administrative claim, that claim was discharged as of the Confirmation Date. See, e.g., In re Globe Metallurgical, Inc., 312 B.R. 34, 42 (Bankr. S.D.N.Y. 2004); In re Manville Forest Prods. Corp., 89 B.R. 358, 374 (Bankr. S.D.N.Y. 1988) (holding

that "bar-dates are likened to statutes of limitations which must be strictly observed" (internal quotation marks omitted)).

*    *    *

Finally, I recognize that I have said little in this decision about the argument on which DHL spent most of its effort – that United's failure to schedule the claim deprived it of due process of law.  The bulk of DHL's opposition was geared towards cataloguing internal United emails that suggest cartel activity and arguing that United had a due process obligation to provide DHL with notice of its antitrust claim.  But this is not the issue before me, and the Second Circuit was clear that this issue never arises if I determine that DHL was on inquiry notice but failed to pursue its claim:  "If DHL lacked such knowledge, the inquiry will then shift to whether United knew or should have known of its potential antitrust liability such that due process required it to notify DHL of the potential claim."  DPWN, 747 F.3d at 153.  The Second Circuit's structuring of the issues is logical – DHL cannot complain about due process when it was on inquiry notice and failed to assert its rights.[11]

In sum, the record before me shows that until it commenced the instant lawsuit, DHL had decided to pursue a rather passive approach in addressing the alleged conduct of the cartel, only inserting itself in private negotiations when it had a chance of outperforming other class members.  That was its right, but it cannot use that strategy as an excuse to maintain this litigation now, years after United's bankruptcy has concluded.

---

[11] DHL relies on In re Motors Liquidation Co., 829 F.3d 135 (2d Cir. 2016), but that case discusses the notice obligations of a debtor without regard to the inquiry notice of a particular creditor, and thus fits easily within the Second Circuit's ranking of the issues in the instant case.

## CONCLUSION

United's motion for partial summary judgment is granted.  All that remains of DHL's complaint against United are the allegations related to United's alleged post-Confirmation Date conduct.[12]

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      March 30, 2017

---

[12] This Memorandum Decision and Order does not determine the length of time that encompasses DHL's surviving post-Confirmation Date antitrust claim, as the parties have not adequately briefed it.  The Court reserves decision on that issue pending further proceedings.